OIL AND GAS LEASE
Paid Up

LEASE NO. 37-0585

THIS AGREEMENT, made and entered into this **21st day of December, 2009** by and between **Thomas R. Lindsay, President, Lincroft, Inc, General Partner, Lindsay Golf Group, LTD., 207 Iron Bridge Road, Freeport, PA 16229-0000** hereinafter called Lessor (whether one or more), and **PENN VIRGINIA OIL & GAS CORPORATION**, Seven Sheridan Square, Suite 200, Kingsport, Tennessee 37660, hereinafter called Lessee;

**WITNESSETH:**

1. That the said Lessor, for and in consideration of Ten and More Dollars, cash in hand paid, receipt and adequacy of which are hereby acknowledged, and of the royalties herein provided and of the agreements of the Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee the land covered hereby for the purposes of investigating, exploring, prospecting, drilling (either horizontally, vertically, or directionally), developing, operating, producing, marketing, and transporting oil and gas along with all hydrocarbon and non-hydrocarbon substances (including sulphur) produced in association therewith. The term "oil" as used herein includes condensate and all other liquid hydrocarbons. The term "gas" as used herein includes, but is not limited to, helium, carbon dioxide, and other commercial gases, as well as hydrocarbon gases such as casinghead gas, hydrogen sulfide gas, coalbed methane gas, gob gas, and all natural gas originating, produced, or emitted from coal formations or seams, and any related, associated, or adjacent rock material. Lessor further grants, leases and lets exclusively unto Lessee said land for the purposes of injecting gas, waters, other fluids, air and any other substances into subsurface strata, conducting all types of recovery operations, establishing and utilizing facilities for the disposition of salt water and other waste materials, laying pipelines, storing leased substances, building roads, bridges, tanks, power lines, telephone lines and any other structures and things thereon to produce, save, take care of, treat, process, store and transport said leased substances and other products manufactured therefrom, and housing and otherwise caring for its employees, together with such rights and easements in said land necessary or useful in Lessee's oil and gas operations on said land or adjoining lands, together with the right to transport through or over the property hereby leased any and all oil and gas produced by Lessee, its successors and assigns, from other property, including the right of way and easement to lay, construct, use, maintain, operate, change, replace and remove pipeline or pipelines for such transportation and with the right to cross any adjacent or contiguous lands of Lessor by use of existing roads or otherwise in order to have ingress and egress to and from said land to carry out such purposes. The land covered hereby is located in the Township of **South Buffalo**, County of **Armstrong**, Commonwealth of **Pennsylvania** described as follows, to wit:

**172.7600000 acres, more or less, described as parcel 1 in Warranty Deed Book 2205, Page 265, dated 03-16-2001, from Carol L. Kronen, Alexander H. Lindsay, Jr., James P. Lindsay, Andrew S. Lindsay, and Thomas R. Lindsay, Trustees of the 2000 Irrevocable Trust for Family of Betty G. Lindsay, to Lindsay Golf Group, LTD., also described as South Buffalo Township (0044), Map 151.00, Parcel Number 02-36. Tax Parcel Id Number 44-151.00-02-36.**

**"SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR OTHER PROVISIONS OF THIS LEASE"**

said land (hereinafter called the Land) being estimated to comprise **172.7600000** acres, whether more or less, which acreage figure may be relied upon by Lessee in calculating rental or other payments hereunder. Notwithstanding the above specific description, it is nevertheless the intention of Lessor to include within this lease, and Lessor does hereby lease, all lands now owned, claimed, or hereafter acquired by Lessor up to the boundaries of any abutting landowner (including any vacancies), together with any and all of Lessor's interest in any lands underlying lakes, streams, roads, easements and rights-of-way which cross or adjoin the Land, including all land added thereto by accretion.

2. It is agreed that this lease shall remain in force for a term of **Five (5) Years** from the above date (herein called the primary term) and as long thereafter as oil and gas, is produced or capable of being produced from the Land or lands with which the Land is pooled, consolidated, or unitized hereunder, or this lease is continued in force by any other provision hereof.

3. Lessee agrees to deliver to the credit of Lessor into the pipeline or storage tanks to which the well may be connected, **eighteen-one hundredths (18/100)** of all oil produced and saved from the Land, or, from time to time, at the option of the Lessee, the market price at the well of such **eighteen-one hundredths (18/100)** of all oil produced and saved from the Land. On gas of whatsoever nature or kind, including coalbed methane gas and other gases, liquid hydrocarbons and their respective constituent elements, casinghead gas or other gaseous substances, produced from the Land, or lands or leases unitized therewith (Gas), Lessee shall pay as royalty, **eighteen-one hundredths (18/100)** of the net proceeds realized by Lessee from the sale thereof, computed at the wellhead. Lessor shall pay a proportionate part of all ad valorem, excise, occupation, depletion, privilege, license, severance, processing, production or other taxes now or hereafter levied, or assessed or charged on oil and gas produced from the Land. During any period (whether before or after expiration of the primary term hereof) when gas is not being so sold or used and the well or wells are shut-in and there is no current production of oil or operations on the Land (or lands with which all or a part of the Land is pooled) sufficient to keep this lease in force, Lessee shall pay or tender a royalty of Two Hundred Fifty Dollars ($250.00) per year for each shut-in gas well, such payment or tender to be made on or before the anniversary date of this lease next ensuing after the expiration of ninety (90) days from the date such well is shut-in and thereafter on the anniversary date of this lease during the period such well is shut-in, to the royalty owners. When such payment or tender is made, it will be considered that oil and gas is being produced within the meaning of the entire lease.

4. It is agreed that no implied covenant shall be read into this lease requiring Lessee to drill or to continue drilling on the Land, or fixing the measure of diligence therefor. Drilling operations shall be deemed to be commenced when the first material is placed on the Land or when the first work, other than surveying or staking the location, is done thereon which is necessary for such operations.

5. Should the first well drilled on the Land, or on lands pooled, consolidated, or unitized therewith, be a dry hole, then, in that event, if a second well is not commenced on the Land, or on acreage pooled therewith, within twelve (12) months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties, unless the Lessee on or before the expiration of said twelve (12) months shall resume the payments of rentals, in the same amount and in the same manner as hereinbefore provided. It is agreed that upon the resumption of the payment of rentals as above provided the provisions hereof governing the payment of rentals and the effect thereof shall continue in force just as though there has been no interruption in the rental payments. If at expiration of the primary term no oil and gas is being produced on the Land or on lands pooled, consolidated, or unitized therewith, but Lessee is then engaged in drilling operations or reworking operations thereon (or on acreage pooled, consolidated, or unitized therewith) this lease shall remain in force so long as such operations or additional operations (whether on the same well or on different wells successively) are commenced and prosecuted with reasonable diligence and dispatch with no cessation of more than one hundred twenty (120) consecutive days and, if they result in the production of oil and gas, so long thereafter as any oil and gas is produced thereunder from the Land.

6. Lessee is hereby granted the right at any time and from time to time, as a recurring right either before or after production, to pool, consolidate, and unitize the Land or any portion or portions thereof, as to all strata or any stratum or strata, with any other lands as to all strata or any stratum or strata, for the production of oil and gas. However, no unit for the production primarily of oil shall embrace more than 80 acres, or

RECORD BOOK PAGE
3975 0256

$ 26.50

for the production primarily of oil and gas (with or without distillate) more than 640 acres; provided that if any governmental regulation shall prescribe a spacing pattern for the development of the field or allocate a producing allowable based on acreage per well, then any such unit may embrace as much additional acreage as may be so prescribed or as may be used in such allocation of allowable. Lessee shall file written unit designations or declarations of pooling in the county in which the Land is located. Operations upon and production from the unit shall be treated as if such operations were upon or such production was from the Land, whether or not the well or wells are located thereon. The entire acreage within a unit shall be treated for all purposes as if it were covered by and included in this lease except that the royalty on production from the unit shall be as below provided and except that in calculating the amount of any rentals or shut-in gas royalties, only that part of the acreage originally leased and then actually embraced by this lease shall be counted. With respect to the production from the unit, Lessee shall pay Lessor, in lieu of other royalties thereon, only such proportion of the royalties stipulated herein as the amount of Lessor's acreage hereunder which is placed in the unit, or his royalty interest therein on an acreage basis, bears to the total acreage in the unit.

7. Lessee shall, without cost, have the right to use oil and gas and water produced from or stored on the Land for Lessee's operations, except that Lessee shall not be entitled to use water from Lessor's domestic water well and Lessee, when requested in writing by any Lessor owning an interest in the surface, shall bury, if reasonable and practical, all pipelines crossing cultivated lands off the well sites below ordinary plow depth. Lessee agrees that no well shall be drilled within five hundred (500) feet of any occupied residence located on the Land as of the date of this lease without the Lessor's consent. Lessee shall pay Lessor for all damages directly caused by Lessee's drilling operations on the Land to Lessor's growing crops, trees, and fences. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed in, on or under the Land by Lessee, including the right to draw and remove all casing and pipelines.

8. The rights of each party hereunder may be assigned in whole or in part and the provisions hereof shall extend to their heirs, devisees, successors and assigns, but no change or division in the ownership of the Land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished with a certified copy of a recorded instrument or instruments evidencing such change of ownership. In the event of assignment hereof in whole or in part, liability for breach of any obligation issued hereunder shall rest exclusively upon the owner of this lease, or portion thereof, who commits such breach. In the event of the death of any person entitled to rentals or royalties hereunder, Lessee may pay or tender such rentals or royalties to the credit of the deceased, until such time as Lessee has been furnished with the proper evidence of the appointment and qualification of an executor or an administrator of the estate, or if there be none, then until Lessee is furnished satisfactory evidence as to the heirs or devisees of the deceased, and that all debts of the estate have been paid. If at any time two (2) or more persons become entitled to participate in the rental or royalty payable hereunder, Lessee may pay or tender such rental jointly to such persons; or, at the lessee's election, the portion or part of said rental or royalty to which each participant is entitled may be paid or tendered to him separately; and payment or tender to any participant of his portion of the rentals or royalties hereunder shall maintain this lease as to such participant. In the event of an assignment of this lease as to a segregated portion of the Land, the rentals payable hereunder shall be apportioned as between the several leasehold owners ratably according to the surface area of each, and default in rental or royalty payment by one shall not affect the rights of other leasehold owners hereunder. If the Land is now or shall hereafter be owned severally or in separate tracts, the premises nevertheless shall be developed and operated as one lease and all royalties accruing hereunder shall be treated as an entirety and shall be divided among and paid to such separate owners in the proportion that the acreage owned by each such separate owner bears to the entire leased acreage.

9. Lessee, and Lessee's successors and assigns, shall have the right at any time to surrender this lease, in whole or in part, to Lessor, or Lessor's heirs or successors and assigns, by delivering or mailing a release thereof to the Lessor, or by placing a release thereof of record in the county in which the Land is situated; thereupon, Lessee shall be relieved of all obligations, expressed or implied, of this lease as to the acreage so surrendered, and thereafter the rentals or shut-in payments payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases.

10. Lessor agrees that should Lessee be advised of or receive notice of an adverse claim or of defective title affecting the Land covered hereby which could affect all or a part of the payments due hereunder, then Lessor expressly authorizes Lessee, at Lessee's sole discretion, and without liability, to withhold payment and delivery of all Lessor's such payments or production in kind hereunder, without interest or penalty, until such time as said adverse claim is resolved or title cured by a final decree in a court of competent jurisdiction. Or, Lessee may file an interpleader action and pay Lessor's payments or production in kind as directed by a court of competent jurisdiction until such time as said court determines and authorizes the proper distribution of said payments or payments in kind to the parties involved. Lessor agrees that in no event shall Lessee's withholding of payment or its payments made as directed by a court of competent jurisdiction constitute a default by Lessee. Lessor further agrees that Lessee shall in no event be liable for interest, conversion, penalty, or wrongful withholding of such suspended amounts. In the event of production hereunder, Lessor agrees to execute a division order confirming his interest herein.

11. The breach by Lessee of any obligations arising hereunder shall not work a forfeiture or termination of this lease, nor cause a termination or reversion on the estate created hereby, nor be ground for cancellation hereof, in whole or in part, unless Lessor shall notify Lessee in writing of the specific facts relied upon in claiming a breach hereof, and Lessee, if in default, shall have sixty (60) days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument, and if Lessee shall fail to do so then Lessor shall have grounds for action in a court of law or such remedy to which he may be entitled.

12. Lessor hereby warrants and agrees to defend the title to the Land and agrees also that Lessee at its option may discharge any tax, mortgage, or other liens or encumbrances upon the Land either in whole or in part, and in the event Lessee does so, it shall be subrogated to such liens with the right to enforce same and apply rentals and royalties accruing hereunder towards satisfying same. "Without impairment of Lessee's rights under the above warranty in event of failure of title, it is agreed that if Lessor owns an interest in the oil and gas in or under the Land, less than the entire fee simple estate, then the royalties, shut-in royalties, and rentals to be paid to Lessor shall be reduced proportionately. Failure of Lessee to reduce such rental paid hereunder or over-payment of such rental hereunder shall not impair the right of Lessee to reduce royalties payable hereunder.

13. Should Lessee be prevented from complying with any expressed or implied covenant of this lease, from conducting drilling or reworking operations thereon or on lands pooled therewith or from producing oil and gas therefrom or from lands pooled therewith, by reason of scarcity of, or inability to obtain or to use pipelines, equipment or material, explosions, breakage of or accident to machinery, equipment, or lines of pipe, the inability to acquire, or the delays in acquiring, at reasonable cost and after the exercise of reasonable diligence, such servitudes, rights of way, permits, licenses, approvals and authorizations by regulatory bodies as may be necessary in order that obligations assumed hereunder may be lawfully performed in the manner contemplated, or by market conditions which (in Lessee's sole judgement) render sales of oil and gas unprofitable or imprudent, or by operation of force majeure, or because of any federal or state law or any order, rule or regulation of a governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on, or from producing oil and gas from the Land or lands pooled therewith, and the time while Lessee is so prevented shall not be counted against the Lessee, anything in this lease to the contrary notwithstanding.

14. The undersigned hereby release and relinquish all rights of dower, curtesy, or other spousal interest and homestead in the Land, insofar as said right of dower, curtesy, spousal interest and homestead may in any way affect the purposes for which this lease is made as recited herein.

RECORD BOOK PAGE
3975 0257

# EXHIBIT "A"

THIS EXHIBIT "A" attached hereto and made a part of that certain "Oil & Gas Lease" dated the 21st day of December, 2009 by and between Thomas R. Lindsay, President, Lincroft, Inc, General Partner, Lindsay Golf Group, LTD., as Lessor and Penn Virginia Oil & Gas Corporation, as Lessee.

**LEGAL DESCRIPTION:**

172.7600000 acres, more or less, described as parcel 1 in Warranty Deed Book 2205, Page 265, dated 03-10-2001, from Carol L. Kronen, Alexander H. Lindsay, Jr., James P. Lindsay, Andrew S. Lindsay, and Thomas R. Lindsay, Trustees of the 2000 Irrevocable Trust for Family of Betty G. Lindsay, to Lindsay Golf Group, LTD., also described as South Buffalo Township (0044), Map 151.00, Parcel Number 02-36. Tax Parcel Id Number 44-151.00-02-36.

**OTHER PROVISIONS:**

1. In the event of a conflict or inconsistency between the printed terms of this Lease and the added terms of this Lease, the added terms shall control and be deemed to supersede the printed terms of this Lease.

2. Lessee's operations on said land shall be in compliance with all applicable federal and state regulations.

3. HOLD HARMLESS: Lessee agrees it will protect and save and keep Lessor harmless and indemnified against and from any penalty or damage or charges imposed for any violation of any laws or ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee, and Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, damage or expense, including any injury to any person or property whomsoever or whatsoever arising out of or caused by any negligence of the Lessee or those holding under Lessee, except to the extent any such damage or injury is caused by Lessor's negligence.

4. AUDIT: Lessee further grants to Lessor or Lessor's representative the right annually to examine, audit, or inspect books, records, and accounts of Lessee pertinent to the purpose of verifying the accuracy of the reports and statements furnished to Lessor and for checking the amount of payments lawfully due the Lessor under the terms of this agreement. In exercising this right, Lessor shall give Lessee notice to Lessee of its intended audit by certified mail. Lessee shall schedule a time for Lessor or Lessor's representative to visit the office of Lessee to conduct said audit within thirty (30) days of the notice by Lessor. Said audit shall be conducted during normal business hours at the main office of Lessee. The Lessor shall be responsible for all costs concerning this audit or inspection or records

5. NO GAS STORAGE: Notwithstanding anything herein contained to the contrary, Lessee agrees the herein described leased premises shall not be used for the purpose of gas storage as defined by the Federal Energy Regulatory Commission. Any reference to gas storage contained in this lease is hereby deleted. If Lessor wishes to enter into an agreement regarding gas storage using the leased premises with a third party, Lessor shall first give Lessee written notice of the identity of the third party, the price or the consideration for which the third party is prepared to offer, the effective date and closing date of the transaction and any other information respecting the transaction which Lessee believes would be material to the exercise of the offering. Lessor does hereby grant Lessee the first option and right to purchase the gas storage rights by matching and tendering to the Lessor any third party's offering within 30 days of receipt of notice from Lessor.

6. LOCATION APPROVAL: Lessor, its heirs, successors or assigns, and Lessee, its successors and assigns agree to enter into consultation concerning a plan of development for the placement of all drilling locations, pipelines, access road locations and facilities and the actual placement of all drilling locations, pipelines, access road locations will be by mutual agreement between these parties, said agreement not to be unreasonable withheld, delayed or conditioned by Lessor

7. GATE CLAUSE: Upon the written request of Lessor, its heirs, successors or assigns, Lessee shall install at its sole cost and expense a gate at the entrance of any road constructed by Lessee on the leased premises

8. FENCE: Upon Lessor's, its heirs, successors or assigns, written request, Lessee shall at its sole cost, expense, and design install fencing for the protection of livestock around any well site(s), tank battery (ies) or facility (ies) installed on the leased premises.

9. RECLAMATION: It is agreed and understood that Lessee shall repair and restore the surface of the leased premises, including any damage to existing drainage tile as a result of the Lessee's operations, to as close as reasonably practical to the condition in which the leased premises existed at the time of the commencement of drilling operations. Weather permitting, this work shall be completed within one hundred eighty (180) days after the cessation of the later of drilling, completing or equipping operations of the last well drilled upon the leased premises. This work shall be done at the sole expense of the Lessee. Such restoration shall apply to any and all properties damaged as a result of the Lessee's operations. It is agreed between Lessor and Lessee that multiple wells may be drilled and reclamation will not occur until Lessee has completed its last well on the location.

10. WATER DAMAGE: Lessee shall have Lessor's current water supply sampled and tested for both quality and quantity prior to spudding of any well drilled on the leased premises. Should Lessor experience a material

RECORD BOOK 3975 PAGE U258

## EXHIBIT "A"



adverse change in the quality or quantity of Lessor's water supply, during or immediately after the completion of Lessee's drilling operations, Lessee shall, within 48 hours of Lessor's written request, sample and test Lessor's water supply at Lessee's expense. Water testing shall be done by a certified, independent laboratory, and results of all testing shall be provided to Lessor. Should such a test reflect a material adverse change as the result of Lessee's drilling operations on the lease premises, Lessee agrees to provide Lessor with potable water until such a time as Lessor's water source has been repaired or replaced with a source of substantially similar quality. In the event any activity carried on by the Lessee pursuant to the terms of this lease damages, disturbs, or injures Lessor's fresh water well or source located on these leased premises, Lessee, at its own expense, shall take all steps necessary to return said water supply to pre-drilling conditions, or to replace Lessor's water supply with a source of water of substantially similar quality. Lessee agrees not to use any water from Lessor's ponds, springs, or creeks without Lessor's written consent.

11. TAXES: Lessee shall render and pay directly to the pertinent local taxing authorities all applicable increases of Lessor's property taxes because of the facilities owned by the Lessee during the term of this agreement unless Lessee qualifies for an exemption there from. Any tax exemption applications covering Lessee's facilities shall be filed by the Lessee. In the event Lessee fails to pay any of said taxes, Lessor may, but is not obligated to, pay said taxes, and such payment shall be reimbursed by Lessee within thirty (30) days of receipt of an invoice evidencing such payment.

12. Market Enhancement Clause: It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form.

13. SUPPLEMENTAL SURFACE DAMAGE PAYMENT: Lessee agrees to pay Lessor, its heirs, successors or assigns, as surface damages, the sum of Ten Thousand Dollars ($10,000.00) each drill site location, including roads and frac pits/ponds on the leased premises and such payment shall be due and payable upon the commencement of drilling operations.

14. ANCILLARY PROCESSING OPERATIONS: Notwithstanding anything in this Lease to the contrary, the parties agree that without the prior written consent of Lessor, said consent not to be unreasonably withheld, conditioned or delayed, this Lease does not grant Lessee any rights to store, compress, separate, process, meter or otherwise handle oil, gas or other hydrocarbons produced outside the leased premises or lands unitized herewith, or to install any, tank battery, separator, compressor, meter, or other equipment for such purpose, across, upon, or below the leased premises. Lessee is permitted to transport third party gas across premises. In the event Lessee has the necessity to transport third party gas, Lessor will be paid the sum of five dollars ($5.00) per linear foot of pipeline.

15. ADDITIONAL FACILITIES CLAUSE: Lessee is not granted any right to construct any gas treatment or processing facility on the Leasehold, including but not limited to separators, dehydrators and compressors, without the Lessor's separate written consent, said consent not to be unreasonably withheld conditioned or delayed.

16. DOUBLE DITCH METHOD CLAUSE: If Lessee wishes to use farm or grazing lands to lay pipelines, Lessee agrees to use a double ditch method for laying pipelines, which is topsoil to one side and subsoil the other, when filling the ditch the subsoil is replaced first and topsoil is placed on top. Any and all pipeline laid by Lessee shall be buried to a minimum depth of 32 inches below ground level where possible.

17. ASSIGNMENT: Each instrument of assignment shall be recorded and Lessor shall forthwith be provided with a copy of the same. Lessee assignment shall remain liable to Lessor for all obligations under the Lease until such assignment is recorded and a copy of the assignment is furnished to Lessor. Lessee will still be liable for payment of any unpaid royalties prior to assignment.

18. PIPELINES: It is understood and agreed between the parties that in the future if any roads or pipelines need moved to accommodate development or other uses of the leased premises, that Lessee shall move any such pipeline or road one time to a mutually agreeable location. If any additional moves of pipelines or roadways are requested by Lessor, said moves may be made, to a mutually agreeable location, at the sole cost and expense of Lessor. Lessor shall be paid minimum damages of five dollars ($5.00) per foot for all surface areas covered for anticipated loss of development potential disturbed by excavating , or construction of gathering lines. Further, if a pipeline is inactive for 3 years, it is deemed to be abandoned and after said 3 year period if not removed by Lessee, the pipeline belongs to the Lessor.

19. ROYALTY PAYMENTS: Royalty payment in the amount of __18%_ (Eighteen Percent), shall be paid at a rate of __17.5%___ (Seventeen and One-Half Percent, negotiated rate less 0.5%) percent to the Lessor or their assigned fiduciary agent, and one-half (0.5%) percent to George R. Cline, Consultant, of 77 Stolze Road, Burgettstown, PA 15021, phone 412-996-7770.

RECORD BOOK PAGE
3975 0259

# EXHIBIT "A"



20. DAMAGE CLAUSE
It is understood and agreed Lessee shall be responsible for the payment for damages to the surface of the land, livestock, crops, timber,field tiles,fences, gates and improvements which are caused by its operations on the leased premises. Lessee further agrees that upon completion or abandonment of any well drilled on the leased premises, Lessee shall restore the premises to as near its original condition as is reasonably practicable.

21. FREE GAS CLAUSE-SHALLOW WELL ONLY
Lessor may use up to 300,000 cubic feet of gas free of charge per calendar year from the gas that Lessee may hereafter produce or otherwise have available from one and only one gas production well completed and operated by Lessee hereunder upon the lease premises, such amount to be proportionately adjusted for that part of the calendar year such well is producing, by Lessor laying the necessary lines and making connections at Lessor's cost, and provided said gas is used with economical appliances and is measured by meter furnished by the Lessee, when and as long as Lessee may elect to produce or operate such well. Gas made available for free use under this paragraph shall be limited to only gas produced from those formations located above the top of the Elk Formation/Group/Zone being depicted at a depth of 6,086 feet on the gamma ray density, neutron, induction and temperature log run on August 19, 2004 in the Range Resources Leitch #1 well (Permit # 37-129-25338) located in South Huntingdon Township of Westmoreland County, Pennsylvania.. Such gas shall be solely for domestic purposes in one dwelling house, which is owned at all times by Lessor and located within a one thousand (1,000) foot radius from said well on said lease premises, at Lessor's own risk, provided at the time a well is first drilled and completed hereunder Lessor owns a dwelling house located on that part of the lease premises on which such well is located. The regulation of such gas will be by regulators furnished by Lessor, placed at a point on the demised premises designated by Lessee. Said gas shall be used at Lessor's own risk and Lessee is not to be in any way held liable for any interruption or insufficient supply of such gas for said domestic use caused by pumping stations, breakage of lines or otherwise, and Lessor shall have available an alternate source of fuel in the event of any such interruption or insufficient supply. Nothing herein shall prevent the Lessee from abandoning any well or wells or pipelines on the lease premises and removing the pipe therefrom at any time. If more than 300,000 cubic feet of gas per year is used, the excess shall be paid for at the rate charged to domestic consumers in the same area, and in case of Lessor's default in payment for gas used in excess of said 300,000 cubic feet, Lessee is hereby authorized to deduct the amount thereof from any royalty or other payments that are then due, or may later become due, under the terms of this lease. Lessor agrees that Lessee has the option and may exercise the option to discontinue the gas supply to Lessor until Lessor pays Lessee in full for any excess gas theretofore furnished. This privilege of free gas is granted upon condition that the Lessor shall use said gas in safe and proper pipes and appliances and shall subscribe to and be bound by the reasonable rules and regulations of the Lessee. Lessor agrees that a condition to use free gas shall be subject to Lessor's execution of Lessee's Domestic User Gas Contract prior to making any connections. Said contract shall set forth the safety and liability usage of the free gas, and Lessee shall be fully relieved of any further obligation to provide free household gas or alternative payment to Lessor if any of the conditions provided herein are not met.

Lessor hereby acknowledges and confirms that Lessor understands, recognizes and is fully aware of the highly dangerous character of gas and its tendency to escape. Moreover, Lessor hereby acknowledges and affirms that Lessor's use of said gas hereunder is being made with the full and complete understanding of the significant risks inherent with the use of said gas, including, but not limited to, explosion and fire. Lessor covenants and agrees that Lessor's use of said gas shall be solely and exclusively at Lessor's own risk. Lessor further covenants and agrees to indemnify and hold harmless Lessee from any and all claims, actions, suits, damages, and injuries, including but not limited to death, that arise out of or are related in any manner to Lessor's use of said gas.
Lessor further acknowledges that Lessee is not a regulated natural gas utility and that Lessee will not inspect or maintain the meters, regulators and pipelines installed hereunder, nor will Lessee inspect the appliances attached thereto. Lessor hereby acknowledges and confirms Lessor's responsibility to inspect and maintain same. Lessor further covenants and agrees to indemnify and hold harmless Lessee from any and all claims, actions, suits, damages, and injuries, including but not limited to death, that arise out of or are related in any manner to the failure to properly inspect and maintain said meters, regulators and pipelines.

Lessor understands and agrees that the use of and entitlement to the free gas shall be subject to the use, operation, pumping and right of abandonment by Lessee of its wells on said land. The service line required for Lessor's use of such gas shall be laid and the necessary meter, regulator(s), valves and fittings installed by a licensed plumber or pipeline contractor at Lessor's sole risk, cost and expense. The point of connection with Lessee's well shall be designated by Lessee. Lessee will provide free of charge to Lessor the necessary consumer meter for installation and will be responsible for maintenance or service of same. Lessee will not be responsible for maintenance or service of Lessor's equipment, line, regulators, appliances or other free consumer equipment associated therewith.

In the event that this lease is part of a unit or pool, the free gas herein referred to shall be used only by the Lessor upon whose property the well is located. If there is more than one applicant from the drill site lease, the first approved applicant will be the only applicant eligible for the free gas.

RECORD BOOK PAGE
3975 U260

## EXHIBIT "A"



Lessor may not sell, transfer, nor convey in any manner this use of free gas. Said use of free gas will terminate immediately upon such sale, transfer or conveyance, or upon the sale, transfer or conveyance of any rights of Lessor under this lease that could be interpreted as selling, transferring or conveying Lessor's use of free gas.

At the time application is made for a Domestic User Gas Contract, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 300,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free household gas. Said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

22. RIGHT OF FIRST REFUSAL
If at any time within the primary term of this lease and while the same remains in force and effect, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease (top lease) covering all or part of the aforedescribed lands, Lessee shall have the continuing option by meeting any such offer to acquire such top lease. Any offer must be in writing, and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such lease, and include a copy of the lease form to be utilized which form should reflect all pertinent and relevant terms and conditions of the top lease. Lessee shall have fifteen (15) days after receipt, from Lessor, of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer.

23. OPERATIONS CLAUSE
It is agreed that no implied covenant shall be read into this lease requiring Lessee to drill or to continue drilling on the Land, or fixing the measure of diligence therefor. Drilling operations shall be deemed to be commenced when the first drill bit starts drilling the initial well on the leased premises. No other preliminary actions shall be deemed to commence drilling operations.

24. NON SURFACE USE
It is hereby agreed and understood that there shall be no drilling activities or other surface operations on the surface of the leased premises without the prior written permission from the surface owner of the applicable portion of the leased premises. Notwithstanding the foregoing, this waiver of surface shall not be construed as a waiver of the rights of Lessee to utilize the subsurface of the leased premises under this lease, and Lessee shall have the right to exploit, explore for, develop and produce oil, gas and other covered minerals under this lease from wells from surface locations off the leased premises, including, but not limited to, directional or horizontal drilling activity which comes under the surface of the leased premises. This drilling surface waiver does not apply to any surface rights associated with instruments other than this lease.

Thomas R. Lindsay, President, Lincroft, Inc,
General Partner, Lindsay Golf Group, LTD.

RECORD BOOK PAGE
3975 0261

Page 1 of 1

**EXHIBIT "A"**

THIS EXHIBIT "A" attached hereto and made a part of that certain "Oil & Gas Lease" dated the 21st day of December, 2009 by and between Thomas R. Lindsay, President, Lincroft, Inc, General Partner, Lindsay Golf Group, LTD., as Lessor and Penn Virginia Oil & Gas Corporation, as Lessee.

**LEGAL DESCRIPTION:**

172.7600000 acres, more or less, described as parcel 1 in Warranty Deed Book 2205, Page 265, dated 03-10-2001, from Carol L. Kronen, Alexander H. Lindsay, Jr., James P. Lindsay, Andrew S. Lindsay, and Thomas R. Lindsay, Trustees of the 2000 Irrevocable Trust for Family of Betty G. Lindsay, to Lindsay Golf Group, LTD., also described as South Buffalo Township (0044), Map 151.00, Parcel Number 02-36. Tax Parcel Id Number 44-151.00-02-36.

Thomas R. Lindsay, President, Lincroft, Inc,
General Partner, Lindsay Golf Group, LTD.

RECORD BOOK 3975 PAGE 0262

REV-183 EX (11-04)

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF REVENUE
BUREAU OF INDIVIDUAL TAXES
PO BOX 280603
HARRISBURG PA 17128-0603

# REALTY TRANSFER TAX STATEMENT OF VALUE

See Reverse for Instructions

| RECORDER'S USE ONLY | |
|---|---|
| State Tax Paid | -0- |
| Book Number | 3975 |
| Page Number | 255 |
| Date Recorded | June 28, 2010 |

Complete each section and file in duplicate with Recorder of Deeds when (1) the full value/consideration is not set forth in the deed, (2) when the deed is without consideration, or by gift, or (3) a tax exemption is claimed. A Statement of Value is not required if the transfer is wholly exempt from tax based on: (1) family relationship or (2) public utility easement. If more space is needed, attach additional sheet(s).

## A. CORRESPONDENT – All inquiries may be directed to the following person: Pam Hilton

Name: Penn-Virginia Oil and Gas Corporation
Telephone Number: 423 723-0230
Street Address: Seven Sheridan Square Ste 200
City: Kingsport
State: TN
Zip Code: 37660

## B. TRANSFER DATA

Date of Acceptance of Document

| Grantor(s)/Lessor(s) | Grantee(s)/Lessee(s) |
|---|---|
| Thomas R. Lindsay | Penn-Virginia Oil & Gas Corp. |
| Street Address: 207 Iron Bridge Road | Street Address: Seven Sheridan Square Suite 200 |
| City: Freeport; State: PA; Zip Code: 16229 | City: Kingsport; State: TN; Zip Code: 37660 |

## C. PROPERTY LOCATION

Street Address: 207 Iron Bridge Road
City, Township, Borough: South Buffalo Twp.
County: Armstrong
School District:
Tax Parcel Number: 44-151.00-02-36

## D. VALUATION DATA

| 1. Actual Cash Consideration | 2. Other Consideration | 3. Total Consideration |
|---|---|---|
| $10.00 | + 0.00 | = $10.00 |
| **4. County Assessed Value** | **5. Common Level Ratio Factor** | **6. Fair Market Value** |
| N/A | x N/A | = N/A |

## E. EXEMPTION DATA

| 1a. Amount of Exemption Claimed | 1b. Percentage of Interest Conveyed |
|---|---|
| 100% | N/A |

**2. Check Appropriate Box Below for Exemption Claimed**

- ☐ Will or intestate succession ______ (Name of Decedent) (Estate File Number)
- ☐ Transfer to Industrial Development Agency.
- ☐ Transfer to a trust. (Attach complete copy of trust agreement identifying all beneficiaries.)
- ☐ Transfer between principal and agent. (Attach complete copy of agency/straw party agreement.)
- ☐ Transfers to the Commonwealth, the United States and Instrumentalities by gift, dedication, condemnation or in lieu of condemnation. (If condemnation or in lieu of condemnation, attach copy of resolution.)
- ☐ Transfer from mortgagor to a holder of a mortgage in default. Mortgage Book Number ______, Page Number ______.
- ☐ Corrective or confirmatory deed. (Attach complete copy of the prior deed being corrected or confirmed.)
- ☐ Statutory corporate consolidation, merger or division. (Attach copy of articles.)
- ☑ Other (Please explain exemption claimed, if other than listed above.) Oil and Gas Lease

**Under penalties of law, I declare that I have examined this Statement, including accompanying information, and to the best of my knowledge and belief, it is true, correct and complete.**

Signature of Correspondent or Responsible Party: Virginia Silaw
Date: 6/18/10

**FAILURE TO COMPLETE THIS FORM PROPERLY OR ATTACH APPLICABLE DOCUMENTATION MAY RESULT IN THE RECORDER'S REFUSAL TO RECORD THE DEED.**

RECORD BOOK PAGE
3975 0263

15. This lease and all its terms, conditions and stipulations shall extend to and be binding on all successors in title of said Lessor or Lessee.

16. For the above consideration, Lessee is granted the option to renew this lease under the same provisions for a secondary primary term of five (5) years from the end of the initial primary term hereof, and as long thereafter as oil or gas is produced from said land or land pooled therewith, or operations are being conducted upon the lease premises, without an unreasonable cessation of such production and operations. Lessee may exercise this option by paying or tendering to the Lessor or Lessor's credit in the depository named in this lease, the sum equal to the number of net mineral acres multiplied by the original bonus amount per net mineral acre paid as consideration for this lease on or before the expiration of the initial five (5) year primary term hereof; which payment, when made, shall constitute the entire payment due for the second primary term of five (5) years.

**IN WITNESSETH WHEREOF,** this instrument is executed on the date first above written.

Thomas R. Lindsay, President, Lincroft, Inc, General Partner, Lindsay Golf Group, LTD.

State Of Pennsylvania

County Of Armstrong

On this, the 23rd day of December 2010, before me a notary public, the undersigned officer, personally appeared Thomas R. Lindsay, President, Lincroft, Inc, General Partner, Lindsay Golf Group, LTD., known to me (or satisfactorily proven) to be the person(s) whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS HEREOF, I hereunto set my hand and official seal.

Notary Public, State of Pennsylvania

Printed Name: Harry C Palmer

Commission Expires: 11-04-2013

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Harry C. Palmer, Notary Public
Butler Twp., Butler County
My Commission Expires Nov. 4, 2013
Member, Pennsylvania Association of Notaries

After Recording, please return to:
Penn Virginia Oil & Gas Corporation
Seven Sheridan Square
Suite 200
Kingsport TN, 37660

LPR# 09-08115-2537

RECORD BOOK 3975 PAGE 0264