# Exhibit I

IN THE UNITED DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

* * * * *

| | |
|---|---|
| LINDSAY GOLF GROUP, LTD., CAROL KRONEN and WILLIAM KRONEN, ALEXANDER H. LINDSAY, JR., and PATRICIA W. LINDSAY, JOHN LINDSAY and ERICA LINDSAY, JAMES LINDSAY and MARY LINDSAY, CHARLES LINDSAY, ANDREW LINDSAY and LISA LINDSAY, THOMAS LINDSAY and BETH LINDSAY and BETTY G. LINDSAY OIL AND GAS TRUST, | Case No. 24-781 |
| Plaintiffs, | |
| Versus | |
| XTO ENERGY INC., | |
| Defendant. | |

* * * * *

DEPOSITION OF HOLLY S. GREEN
taken on behalf of the Plaintiffs
via Zoom
on Friday, August 29, 2025
at 9:30 a.m.

APPEARANCES:

ALEXANDER H. LINDSAY, JR., ESQUIRE
The Lindsay Law Firm
110 East Diamond Street, Suite 301
Butler, PA 16001

For - the Plaintiffs

JUSTIN H. WERNER, ESQUIRE
Reed Smith, LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222

For - the Defendant

INDEX TO WITNESS


| WITNESS: | PAGE |
| --- | --- |
| Holly S. Green | |
| Direct Examination by Mr. Lindsay | 4 |

ZOOM PROCEEDINGS OF AUGUST 29, 2025

HOLLY S. GREEN, called as a witness, being duly sworn by the court reporter, testified as follows:

DIRECT EXAMINATION

BY MR. LINDSAY:

Q. Would you state your name, please.

A. Holly Sue Green.

Q. And, Ms. Green, have you ever given a deposition before?

A. I have.

Q. And, then, I guess you're familiar with how this works. We ask you questions, you give us answers.

A. Yes.

Q. And I assume that your lawyer has instructed you how to comport yourself in a deposition, so I won't go into that, other than to say this: We need audible answers to the questions that we ask. We all have a tendency to answer with gestures. We shrug and we nod and so forth. She can't take those down -- but I guess we have it maybe on video. We could probably get them. But I prefer that you gave an audible answer.

And the second thing is, is that we sometimes have a tendency to step on each other's lines. In other words, you'll interrupt a question or I'll interrupt your answer. I'll try to avoid that. And I would

request you would, too. Okay?

A. Okay.

Q. What's your job there?

A. I am the global process advisor for the Produce to Report Organization within XTO.

Q. Okay. And what is that job? You've given us the name.

A. It's a new position that was created in February of this year, but I -- I work with the various groups under Produce to Report. So Produce to Report would encompass revenue accounting. It would encompass portions of land, what I would call division order. So the groups that pull together who owns a well and what their interest might be, and then a small portion of the production accounting organization.

And so I work special projects. I provide guidance or best practice recommendations. Like I said, it's a new position. So we're still working out all the specifics, but that's what I'm doing.

Q. What was your position, say, from January 2022 up until January of 2025?

A. So the first two months of 2022, I was in the revenue organization. I was a manager in the revenue organization. And then in March of 2022, I moved to special projects. And that's what I was doing up until

February of this year.

Q. What are special projects?

A. So the special project that I was on was looking at the various tools that the organization used. So, again, for me, that would have been specific to revenue, but looking at what was available out in the, I guess, software community, looking to see whether we wanted to make any changes, and then also looking at opportunities to make processes run more smoothly or look at ways to do things maybe that didn't require as many steps. Trying to simplify, maybe that's a way to say it.

Q. Let me ask you this question.

First of all, are you familiar with the litigation we're involved in? That's Lindsay Golf Group et al. versus XTO?

A. Yes, I am.

Q. Okay. And you recall that in 2000- -- I guess it would have been in May -- May 24th, 2024, you executed a declaration that was attached to a notice of removal in this case. Are you familiar with that?

A. Yes.

Q. Are you familiar with that declaration?

A. Yes, I'm familiar with it. I couldn't quote it, but I am familiar with it.

Q. Okay. Well, I'll quote it for you. What I'm

interested in -- we'll just take one paragraph of that declaration. And as we will indicate, it's kind of a replica of a number of paragraphs.

Paragraph 6 says this, "Based on my personal knowledge and my examination of XTO's business and accounting records as of the date of the filing of the complaint, XTO overpaid royalties to Plaintiff Lindsay Golf Group, Limited in the amount of $52,861.75. XTO placed Lindsay Golf Group, Limited in a -- in suspense for the recoupment of the overpaid royalties in the amount of $52,861.75." Do you remember that paragraph?

A. Yes, I do.
Q. And was it true?
A. Yes.
Q. Okay. So what the information in there was was a matter of your personal knowledge, I take it, correct?
A. Yes.
Q. Okay. What I would like you to do, if you would, is explain from your personal knowledge and your examination how it was determined that XTO overpaid royalties to that particular plaintiff, the Lindsay Gulf Group, Limited, in the amount of $52,861.75. Can you do that for me?
A. Yes. The way -- the way I determined it is the check details of the -- the detail that is generated

when revenue is booked that gets taken to the well level, and then to each of the owners who would own in the well, I took the detail that would have been generated over the course of the production months up to that point.

And then using that data, I would have seen the original payments that would have gone out and then the reversal of those payments, which would have been what would have put the owners in suspense.

And then the revised payment, the correction, however you want to phrase that, that would have been shown where the overpayment would have occurred versus what the actual payment should have been. And then with that information, I went back and looked at the data that would have been used by the revenue organization to do the initial calculations of the sales and then the revised calculations.

And from a -- from that, then that was how I was able to determine that there was an original booking, a reversal rebook, which sometimes you'll hear us call "PPAs" or "prior period adjustments." And the original payment was based off of, I guess -- well, the original payment, as well as the revised payment, is all based off of an allocation.

So you have -- you have a volume that is sold and

then that volume gets distributed amongst the wells based on their proportionate share. And when the adjusted proportion, or however you want to -- however you want to look at it, when that came through with all of the information, that was why that payment was originally recouped and then revised to get what was the -- I'm going to say the correct payment out, which, again, was that recoupment of the $52,000.

Q. All right. And I must confess, I'm going to have to go back through this because I don't understand this. It's because I'm not -- the word would be "well-versed" in this particular field.

But let's start with this. I take it that there was a misallocation, is that correct, of royalties?

A. I would say there was a misallocation of the volume across the wells, which then resulted in how the royalties were calculated.

Q. All right. So we start with this. There's a miscalculation of the volume. How did you put it, across the wells?

A. Yes.

Q. All right. And let's start with that. What does that mean?

A. So anytime -- anytime there is -- you have the situation of one sales point, sometimes you'll hear that

referred to as essential delivery point. But the designated place -- that designated point that has been determined where the volume has been sold or the basis for what volume was sold, anytime you have more than one well behind that sales point, there is an allocation back to the wells.

And if you think about it, we just kind of use a simple example. If I have two wells that each produced 50 MCF a month and I sold 100 MCF, then that allocation would be 50/50. But if I have a well that produced 75 and another that produced 25, then that allocation would adjust based on that. And then every time you add wells to that, then that allocation changes.

And so with the particular wells in question from the point in time where this readjustment occurred, there were nine wells behind this central point. And the volume that revenue had received did not contain all of the metered volume. So there were -- there were meters out in the field that -- in these particular cases, these wells had meters, and those volumes would come into the production system, which would feed to the revenue system. And that's your basis for your allocation and --

Q. Wait --
A. I'm sorry.

Q. I'm sorry, I just -- we have to -- you're dealing with someone who is a child when it comes to this.
We're starting with this. There are nine wells involved in this particular situation; is that correct?
A. In this particular sales point, yes.
Q. All right. And what is the sales point?
A. The -- I know -- off the top of my head, I'm not sure, but the specific name, I believe it's the McIntyre CDP. But there's a --
Q. Can I interrupt you. You said the McIntyre what? DDP?
A. CDP.
Q. Which is con- --
A. Central delivery point.
Q. All right. So there is a controlled [sic] delivery point, and that is what? Where all of these -- all the gas comes in from these nine wells? What is it?
A. Yes. It -- so I'm not a measurement expert, so I'm using the terminology that I understand from a revenue perspective. But there is a meter -- there is a meter that represents this sales point. We can say it's the McIntyre CDP, and that metered volume is what is determined to be the sales for these wells that connect into it. So --
Q. Can I interrupt? I don't mean to interrupt you,

but the problem is that --
A. That's fine.
Q. -- I have to.
All right. There's, you said, a meter at the sales point; is that correct?
A. Yes.
Q. All right. And so we have -- on this particular thing, you're stating there are nine wells?
A. Correct.
Q. And this -- and so there's one meter at the sales point; is that correct?
A. There's, yes, one meter at the sales point.
Q. All right. And that's this McIntyre what did you call it?
A. CDP, Central Delivery Point.
Q. Okay. And do you know where that is, by the way?
A. I -- physically, no, I do not.
Q. Okay. All right. So the McIntyre CDP -- and that's metering all of the gas that's coming in from these nine wells; is that correct?
A. Yes. And then -- sorry, I'll wait to go on.
Q. Yeah, I'm sorry. I'm going to have to go very slowly here because I don't know anything about this.
So we have the one meter at the collection point, and that's -- that's taking into consideration all the

gas from these nine wells, correct?

A. Correct.

Q. But in addition to that, there are other meters, correct?

A. Correct.

Q. And each well has a meter, or meters plural?

A. With these specific wells, yes, each well has its own meter. And then the Trilogy 5 well actually has several meters based on the amount of production that's coming out of it.

Q. Explain -- well, first of all, each of the other -- first of all, when you say nine wells, are there the Trilogy -- you're treating the Trilogy -- what do you call it? Can we just call it the Trilogy well? That's one of the nine wells; is that correct?

A. Correct. There are five Trilogy wells, but so -- there are -- yeah.

Q. All right. But there are five Trilogy wells. But is each one of those part of the nine, or are --

A. Yes.

Q. -- there eight others?

All right. So we have -- you say you had, I think, eight wells all together?

A. Nine.

Q. Nine wells all together, and five of those are

the Trilogy; is that correct?
A. Five of them are named Trilogy. So there are nine distinct wells. Five of them have Trilogy in the name, and then the other four have very different names.
Q. All right. And the other -- do you know what the other four are?
A. I do.
Q. And what are they?
A. So you have the Terry Bowser. You have the --
Q. Go ahead.
A. You have the Charlton.
Q. Okay.
A. You have the Frantz.
Q. Frantz.
A. Okay, Frantz.
Q. Sorry.
A. No, I wasn't sure how to pronounce that.
Q. This is all local, ma'am.
Okay. Go ahead.
A. And then the Alexander Lindsay.
Q. All right. So we're looking at nine separate wells and five of them are called Trilogy and given various names.
Now, those are at one well pad site, I take it, correct? The Trilogy wells, if you know?

A. I -- yeah -- I'm not -- I'm not positive on that.
Q. Okay.
A. Based on their name, I would think they're different pads, but I honestly don't -- I haven't seen it personally, so I don't know.
Q. Okay. So there is the -- so you have the five Trilogy wells, and you have the Terry Bowser, the Charlton well, the Frantz well, and the Lindsay well, correct?
A. Correct.
Q. Now, the Lindsay well, Frantz well, Charlton well, and Terry Bowser well, they all have their own meters, correct?
A. Correct.
Q. Okay. And I take it -- you say with regard to the Trilogy wells, does each one of those five wells have its own meter?
A. So each of the five Trilogy wells have one meter, and then the Trilogy 5 has at least one additional meter.
Q. All right. So there are five meters with the Trilogy 5 wells, correct?
A. Sorry, say that again.
Q. All right. Each one of the Trilogy meter -- each one of the Trilogy wells has its own meter?

A. Correct.
Q. But there's another meter that I guess for all five of them -- or two?
A. There's another -- there's another meter. The way I understand it, there's another meter just for the Trilogy Number 5.
Q. Oh.
A. Yeah. So you think there's Trilogy 1, 2, 3, 4, 5. The Trilogy Number 5 has more than one meter.
Q. Why?
A. My understanding is because of the amount of volume that it produces. There was a need to have more than one meter to measure the volume.
Q. And was the volume on that particular -- the Trilogy 5 well significantly higher than you would expect?
A. I can say it's significantly higher than the other wells. I would have no -- not to sound -- not to sound rude, but I would have no expectation of what the volumes would have been coming out of the well since that's not my -- that's not my background.
Q. All right. So, once again, I just want to make sure I've got it right. So if I appear to be redundant, forgive me.
A. Oh, no, you're fine.

Q. When it comes to the Trilogy 5 wells, each one of the Trilogy wells has its own meter, except that the one meter -- or one of the wells, the Trilogy 5 well, has had two meters because of the volume; is that right?

A. Yes. I guess the way -- the way I understand it, it has had -- it has more than one meter. It's at, I think, two meters now, but they had -- I'm trying to think how to phrase this.

So it started -- it started with -- it started with a meter and then a second meter was added and then I think a third meter. Those were considered temporary meters, and then they got permanent meters in place and we're at two meters.

I think -- I mean, that's the recollection that I have from the discussions with the group that would have known that.

Q. How does it work if you're metering when you have multiple meters?

A. So that -- yeah, that's -- that's not uncommon. Yeah, it's not uncommon. And, you know, the -- depending on the type of meter, that information will come into your production system, whether it's one meter or two meters.

And so the production system would get the meter volume at the wells and then it would get the meter

volume at the sales point. If you have more than one meter at the well, it would receive that information as well.

Q. Let me ask you this. I take it that these meters are connected to Houston or where you're doing the accounting; is that correct?

A. So Houston would have the information that comes from the meters. Specifically how they're connected, that's not something that I know. It is -- again, depending on the type of meter, you can have -- you can have somebody that physically goes out and reads it. You can have some that have, like, a kind of a WiFi internet connection that feeds the data in.

On these, I do not know the specific types that are out there.

Q. Well --

A. But the data that would be needed would be coming into the organization in the system.

Q. All right. Going back now to the four wells, the Frantz well, the Terry Bowser well, the Charlton well, the Lindsay well, they had meters that were in place that would accurately record the volume of gas from those wells, correct?

A. The volume of gas produced, yes.

Q. And they -- and that information that was being

sent to Houston, however it was being sent, that would show what those wells were producing, correct?

A. Yes. The produced volume would have come through for those four wells, yes.

Q. So we have those four wells and we know exactly what's being produced volume-wise in those four wells, correct?

A. Correct.

Q. Now, going back to the Trilogy 5 well, which is the -- I guess the pivotal well here. There were -- where your investigation showed -- or did it show that there were at one time one meter, then two meters, correct?

A. Yes.

Q. Okay. And then at some point, there was a third meter placed on that well, correct?

A. That's my understanding, yes.

Q. And when did that occur?

A. I'm not sure of the exact date, but it would have been sometime around May 2022, because that's your -- that's your first production month where you see the difference in the reallocation. So --

Q. Okay.

A. Yeah.

Q. I didn't mean to cut you off.

Around May 2022 -- so I guess when there were -- there were at least two meters on the Trilogy 5 well prior to May '22. And everything was, I guess, ordinary -- what would you call -- we say "copacetic." Everything was working, right?

A. Yeah. I know the well came on in December 2021 production, and at some point they added additional meters. To be honest, I don't know if it started with two and they added the third or if it started with one and then they added two and three. I'm sorry, I don't have that specifics of when that occurred, but...

Q. Can we agree that the misallocation of volume started when the third meter came on in May of 2022?

A. I guess so. I mean, it's possible you had two meters -- two and three meters come on in May. It could have been you started with one and went to two, started with one and went to three. So definitely May '22 is the pivotal month. But as far as the specific number of meters, that piece, I'm not 100 percent on.

Q. All right. Now, there are either two or three meters in May of 2022 which are tracking, recording the volume of gas at Trilogy 5, correct?

A. Correct.

Q. And I take it that there are these other four wells that have their meters that are putting out

accurate information concerning the volume of those wells, correct?
A. Correct. All of the meters had accurate information that was coming out of the wells.
Q. All right. Now, is it the position of XTO that somehow the one -- or either the second or third or both of the meters on the Trilogy 5 well, were somehow volume being credited to these other four wells?
MR. WERNER: I'll object to form.
Holly, you can answer.
BY MR. LINDSAY:
Q. Did you understand my question?
A. I believe so. I believe what you're asking, was a portion of the Trilogy volume allocated to -- sorry, was a portion of the Trilogy 5 allocated to the other eight wells.
Q. Okay, yeah.
A. Okay. So, yes, the -- the original -- the original sales allocation and payments that went out had the Trilogy 5 -- a portion of the Trilogy 5 volume allocated to the other eight wells.
Q. My question is, how could that happen?
A. So based on what information I have been able to discover in the production system -- so as I mentioned, you have these meters with the volumes, that data comes

into the production system. And there was a formula that needed to be adjusted in the production system to take all of the meter volumes for the Trilogy and do that calculation.

That particular formula is not something that anybody can go in and edit. And so if you think about it from a standpoint of you want to have things kind of in a controlled environment, it required an IT resource to go in and make those updates. And so we -- you had the volumes coming in, but the production system wasn't able, without this formula change, to take all of the Trilogy 5 volumes and give it to the Trilogy 5.

And so for those months until that formula got adjusted, the Trilogy 5 volume, although accurately metered and fed into the system, did not all get added together for the Trilogy 5, which meant when it came into the revenue system, the Trilogy 5 volume was not showing 100 percent of what it produced.

And so that sales allocation, that distribution across all nine wells was misproportioned because of the Trilogy 5 being the biggest producer, not showing to be the biggest producer in the system, but it was this formula that needed to be adjusted that, like I said, needed an IT resource to make that update.

Q. Okay. I'm going to have to go back here because

I'm lost. Forgive me.

We start with the idea that these individual, these four non-Trilogy 5 wells that we talked about -- and those would be the Frantz -- Bowser, Charlton and Lindsay wells have their own meters.

A. Correct.

Q. And we know what they're producing, correct?

A. Correct.

Q. And then there is the Trilogy 5 and specifically -- the Trilogy 5 wells, but then there's a particular well which is apparently the heavyweight, which is Trilogy 5, correct?

A. Correct.

Q. Okay. Now, what I'm asking, if these four other wells, the non-Trilogy wells, had accurate meters that were metering the volume, how were the Trilogy gas, whether it's from Trilogy -- well, first of all, I guess let me go back and start again with this question.

You indicated that at some point there was some formula that was inserted into this metering system, correct - --

A. There's a formula in the production system that needed to be updated to take all of the meter information for the Trilogy Number 5 and add it all together.

Q. -- All right. But that was involving the Trilogy 5 wells, correct?
A. The Trilogy Number 5 well, correct.
Q. Just one well or all of them?
A. Just one well.
Q. All right. So there was this formula, which I guess is -- you indicated is done by IT; is that correct?
A. It's updated by IT, yes.
Q. Why was it updated?
A. Because of the addition of the meters. And so if you think about the Trilogy 5, Number 5, started producing as a new meter or meters were added. Now, a formula was needed to take the multiple meters and add them together to attribute that volume back to the Trilogy Number 5.
Q. Okay. What I'm asking is, can you explain using that formula -- or before the formula -- I guess, is the formula -- when they applied this formula, is that when the correction supposedly took place?
A. The formula was applied in the production system after September '22 production, those were your months. And then revenue came back and ran the corrections to adjust the royalty payments that have come out. But there was some time difference between the formula

update in production and then the revenue adjustments.
Q. Okay. Now, in May of 2022, there was this two or three -- the second or third meter was added to Trilogy 5, correct?
A. Correct.
Q. Okay. And from that point, there was some allocation of Trilogy 5 volume to the other four wells. And I'm talking, for clarification, with the Frantz, Bowser, Lindsay and Charlton well after this second meter -- or third meter was placed on the Trilogy 5 well, am I correct?
A. Well, so I don't want to say no, but I want to rephrase just because there's a difference between the metered volume and the sales volume.
So I'll try to answer -- instead of a yes or no, I'll answer with a statement. Those nine wells, their combined volume is what makes it to the McIntyre meter. So that metered volume is the sales volume and revenue pays based on sales.
So that sales volume, which included the Trilogy Number 5's large volume Bowser, Bronze Wells, et cetera -- Frantz wells, et cetera -- all of that went to sales. When that allocation of that sales volume went back to the nine wells, because the Trilogy Number 5's total volume was not in the mathematical equation, you

had more sales volume -- way more sales volume than what had been produced based on what the revenue system received. Not that the meters are wrong, but all that meter data didn't come in. So the sales that should have been booked back to the Trilogy 5 was redistributed to the other eight wells.

So it's not that the produced volume got redistributed, it's the fact that the sales are an allocation back to the wells based on what the system shows they produce. So if this had all been done manually with, you know, somebody looking at physical statements, doing something, you know, manually with a calculator, then that allocation would have been 100 percent because you would have seen all five statements and been able to add them all together as, you know, personally.

But as I mentioned, this formula needed to be tweaked to add the meter statements for that Trilogy 5, which meant until that happened, sales associated with the Trilogy 5 were being redistributed to these other wells. So the Trilogy Number 5 received very little sales volume based on what it produced, and then the other wells got the difference.

And maybe another way to think about it is if each of the wells had their own sales point, though not

nine coming together and selling at one, then the Bowser, Lindsay and other four Trilogy wells, they would have never gotten the volume associated with the Trilogy 5. But it's very uncommon to have individual sales points at a well. So this common sales point has the need to then allocate back based on produced volume.

I know that's very complicated and I'm sorry.

Q. It is. Let me try this. I take it that the amount of revenue or -- what do you call it -- royalties paid out is not based on the meters for the individual wells, but rather the meter at the sales point; is that correct? That's what's going to determine what we're going to get paid; is that correct?

A. Correct. That that's your designated point of sale, that's where your contract would sit. So that meter at the McIntyre, that's your volume that was sold, and then the contract that would say what price you received would also be based off that sales point.

Q. Okay. And as we sit here today, what occurs is the total volume that's coming to the sales point is what we use to determine what the royalties are going to be; is that correct?

A. Correct. The total sales gets allocated to the wells, and then behind each well, the royalties would get paid based on that volume allocated to the well.

Q. Well, can I ask you this question? The volume of gases recorded at each individual well is significant only to establish the formula; is that correct? It's not used to determine what the royalties are?

MR. WERNER: Object to form.

But you can answer, Holly.

MS. GREEN: When I have measurement at the well, then that measurement should be the basis of how to allocate back the sales, because your sales point is the indication of how that volume has been sold, et cetera?

Again, if I have a sales point at the well, then the metered volume and the sales volume are usually very close, if not one in the same. But anytime you have these central points, then the metered volume is the basis to determine what the proportion that the well sold at that central point.

Q. How often is this formula adjusted?

A. It's -- I would say a formula like this is only adjusted when you have a situation like this where an additional meter or meters come on. So in your -- if the Trilogy Number 5 had never needed additional meters, the formula would have never needed to be adjusted because the initial setup would have said, here's my nine wells, here's my sales point. Allocation is sales point to the wells and you're done.

But in this situation, because the extra meters were being added just to that one well, that's what necessitated the need of the formula change.

Q. All right. So I guess once you establish -- let us say it with the way it is now, there's a formula?

A. Correct.

Q. And where we allocate the volume to the individual wells, the nine individual wells based on this formula, we -- number one, we're looking at the total volume that comes to the sales point for starters, correct?

A. Correct. Your starting point is -- their starting point is the metered volume that was sold. So that's your --

Q. At the sales point?

A. At the sales point.

Q. Okay. So we're at that point, and then there is a formula that allocates that volume to the nine wells that feed into that sales point; is that correct?

A. Correct.

Q. And the formula doesn't change, correct, unless you're putting on another meter?

A. Correct. In the sense that your formula for the allocation of the sales back to the well, you set that formula up and you're done. If you had drilled the

Trilogy 6 and added a new meter, there would not have been a need to change the formula.

But when you add another meter to an existing well, that was the need to change the formula. So the allocation formula didn't change. It was the formula that was needed to take the multiple metered statements for the Trilogy 5 and add them together. So the allocation represented 100 percent of the Trilogy 5 volume and not a third or two-thirds or whichever meters it wasn't pulling in.

Q. All right. So you change the allocation or the formula when you put on an additional meter, is that your answer?

A. My answer is when the formula for how to add up the wellhead volume for the Trilogy 5, that is the formula that was changed. I would not say the allocation formula was changed, but there was a need to add up the Trilogy meters. So the Trilogy 5 volume being used in a separate formula, the sales allocation at the correct volumes.

Q. Well, the sales --

A. The total volumes.

Q. The sales allocation formula is based on the production, is it of a well; is that correct? I mean --

A. Correct.

Q. All right. So we've got this -- these wells have a meter on each one and they're showing the production, correct?

A. Correct.

Q. And that production is used to establish the formula that we're going to have the sales allocation based on; is that correct?

A. Yes.

Q. Okay. And I take it that once that production formula is set, it's set. It doesn't change from month to month or whatever; is that correct?

A. For the allocation of sales, correct.

Q. All right. So when we record each one of these nine wells, including the four wells that are not Trilogy wells, the production of those on a month-to-month basis is irrelevant in this formula, is that not correct?

A. It's very --

MR. WERNER: Object to form.

MS. GREEN: It's very relevant because your formula -- your formula isn't a locked -- so an allocation is not a -- let me think about how to say this.

An allocation is a proportionate share based on what is produced. So if we go back to my two wells

behind one sales point example, I have a -- my formula would be take each of the volumes from the meter and add it together. So let's take my 50 and my 50, I add that up, that gives me 100, and then I'm going to take the 50 divided by the 100 and that gives me 50 percent per well. That's my allocation basis.

Then whatever I sell gets allocated 50/50. So if I produce 50 in Well 1, produce 50 in Well 2, I have the 50/50 percent, and I sell 90, then 90 gets allocated back half and half.

But if the following month I have these same two wells and I produce 25 volumes and 75 volumes, my formula -- the equation doesn't change. The percentage changes with the math, but it's still the exact same formula. And so when you think about then having the nine wells, the formula is take the individual volume for each well, sum it together and then calculate the percentage based on what the well produced and that gets multiplied by the sales. So that's your allocation formula. And every month as the volume fluctuates by well, the percentages of what the well receives for sales can change.

Now, in wells that are established that have, you know, your production occurring on a daily basis, you're usually not going to see big swings month over month,

but you have a well that goes -- gets -- needs to be worked on. So it's shut down for half a month and your percentages are going to change. So that's your sales allocation.

But what's unique about the Trilogy 5 is in order for this formula to work, the Trilogy 5 couldn't be -- had to have its original volume basis derived based on -- or not derived, but calculated based on adding together the meters. So the formula of the allocation didn't change. But for the Trilogy volume to be accurately represented in that allocation, that specific formula on the Trilogy Number 5 only had to be changed to be able to add together all of its meters. So when it came into that equation, it was accurate.

So if we go back to my two wells, 50/50. If one well is the Trilogy 5 and its formula only brings in the one meter, then that might give me my 75/25 percent. But I really need to be able to get the other two for it to represent a 50/50 split. And I know that's super confusing, but it's -- there's -- in this particular case, there's -- how I would describe it is there's two formulas. There's the formula to get the total volume the Trilogy produced to represent all of the meters to then be used in the allocation formula for the sales distribution back to the nine wells.

BY MR. LINDSAY:
Q. All right. In May of 2022, apparently these -- there was an additional or two additional meters on the Trilogy 5 well, correct?
A. Correct.
Q. And in September of 2022, it was determined that whatever was being used to allocate the royalties was out of whack, correct?
A. I believe it was determined before September 2022. It was -- it was determined, I think, in May with May production. But because IT needed to come in and change the formula, it took a few months for that to happen.
So May production through September production is where the initial basis of that allocation -- because of the Trilogy 5 formula not being 100 percent, that's your month of where the volumes got redistributed. But I believe it was found before September.
Q. In May of 2022, with the additional meter or meters was added to the Trilogy 5 well, it was determined that the formula was not accurate; is that correct?
A. For the Trilogy 5, yes.
Q. But you continued -- I guess you or XTO continued to operate on that formula until September '22 the

inaccurate formula?

MR. WERNER: Object to form.

But you can answer.

BY MR. LINDSAY:

Q. Do you understand my question?

A. I do. From a revenue perspective, revenue settled sales volumes with the Trilogy 5 volume not representing 100 percent of its volume. And maybe a way to think about it, when we receive our sales volume, sales value, we need to turn around and distribute that out to the royalty. And so revenue would have used the information they had available at that time to be able to get settlement made and money out the door.

Q. You refer to someone as "revenue." Is that a section or a group of people that work for XTO Revenue?

A. Yes.

Q. All right. So revenue -- what you're saying is revenue needed to get something out in May of 2022, correct, with regard to royalties --

A. Correct.

Q. But revenue, or at least someone, knew that those payments were not correct; is that correct?

A. So the production organization, they were aware the formula needed to be changed so the volume was coming into revenue correctly. I'm not able to say what

revenue knew because there's -- I can't talk to whoever it was that was there that did it at the time because they're no longer here. But the intent would have been to settle based on the information that they have. But I don't know if they knew that it was misallocated or if adjustments would be needed. I don't --

Q. Somebody would have known, correct?

A. The production person who knew the formula needed to be changed, they knew there was a misallocation. But I do not know if that carried over into the revenue organization who is the one that does the sales recordings and then distribution of the royalties.

Q. Who was it? Who was the person in the -- what did you call them? The production -- there are two -- you're talking about two groups here, I guess?

A. Correct.

Q. Production group and the revenue group; is that correct?

A. Correct.

Q. All right. Somebody in the production group knew about this issue involving the Trilogy 5 well, correct?

A. Correct.

Q. Who was that?

A. Her -- let's see -- her name is Joyce.

Q. Okay. So Joyce knows immediately when they put

that third thing on that, "Hey, this is a misallocation of production," correct?

A. I don't know if --

MR. WERNER: Object to form.

MS. GREEN: I don't know that she knew immediately. I know she figured it out, but I don't know -- I don't know how long it took her to figure it out.

BY MR. LINDSAY:

Q. Well, she figured it out in May of 2022, from your previous testimony, correct?

A. Well, May of 2022 is when it started. Like, that's when the data tells you that the Trilogy 5 was not getting all of the volume attributed to it. And an IT ticket was turned in and by October '22 production, the allocation with the total Trilogy 5 volumes was now right.

But I don't know when she -- I don't know when she learned about it and when the tickets went in. But May to September are the months where the allocation was not proportioned correctly based on the Trilogy 5 volumes.

Q. Well, at some point between May and October, Joyce at least knew that these allocations are not taking into consideration the volume of Trilogy 5,

correct?
A. Correct.
Q. And you have no knowledge as to when or why that was committed to reve- -- or conveyed to revenue, correct? You don't know, right?
A. I don't know.
Q. Okay. All right, now let me go back to this paragraph 6. You stated in paragraph 6 -- and once again, when I talk about paragraph 6, I'm -- of your declaration, that refers to the Lindsay Golf Group.
But the same language is for all of the other plaintiffs. They are, you know, like, for example, paragraph 7 refers to Carol and William Kronen and so forth. So when I talk about the language of this one, just so you understand, I'm kind of referring to all of them.
You state that overpaid royalties to Plaintiff Lindsay Golf Group is in the amount of $52,861.75. You have this calculated down to the penny; is that correct?
A. Correct.
Q. How do you do that?
A. Well, the way I did it is the check detail -- so each owner has check detail. Some of them get it mailed to them, some of them pull it from a website. But I have that check detail in a Microsoft Excel form. And

so I was able to take all of the payments that would have been made to each of the individuals by well by production month, and compare it to the revised payment. And then that shows me overpayment versus correct payment. And then that difference is that calculation. And the royalties and the payments are paid to the second decimal point as far as value. So that's how I was able to get it to the pennies.

Q. There's an additional factor that you just brought into this. It's the revised. What did you call it? The revised --

A. The revised payment.

Q. Yeah, the revised payment. How was that figured out?

A. So -- well, in my analysis, again using the check detail, that detail that each owner has the ability to receive would have the original payment and then it would have the revised payment. And I just did the math of the difference. How that revised payment was calculated, which I believe is your question --

Q. It is.

A. The revenue organization would have received -- once the formula in the production system was corrected, that revised volume for the Trilogy 5 would have come into the revenue system, and then they would have

reprocessed or rerun those production months to redistribute sales.

So they basically take the now 100 percent volume for the Trilogy Number 5. That gives them their updated percentage split by well. It's the same volume and the same value. So that didn't change. But it's now been redistributed across the other eight wells.

And then that would have been settled through the system which would have done the calculation to the royalties. And so it would have taken the update in the production system, that data coming into the revenue system, and then revenue rerunning their allocation again to redistribute sales to the well based on the 100 percent for Trilogy 5.

Q. And, once again, I may be belaboring something with regard to the revised -- what did you call it? Revised --

A. Revised payment.

Q. The revised payment, that is calculated by using a new formula as of September '22?

A. The sales allocation formula is the same formula. It's now the Trilogy 5 volumes are represented in full.

Q. Wouldn't you be changing the formula to reflect the additional volume from Trilogy 5?

A. So the percentage in the formula would have

changed.

Q. Right.

A. But the calculation, the math or the logic -- maybe I should put it this way. The logic of the formula did not change, but the percent changed. And so maybe one way to think about it is with the original allocation, the Trilogy 5, Number 5 well, based on the volumes that revenue had available to them, it got 9 percent of the sales volume. But when revenue received the updated Trilogy 5 volumes to represent all of the meters, it now got 51 percent of the sales.

And so what would have originally been around 70,000 MCF -- sorry, 138,000 MCF for the Trilogy 5 now became 830,000 MCF. So there -- that percentage was adjusted in the logic of the formula because the Trilogy 5 volume now was all part of the bases. But the math of the lot, the math of the equation didn't change, but the percentage changed. That's how I would explain it.

Q. I understand. The math is what you use to have the payment -- to figure out what the payment is. And we understand what the math is, but the math is based on a change in the formula based on the percentages that you were learning about in May of 2022, correct? The percentage of volume.

A. Percentage of volume change, yes.
Q. All right. So when we talk about what your calculation that you did is just applying the formula?
A. No, the calculation that I did was based on what was originally booked. So what was booked with the original percentage allocation and what was then rebooked with the adjusted percentage allocation.
So -- and maybe that's what you were asking? I'm sorry, I may not have understood the question. But I took original recordings and revised recordings and then did -- calculated the difference.
Q. When did you do that?
A. For this -- for the declaration? I would have done it --
Q. No, no, I'm talking about -- all right. The declaration, you did in May of 2024, correct?
A. Right.
Q. Okay. And we know that as of September of -- or I guess September or October 2022, there was a redo, if you will, of the formula, correct?
A. Yeah. Redo of the percentage allocation, yes.
Q. Okay. Now what I'm asking is when did you do your math or your calculations based on the information that was coming from revenue concerning the check information? When did you do this?

A. When did I -- when did I personally --

Q. Yeah.

A. So I did -- I did analysis prior to the submission of the declaration and then I did additional analysis this week and last week in preparation for the deposition.

Q. Well, let's go back to your analysis was done prior to the preparation of the declaration in May of 2024, correct?

A. Correct.

Q. But someone had to do the same calculation as of at least September of 2023 because that's when the recoupment began, correct?

A. Right. So the revenue accountant who was responsible for these wells, as part of their monthly process, they book current month production and then they would go back and run any prior period adjustments that might be needed.

You know, so sometimes you receive a revised price from a third party, sometimes the ownership changes in a well. In this particular case, the volume needed to be updated to bring in the Trilogy 5. And so that revenue accountant would have gone back for these production months and they would have, using the system, created the reversal of the original recording and then

the rebook, using the updated information to then recalculate and resettle with the updated numbers.

And like you said, I think that was around September 2023 when that went through.

Q. All right. The correction was made in September or October of '22, correct?

A. The formula in the production system was corrected sometime in 2022. That's my understanding.

Q. Okay. And was there any recalculation of the check payments prior to September '23?

A. Not that I have seen, no.

Q. Why not? How could that be?

A. So I can't answer specifically why not in this case because I don't have -- I don't have the person to go and ask. So I'm sorry about that. But it is -- as part of the oil and gas business from a revenue production perspective, there are -- it is not uncommon to have adjustments throughout the course of the life of a well. As I mentioned, sometimes you receive revised pricing, sometimes you receive updates to ownership where I sold my interest to Justin, but that took a while for title and everything to process. So they need to go back and run corrections in the system. So that happens on a regular basis.

And so the revenue accountant, like I said,

they're settling current month and then they're managing, going back and running those corrections. And depending on --

Q. When --

A. I'm sorry?

Q. When did the revenue go back and recalculate the -- I guess, the royalty payments?

A. Well --

Q. We know that in September '23, they stopped the payments. But, I mean, when did they determine that they were going to recalculate the royalty payments? When was that determined?

A. I'm not -- I'm not able to answer that because the person who did those adjustments isn't here to talk to.

Q. What's his name? Or her name?

A. I believe -- I believe his name was Ahmad.

Q. So at some point in that year, from September 2022 to September 2023, Ahmad determined that these royalty payments had to be reallocated; is that correct?

A. Yes, I would say that they would have determined that adjustments were needed to be made to the revenue recordings. And the reason why I say that is revenue looks at things at the well and sales point level. The system does the calculation at the royalty level.

And so revenue kind of has that focus on has total volume, total sales, been booked correctly, and then have the wells been booked correctly. So at some point, Ahmad or somebody in that -- in that group would have gone back and run the corrections, the adjustments for the May through September 2022 production. Sometime in 2023 is when I saw that occurring.

Q. And you did an investigation concerning that, I guess?

A. I went in and I looked to see the original bookings and the adjustments that were made in the system and then the timing of when all of that occurred, yes.

Q. Okay. At some point -- there's this concept known as recoupment, correct? Do you know what I'm talking about when I mention recoupment?

A. Yes.

Q. Okay. At some point, there was a decision to exercise this process that we call recoupment, correct?

A. I would say there was a decision to reverse and rebook so the revenue was correctly paid at the well level. We don't typically approach it from the standpoint is a recoupment needed. It's do I need to get the revenue revised to represent what actually happened. So that did happen, yes.

Q. There was a recoupment, correct?

A. As a result of the correction, yes. There was a recruitment for some owners.

Q. All right. And who decided that there should be a recoupment?

A. Revenue would have decided to run the correction to record the wells with the updated information. The system that does the calculation to the royalties, that math would have done -- would have determined where the recoupment was needed.

And so if you think about it this way, if I was the revenue accountant, I would have seen that there was an adjustment to the volume across the wells, which told me I needed to rerun, so the allocation was correct. I would post that into the system, and then the system would go in, take that new information, distribute it, or calculate it at the owner level. And now it's going to do the math of if I paid you $50 and I should have paid you $100, then it would give you the additional 50. If that's reversed and I paid you 100 and it should have been 50, then it would take the 50 back. But the system is the one that does all of that, I guess what you're calling recoupment, but it's -- the revenue accountant looks at it at the well level.

Q. When you say I call it recoupment, "recoupment"

is the terminology that's been used by XTO in the course of this litigation.

A. Right. I'm sorry.

Q. That's why I'm using it.

A. Yeah, no, I just meant from the standpoint of when you're looking at it, you're looking it at the royalty piece; whereas, revenue is looking it at the well piece. And so they don't look at it from a recoupment perspective. They look at it getting the revenue settled to the wells based on the information they have.

Q. Okay. Can we agree that for a period from, I guess, September 2023 to November 2024, this process, whatever you call it, recoupment or whatever, resulted in a total stoppage of royalty payments to at least the plaintiffs in this case, which were getting gas from, I guess, the Frantz -- I guess all four of these wells -- the four -- what do we call them? The non-Trilogy wells?

A. Non-Trilogy, yes.

When it was determined that those owners had been overpaid and with the revised calculation, they would have been put in -- I use the term "suspense," but recoupment -- they would have been put in suspense, which essentially means the system now sees where

somebody has been overpaid.

And as new revenue is booked, it reduces that overpayment. And then once that overpayment has been recouped, then the money goes out the door. And so if I gave you $100 and I should have only given you 50, until I recoup that 50, no additional revenue goes out the door.

Q. Here's the question I have from your testimony here. You've talked about the -- whatever the -- the system.

Is there somewhere in this process from October 2022 up until November '24, is there a warm body that's making any decisions with regard to this recoupment payment or is that just all computer-based?

MR. WERNER: Object to form. But you can answer.

MS. GREEN: So there --

There is a person that, in total, reviews recoupment. So not at the owner level, not at a well level, but they will look to see has -- you know, is there recoupment taking place?

And maybe the way to phrase it is -- and you have -- as these adjustments come through, there can be times where owners are drastically overpaid, and that is where that analysis is taking place.

And I'll use an example. When I worked at

another oil and gas company, there was somebody who received a million dollars -- which back then a million dollars was a whole lot of money -- and there was a mistake that was made. Again, not XTO, but another company. And usually somebody in this position, that's the analysis that they do. And when you see that type of overpayment, then you'll reach out and say, "Hey, there was a mistake. If you'll send it back, then that takes you out of the recoupment status and the money can come out the door."

So from an XTO perspective, there is a process that is looking to see have there been big overpayments to where those conversations need to take place. But, again, they're looking at a much higher threshold than what would have occurred in this particular situation.

BY MR. LINDSAY:

Q. In other words, these particular overpayments were simply too small to have an actual individual review them; is that correct?

A. To have an individual review and reach out to an owner about having the money come back. I can't say that their process doesn't review smaller balances, but they're -- the focus of the person that would sit in this particular role, it's really looking to see if there has been a significant amount of money sent out

where that conversation about having it come back needs to occur.

Q. But we're not talking about that here, about it coming back. We're simply talking about suspending royalties during a certain period, correct?

A. Correct. So when the overpayment is not something that is extremely large, then the industry practice is typically to put somebody in suspense and then recoup. The other option, which, you know, again depending on the amount of money we're talking about, somebody would have reached out to an owner and said, "You were overpaid by X amount of money. This was a mistake. If you send the money back, then you're no longer being recouped across the spread of the months," right?

The recoupment still occurs. The money is still expected to come back. It's just the owner could cut a check versus the owner's checks are used -- the future payments are used to reduce the overpayment, if that makes sense.

Q. Okay. One of the issues here is from September on, I guess, until we commenced discussions with your counsel, there was no communication whatsoever with the plaintiffs in this case about what was going on with these payments. You're aware of that?

A. That's my understanding, yes.
Q. Is that the usual practice?
A. I would -- well, I don't -- I'm not sure how to define "usual practice." I will say that if an owner was to see that they weren't receiving checks and they were to call in, there would have been a communication. But if your question is, every single time there's a situation where a recoupment needs to take place is an owner contacted, then I'm not aware that that's occurring.
Q. Well, in this particular case, there was testimony that there were inquiries or attempted inquiries to determine what was going on, and there was asked for something in writing. You're aware of that, I take it? Or not?
A. So based on -- what --
Q. All right. Well --
A. Yeah, I mean, as far as I know, no, I'm not aware of that.
Q. Well, there was testimony yesterday from Travis Lindsay and it was also brought up in the deposition of John Maloy that there was -- that Mr. Maloy was asked what's going on, and he said there was no explanation he could give. There would be no writing. And that was somebody had made a decision that

there would be no explanation or written explanation concerning what was going on. Are you aware of that?
A. No, I'm not.
Q. Well, is there -- all right.
What you're doing is there's an internal formula that you're talking about that all of this led to this recoupment, or whatever you want to call it, where they stopped payments for a period of over a year. All right. That's occurring internally, correct?
A. Yes.
MR. WERNER: Object to form.
BY MR. LINDSAY:
Q. Within XTO?
A. Yeah. I mean, the formula -- the formula needing tweaked caused the distribution across the wells to be incomplete. When it got corrected, then the payments were sent out the door, representing what should have been paid. And that's where that determination of overpayment having been occurred. But it was because a formula needed to be tweaked to bring all the metered volume in.
Q. But let's start with this. In this particular case, had there been no inquiries made by Travis Lindsay to John Maloy, there would have been -- and inquiries to your counsel, the payments to these -- what do you call

them? Lessees -- or lessors would have been stopped for a year without any explanation whatsoever; is that correct?

MR. WERNER: Object to form.

MS. GREEN: Like I said, my understanding is if an owner had called in and asked the Owner Inquiry Group, which there's a number on the check detail and I think on the website, that if they had called and asked, "Why am I not receiving payment," et cetera, somebody should have researched that and then provided an answer back.

BY MR. LINDSAY:

Q. Well, let me ask you this question. There was at least testimony from Travis Lindsay in his conversation with John Maloy that there was a conscious decision made by someone at XTO that there would not be an answer back. They would not explain what had happened. Are you familiar with that?

A. No.

Q. Well, is there such a policy that you're not going to explain what was going on here?

A. I have never encountered that. Can there be a delay in a response? Yes, because research would be needed.

But I personally, in the 20-plus years that I

have worked here, I have never seen anybody come up with a policy that says we will not give an owner an answer to their questions.

Q. Were you informed about this conversation between Travis Lindsay and Mr. Maloy?

A. No.

Q. You've never heard of it until today?

A. Correct.

Q. All right. Give me a moment.

If you need a break, let me know.

MR. WERNER: Why don't we take a quick break, Mr. Lindsay? We've been going a while.

MR. LINDSAY: That's fine.

(The deposition recessed at 10:50 a.m. and reconvened at 11:03 a.m.)

MR. LINDSAY: We're back on the record.

Can you hear me, Ms. Green?

MS. GREEN: Yes.

BY MR. LINDSAY:

Q. Okay. This -- you made this, I guess, statement -- I'm trying to figure out what you call it here -- a file.

Did you do any other report of any kind concerning this matter, other than the declaration of Holly Green that you filed in May of 2024?

MR. WERNER: I'll object to form. I don't know what you mean by "report".

MR. LINDSAY: Well, anything.

BY MR. LINDSAY:

Q. Is there any writing that you've done concerning your investigation other than that statement?

A. No.

Q. Okay. And with regard to -- you've been questioned at some length about the notification to the plaintiffs in this case.

And my question is, was there any decision made by anybody not to notify these people as to what was going on?

A. I have not been made aware of any decision that would have restricted communication.

Q. Are you in possession of a letter from Mr. Werner dated January 10th, 2024? Do you have that?

A. I believe so, yes -- well, 2024 -- January 10th, 2024?

Q. That's it.

A. Yes.

Q. Okay. If you go to the first page, the bottom, there is this statement. "The erroneous allocation of the volumes from the Trilogy 5HU well resulted in the allocation of volume to the Bowser A -- I guess 3 -- I

can't read it -- well and Frantz well that were about 40 percent above the volumes accurately reported to the Pennsylvania Department of Environmental Production."

Now, the -- what was reported to the Department of Environmental Production? What numbers were used?

A. My understanding the numbers that were used represented all of the volumes from all of the meter statements. So the Trilogy 5 well's volumes would have been all of the metered volumes.

Q. What about the four outliers? The four wells are not Trilogy 5? What would have been reported to the Department of Environmental Production?

A. Their production volumes.

Q. And it would be their precise volumes?

A. That's my understanding, yes. They're produced volumes all from meters -- the meter statements.

Q. And that would be the meters on the individual wells?

A. Right. That's my understanding.

I don't prepare the report, but that's my understanding of how it works.

Q. And those, of course, we're not considering those when we consider, I guess, this formula, correct?

MR. WERNER: Object to form.

MS. GREEN: I know that the Pennsylvania forms

were created manually because of the Trilogy 5 volumes needing to be added together. I don't think they are part of the allocation. I think it's the produced volumes which would have been from the meters. The Trilogy 5 was added. Those meters were added together for all the Trilogy 5 meters. And that's what was reported, but I don't think the calculation has anything to do with the Pennsylvania reports.

BY MR. LINDSAY:

Q. How often are these recorded with the Pennsylvania Department of Environmental Protection?

A. I'm not sure if they're monthly or annually. Again, this is something that I don't do, so I have no direct knowledge of it.

Q. But the numbers that were used and submitted to the Pennsylvania Department of Environmental Production would have had no significance in how this formula was being conducted; is that correct? They weren't used at all?

MR. WERNER: Object to form.

MS. GREEN: The metered volumes for all of the wells on the Pennsylvania form, as well as what was used in revenue, would have all been the same except for the Trilogy Number 5. So the Trilogy Number 5 on the report to Pennsylvania would have been the sum of all of the

Trilogy 5 meters; whereas, what revenue would have been available to them would have not included all of the volumes for the Trilogy 5.

So the basis for all of the other wells would have been the same in both the production system, the revenue system and what went on the report. The Trilogy 5 is the one that would have been under -- have lesser volume in the revenue system because of that missing -- that updating formula that needed to be updated. The report to Pennsylvania was manually prepared; therefore, those volumes could be manually added together.

BY MR. LINDSAY:

Q. There was some discussion in the deposition of Mr. Maloy concerning recoupment contractual -- contractual basis for that. And I requested from counsel that Mr. Maloy mentioned that there was a standard XTO Energy lease that referred to it.

And counsel, I think, provided me with a copy of that lease. And I note that apparently the -- this particular lease would have been used with the plaintiff, Charles Lindsay. Are you familiar with that or not?

A. No, I have not looked at any of the leases.

Q. Are you familiar with the standard lease?

A. I know that there -- that they exist, but I couldn't tell you what's on them or how they read.

That's -- as a revenue accountant, it's not part of my normal process to interpret leases or to know what's on them from that perspective.

Q. Unfortunately, as a lawyer, we are. That's kind of something we look at.

A. Yeah.

Q. I've tried to find, and maybe counsel can correct me, if we look at the standard XTO lease, which I think was also the lease that was used with Charles Lindsay, paragraph 4 reads as follows, "In addition to the covenants of general warranty here and above contain lessor further covenants and agrees that if lessor's title to the lease premises shall come into dispute or litigation or if in the judgment of the lessee," that would be XTO, "there are bona fide adverse claims to the royalties here and above provided then lessee at its option may withhold the payment of said royalties without interest until final adjudication or other settlement of such dispute, litigation, claim or claims and the lessee at his option may pay and discharge any taxes, mortgages or other liens or liens existing, levied, assessed, or which may here and after come into existence," et cetera.

And I guess -- you don't know whether that's the recoupment clause, or do you?
A. I would have no idea.
MR. LINDSAY: Can I ask counsel, is that what you're referring to? Is that the recoupment --
MR. WERNER: Sitting here today, I'd have to talk to the land department, Mr. Lindsay. So if you want to shoot me, you know, an email asking questions, we can refer you to the provisions we're talking about. That's fine. Ms. Green can't answer these questions.
MR. LINDSAY: Okay. All right.
Well, the -- well, why don't you take a look at it? I assume you sent me this form.
MR. WERNER: I did. I'll be honest with you, I haven't studied it yet, so... And I would have to talk to their land group, so...
MR. LINDSAY: You sound like my kind of lawyer. I'm not sure what --
MR. WERNER: Not my problem.
MR. LINDSAY: All right. Then I will --
MR. WERNER: We'll direct you to the provisions that he was referring to.
MR. LINDSAY: Okay. All right.
If you would, we'll look at the standard contract. And also while you're at it, the other

plaintiffs in this case have a different form, which was the --

MR. WERNER: Correct.

MR. LINDSAY: With whatever -- you know, it's a different form.

MR. WERNER: Right. It's a third-party form,

MR. LINDSAY: That form, I think it has a paragraph somewhat like that, but not exactly and it's a little different. So, in any event, I just -- you know, we've been talking about recoupment and I've been whining about contractual provisions and I guess that's it. I don't know, you know. Take a look at it, if you would.

MR. WERNER: Will do.

BY MR. LINDSAY:

Q. Now, can you state -- I take it that the payments were withheld to these. Can I call them the "outlined four well lessors"? You know, we've got this -- these -- this group includes the Trilogy 5 wells and the other four wells.

So the other four wells, I guess with regard to those, can you state that payments were suspended to all of the lessors in the outlined four during that pertinent period?

A. I believe they could have been suspended to all

eight of the wells because the -- all of the wells, with the exception of the Trilogy Number 5, were over-allocated. And so based on based on the analysis that I did, it looked like all of the wells, with the exception of the Trilogy 5, were impacted.

So, for example, one of -- one of the owners actually owns in the Trilogy 5. So that is Betty -- Betty Lindsay. She actually owns in the Trilogy 5. So she would have seen the reduction in the other wells and the increase in the Number 5. But as far as I can tell, all of the wells except 5 had those adjustments.

Q. All right.

A. Yeah, taking the money away.

Q. All right. We're talking about the Betty G. Lindsay Trust, that's one of the lessors.

A. Right.

Q. And they are a lessor with the Trilogy 5 well; is that correct?

A. That's based on the information I have, yes.

Q. All right. So she would have been one of the ones that would be entitled to an adjustment upward?

A. Correct.

Q. All right. My question is this. With regard to the money that was recouped or withheld, what happened to that money? In other words, what did -- how was

that -- apparently the individuals that were shorted were individuals who had revenue coming as a result of the Trilogy 5 well, correct?

A. Correct.

Q. All right. So with regard to the recouped funds, what was done to adjust the other -- well, do you understand my question? I'm trying to figure out what happened here with the recoupment.

A. Yeah, I believe so. So the initial -- the initial payment for May 2022 production would have gone out. And so the eight well owners would have been overpaid. The Trilogy 5 well, that owner would have been underpaid. The correction is run. The money's already gone out, right. So XTO then would have, out of their own pocket, paid the additional Trilogy 5 owners their additional value as it was recouping from the owners that were overpaid.

And so at the end of it, once everything was back in line, everybody would have the value that they were entitled to based on the adjusted allocation. So overpayment, underpayment -- the underpayment people get paid again out of XTO's pocket until all of the recoupment comes back. And now owners of all the wells and XTO have now been paid based on the correct -- the updated allocation.

Q. All right. We know in September 2022 that there has been an underpayment to the Trilogy 5 lessors, correct?
A. For May 2022 through September 2022, yes, they would have been underpaid.
Q. And we know that in September '22, correct?
A. Again, I don't know when they specifically knew, but I know those months are the months that required the adjustment.
Q. All right. When did the adjustment occur to increase the royalties to the Trilogy 5 lessors to account for this whatever?
Do you understand my question?
A. I do. I am trying to think. I didn't look at it specifically that way. So I would believe that the adjustments that were run in 2023 -- well, let me put it this way. The adjustments that were run in 2023, based on what I have seen, was when those corrections were made.
So when those corrections went through, that's when all of the wells were reallocated, the sales were reallocated to those wells, and that's when those payments would have gone out.
And so if an owner in the Trilogy 5 had not been overpaid in the other well -- so, for example, if I only

owned in the Trilogy 5 and not the other wells, then that payment would have gone out in 2023. If I owned in the other wells, then the adjustment would have occurred netting across the various wells.

Q. Well, let me ask you this question. At some point, this adjustment was made?

A. Correct.

Q. Okay. And we can agree that the Betty G. Lindsay Trust was receiving revenue from the 5 -- the Trilogy 5 well, and apparently one or two other wells; is that correct?

A. Correct. But it looks like the no interest in the Trilogy 1 well, and no interest in the Frantz and Bowser wells, but interest in all the others. So of the nine wells, it doesn't look like that trust owned in three wells.

Q. Did they own it in part of the Trilogy 5 well?

A. Correct. Yes, they did.

Q. All right. So there would have been some adjustment to --

A. Correct.

Q. -- the Betty G. Lindsay Trust, a favorable adjustment based on this reallocation, correct?

A. A favorable adjustment on the Trilogy 5, yes. But would have been offset by the other wells originally

being over-settled.

Q. Would that -- what we're talking about, the increase or the favorable adjustment and the offset be reflected in documents that have been provided showing the Betty G. Lindsay Trust and what's happened. Would we see a reflection of that?

A. Yes, you should in the check detail that was sent out with the -- so with -- if there was a period where there was no payments going out because they were in suspense or recoupment, as soon as that recoupment was met, that check detail would have been sent out and it would have had all of that adjustment information on it.

Q. All right. With regard to -- and we call it a "recruitment" -- and I got that term from the defense side of this litigation.

Is there any written policy of XTO concerning how that process is to occur?

A. I have not come across any written policy, no.

Q. Now, can we agree that with regard to the recoupment, the recoupment can occur as it did here, where there's a total suspension of payments, but there's also a process where the XTO could decide to take a percentage and recoup at each month? In other words, reduce the amount of royalties paid. Are you familiar with that process?

A. Not personally, no.
Q. You've never heard of that?
A. No.
Q. Where we say we're going to cut your payments back a certain percentage based on the recoupment, or something?
A. It's not something I've heard of. I'm not saying it doesn't happen, but I've not heard of it.
Q. All right. Is there -- in this particular case, there was no -- do you know whether there was any notification to any of these lessors prior to the recoupment process taking place?
A. I'm not aware of any, no.
Q. Is there a policy concerning that -- letting people know ahead of time that, look, we're going to lower the boom on you?
A. I don't -- I don't think I've ever seen a policy, no.
Q. Suppose that a -- in the course of this process, which in this case took about a year, a lessor disagrees with XTO, how do they contest the findings of XTO with regard to misallocation?
MR. WERNER: Object to form.
MS. GREEN: I can answer how they could inquire as to what's going on. But as far as how they would

contest, I don't know what -- I don't know what or how that would work.

BY MR. LINDSAY:

Q. Have you ever heard of anybody contesting a recoupment that was not involved in litigation? In other words, is there anyone that you've ever heard of saying, "Hey, this shouldn't have occurred. I disagree with XTO"?

A. I certainly have -- back when I have booked revenue, I have had conversations where an owner has called in asking why there was a recoupment. In fairness, any of those conversations I've been directly involved in, once we've walked through and explained what's taking place, there hasn't been anything beyond that. So I have not personally encountered where somebody has called in and after receiving the explanation said that they can't -- that can't happen, and then it's gone beyond that.

Q. Well, if you had someone you -- you know, you give them the explanation and they say, "I don't agree with that," is there any process they have to contest the decision of whoever's making the decision?

MR. WERNER: Object to the form.

MS. GREEN: I wouldn't. I mean, from a royalty owner's perspective, I couldn't say what, like, a

process is. Some owners have royalty rights -- sorry, audit rights in their leases, and so those owners could audit. But, I mean, in most cases, once there's been a conversation initiated and discussions and information-sharing, usually that -- that kind of addresses the need. So I don't -- I don't know what recourse, or I don't remember the word used specifically, but I don't -- I don't know how that would work.

Q. You mentioned audit. Are you familiar with that process?

A. Yes.

Q. These leases do contain an audit provision.

A. Okay.

Q. How does that work?

A. So it's up to -- it's up to the royalty owner how they want to do that. So they can either hire somebody to come in and audit on their behalf, or they can audit themselves. They would have to submit the request and then based on the terms within the lease, that would allow them to have access to statements or have somebody kind of like what I'm doing now, walk through how the calculations, et cetera, work from a -- you know, just in general terms.

Typically, you're only allowed to audit so many

years back. So, for example, if I wanted to come in and audit somebody today, I can't go back to, you know, the beginning of time. I may only have a two-year window. But, again, it's all based on how specific the lease is and then how the royalty owner chooses to do that.

But in the past, pre-COVID, the auditor would have come into the office and sat down and walked through documents. Now that -- now that, you know, COVID has changed that, most of that is all electronic and through email, or what have you.

Q. You use the expression "come in" or "come into the office." Where is the office?

A. Well, I'm in Houston.

Q. When you use "come in," what does that mean? Does that mean Houston?

A. Well, I mean, it depends on what you're auditing. And it depends on -- I mean, I don't -- to be honest, I don't know how that works with the campus here in Houston because I have not been involved in that process. But in years past, the auditor would physically come into the office. But with COVID, most of that changed where it's all electronic now.

Q. When did it change, if you know?

A. Well, COVID is when I saw it change.

MR. LINDSAY: Okay. Excuse me for a second.

(Brief pause.)
BY MR. LINDSAY:
Q. You're involved in this particular, I guess, recoupment process, for lack of a better term. Have you ever done this in any other cases other than this particular case?
A. Discussed recoupment?
Q. Yes.
MR. WERNER: Object to form.
But you can answer.
MS. GREEN: Not that I remember, no, I don't. I don't remember discussing recoupment in any of my other depositions.
BY MR. LINDSAY:
Q. And I don't mean to belabor this point, but I wanted to ask, this whole idea of communicating with the royalty owners or explanation concerning what's going on, there's -- that's not -- that's not determined by anybody; it just happens, correct?
In other words, is there someone determining what information is given out and what's not, or is it just no policy?
A. I mean, I guess it depends on what you're asking. So if an owner was to call the owner inquiry number and ask questions, the intent is to answer those questions.

Sometimes that can be done right then on the call, and sometimes it requires going back and doing research.

But for any time I have seen when an owner initiates conversation, there is an intent to answer those questions, you know, based on the information that's available. But I'm not sure that that's what you're asking, but that's what I know.

Q. We can agree that if the owner or the lessee doesn't make an inquiry, there's no information given to the owner or lessor concerning this suspension; is that correct?

MR. WERNER: Object to form.

MS. GREEN: Based on what I understand, when there is a significant overpayment that needs to be recouped, then there can be a conversation initiated by the land organization or by somebody in the revenue organization giving them, the person who received the overpayment, that option to send the money back. So those conversations can and do occur.

BY MR. LINDSAY:

Q. But they only occur where there's a significant adjustment that has to be made, correct?

A. As far as I know, yes.

Q. And, for example, the level we're talking about this case is insignificant, correct?

MR. WERNER: Object to form.
BY MR. LINDSAY:
Q. You can answer.
A. Yeah, I mean, it's -- so it's not -- it's not my process. So I'm not -- I'm not sure like what the number is that determines significant. But I will say, in the course of your royalty payments that are going out the door, if an owner has received, you know, I think in, you know, a little over $50,000 more than they should have, I don't think that would have been considered significant in the course of your royalty payments going out the door.
I appreciate that it may be significant to the owners, but, you know, if you look at the number of wells and the number of owners, that would not have been a significant amount, I don't think. But, again, I don't have the data in front of me to say what they consider to be significant.
Q. You know, I just had a question to ask and then I got waylaid by the extension of your answer?
A. I'm sorry.
Q. Apology accepted.
A. It was not my intent.
Q. You don't have to say you're sorry,.
Oh, the -- when we look at the amount that was

misallocated, we're taking the -- I guess we're talking about a dollar amount or the -- what would you call it? The -- we got your volume over here. We have the price over here. Or the -- what do you call it? The check amount?

A. Sales amount, yeah.

Q. All right. There's a sales amount and there's a volume amount. All right. Now, what is determined what the amount of -- the amount of money that's to be recouped, are you using the sales amount to determine that or the volume amount? They're the figure?

A. I'm going to say both. And let me explain why.

So for every month that I book a sales volume, I have an associated price. And that sales volume and that price could be different month over month. And so when I do my original booking and then I do my reversal and rebook, I always use the same production month's basis of information.

So, in this particular case, the volume changed across the wells, but the price was the same across the wells. So the value does change by well, but it's still the same price. And then -- so you're looking at May through September. May's adjustments would have been based on May's price. June's adjustments would have been based on June's price.

The recoupment, of course, is going to be made off of the additional bookings. And so when I -- September is the last month that was needing the redistribution. When I book October, again, booking October volumes with October price, that's what starts the recoupment. So that October value is going to be leveraged to start recouping these other months. But I'm not mixing prices across production months. The price for the month is the price for the month, if that makes sense.

Q. Well, the price for -- let's talk about the period where between May of 2022 and September 2022, we have general prices for that -- those months, correct?

A. Correct.

Q. And then the prices from September '23 to November '24 are different, correct?

A. Correct. Each month would have their own unique price just because of the basis of how that works.

Q. Okay. So I guess what I'm asking -- first of all, can we agree that those months in May of 2022 to September 2023, the prices for gas were significantly higher than they were in September 2023 to November 2024?

A. Honestly, I did not do any price analysis other than verifying that the price used to do the

recalculation for each month was the same. So I did not compare pricing like of '22 to '23. So I don't know. I could see where there would be differences in prices, but I don't know what the spread was. I didn't look at it like that.

Q. Would that variation in price have any significance to you in how they calculate the recoupment?

A. It would certainly -- it would lengthen how long it would take to recoup. So if I overpaid with higher prices and I'm recouping off of revenue booked with lower prices, then it may take a few more months to recoup versus if that was flipped.

But the recoup -- the current revenue is always booked off of that month's price. The recoupment is simply -- I mean, I guess maybe -- I'm trying to think. If you think about you have a balance on your credit card and every month you're paying a portion of that off, whatever that number that you owe to the credit card company, however you're paying month over month, that's how quickly it reduces.

So you're not taking pricing from the two months or across the years and meshing them across one another. It's more -- it's been determined X number of dollars is owed and until enough revenue has been booked to recoup

that X number of dollars, the recoupment continues. But the pricing for the months don't get -- like I said, we don't mix and match pricing and volumes based on how that recoupment works.

Q. Well, recoupment is based on dollars as opposed to --

A. Correct.

Q. As opposed to (inaudible)?

A. Correct.

MR. LINDSAY: I would like just a minute.

(Brief pause.)

BY MR. LINDSAY:

Q. We can go back to May of 2022 when we had one meter. Before you put the second or third meter on, where any of those meters -- if I use an expression -- let's start with this. If I use an expression where a meter is pegged, do you know what that means?

A. No.

Q. It means that the capacity -- the volume exceeds the capacity of the meter to measure it. When you say it's pegged, it's all over. It's like when you're driving a car and you get up past 120 and your speedometer doesn't go any higher. Do you understand what I mean?

A. I do.

Q. Was there -- were those meters -- meter or meters ever paid with the 5 -- Trilogy 5 well, if you know?

A. I haven't heard that term used, so I -- but I don't know for sure.

Q. Well, do you ever know that there was a time when the meters -- meter or meters were not able to correctly measure the volume of the gases coming out of the 5 -- Trilogy 5 well? Do you know that?

A. I have not been told that there was any measurement issues, that it was all the calculation that needed to take place in the production system.

Q. Do you know why they would have added a third meter then?

A. My understanding was that the well was a very good producing well and they wanted to have the measurement there. But beyond that, that's not something that I would have any direct knowledge of.

Q. Let me ask you about this Trilogy 5 well. You say it's a good producer?

A. That's what I've been told, yes.

Q. How good?

A. I mean, relative to the other wells behind that McIntyre CDP, it's very good. But relative to other wells, I would not have any basis for understanding that.

Q. Well, can we agree that the four -- we'll call them "outlier wells" are what we call Marcellus wells, if you know. They're down to the Marcellus Shale --

A. The formation, yeah. I have heard certainly discussions about the formations, but I don't know off the top of my head which wells are in which formation.

Q. All right. So you don't know, for example, whether or not Trilogy 5 is a Utica well? You don't know that, or do you know?

A. I do not.

Q. Okay. And with regard to the other Trilogy wells, the other Trilogy four, do you know whether --

A. I do not.

Q. And those wells, the other Trilogy four, are insignificant compared to Trilogy 5, I take it; is that correct?

MR. WERNER: Object to form.

MS. GREEN: I can answer, based on the volume that the Trilogy wells produce, the five Trilogy wells produce much more volume than the four wells -- the Bowser, Charlton, Frantz and Lindsay. But the Trilogy 5 is the biggest producer of the five Trilogy wells. So your 1, 2, 3 and 4 have much more production than the Bowser, Carlton, Frantz and Lindsay. But the Trilogy 5 has the most production in that grouping of the nine

wells.

BY MR. LINDSAY:

Q. The -- is there any period of time prior to May of 2022 when you weren't able to precisely determine what the volume of gas was coming from Trilogy 5?

A. I'm not aware of any time in any of the wells that we were not able to precisely determine what was coming. We've always had the measurement, and my understanding is everybody feels confident with the measurement. It was the production system's ability to take the multiple meters and add them together to have that measurement in the system, which then would feed to the revenue system. But, again, I've not heard anything indicating there was concerns with the meters or the measurement at any period before or after May.

MR. LINDSAY: Excuse me for a moment.

(Brief pause.)

MR. LINDSAY: That's all. I have no further questions.

MR. WERNER: Very good. We will read and sign. And other than that, I think we're done.

(The deponent did not waive signature.)

(The deposition terminated at 11:47 a.m.)

* * * * *

CERTIFICATE OF REPORTER

COMMONWEALTH OF PENNSYLVANIA :
:
COUNTY OF WASHINGTON :

I, Lauren E. Bauer, a Notary Public duly commissioned and qualified in and for the said Commonwealth and County, do hereby certify that pursuant to the notice, the within named person was sworn by me to testify to the truth and nothing but the truth; that supervision; that this deposition is a true record of the testimony given by the witness; and that the witness did not waive signature.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties or financially interested in this action.

In this testimony whereof, I have hereunto subscribed my hand and affixed my seal of office this Monday, September 8th, 2025.

My Commission Expires:
September 28, 2026

Lauren Bauer

Notary Public

Commonwealth Of Pennsylvania - Notary Seal
Lauren Bauer, Notary Public
Washington County
My Commission Expires September 28, 2026
Commission Number 1338313

COMMONWEALTH OF PENNSYLVANIA : C O R R E C T I O N
COUNTY OF ____________________________: S H E E T

I, Holly S. Green, have read the foregoing pages of my deposition held on August 29, 2025, and wish to make the following, if any, amendments, additions, deletions or corrections:

Page No. Line No. Change and Reason for Change:

In all other respects the transcript is true and correct.

Subscribed and sworn to before me this
________ day of ______________, 2025.

_________________________
Notary Public

## $

**$100** [2] - 47:19, 49:5
**$50** [1] - 47:18
**$50,000** [1] - 74:9
**$52,000** [1] - 9:8
**$52,861.75** [4] - 7:8, 7:11, 7:22, 38:18

## '

**'22** [9] - 20:3, 20:17, 24:22, 34:25, 37:15, 40:20, 44:6, 65:6, 77:2
**'23** [4] - 44:10, 45:9, 76:15, 77:2
**'24** [2] - 49:12, 76:16

## 1

**1** [4] - 16:8, 32:8, 66:13, 80:23
**100** [12] - 10:9, 20:19, 22:18, 26:13, 30:8, 32:4, 32:5, 34:16, 35:8, 40:3, 40:13, 47:20
**10:50** [1] - 55:14
**10th** [2] - 56:17, 56:18
**110** [1] - 2:3
**11:03** [1] - 55:15
**11:47** [1] - 81:23
**120** [1] - 78:22
**138,000** [1] - 41:13
**15222** [1] - 2:7
**16001** [1] - 2:3

## 2

**2** [3] - 16:8, 32:8, 80:23
**20-plus** [1] - 54:25
**2000** [1] - 6:17
**2021** [1] - 20:6
**2022** [30] - 5:20, 5:22, 5:24, 19:20, 20:1, 20:13, 20:21, 25:2, 34:2, 34:6, 34:10, 34:19, 35:18, 37:10, 37:12, 41:24, 42:19, 44:8, 45:19, 46:6, 49:12, 64:10, 65:1, 65:4, 76:12, 76:20, 78:13, 81:4
**2023** [10] - 43:12, 44:4, 45:19, 46:7, 48:13, 65:16, 65:17, 66:2, 76:21, 76:22
**2024** [9] - 6:18, 42:16, 43:9, 48:13, 55:25, 56:17, 56:18, 56:19, 76:23
**2025** [6] - 1:20, 4:1, 5:21, 82:14, 83:5, 83:22
**2026** [1] - 82:16
**225** [1] - 2:7
**24-781** [1] - 1:5
**24th** [1] - 6:18
**25** [2] - 10:11, 32:12
**28** [1] - 82:16
**29** [3] - 1:20, 4:1, 83:5

## 3

**3** [3] - 16:8, 56:25, 80:23
**301** [1] - 2:3

## 4

**4** [4] - 3:3, 16:8, 60:12, 80:23
**40** [1] - 57:1

## 5

**5** [109] - 13:8, 15:19, 15:22, 16:6, 16:9, 16:15, 17:1, 17:3, 19:9, 20:2, 20:22, 21:7, 21:15, 21:20, 22:12, 22:14, 22:16, 22:17, 22:21, 23:3, 23:9, 23:10, 23:12, 23:24, 24:2, 24:3, 24:12, 24:16, 25:4, 25:7, 25:10, 26:5, 26:18, 26:20, 26:21, 27:4, 28:21, 30:7, 30:8, 30:15, 30:18, 33:5, 33:6, 33:12, 33:16, 34:4, 34:16, 34:20, 34:23, 35:7, 36:21, 37:13, 37:16, 37:21, 37:25, 39:24, 40:4, 40:14, 40:22, 40:24, 41:7, 41:10, 41:13, 41:16, 43:22, 57:8, 57:11, 58:1, 58:5, 58:6, 58:24, 59:1, 59:3, 59:7, 62:19, 63:2, 63:5, 63:7, 63:8, 63:10, 63:11, 63:17, 64:3, 64:12, 64:15, 65:2, 65:11, 65:24, 66:1, 66:9, 66:10, 66:17, 66:24, 79:2, 79:7, 79:8, 79:18, 80:8, 80:15, 80:21, 80:24, 81:5
**5's** [2] - 25:21, 25:24
**50** [12] - 10:9, 32:3, 32:4, 32:5, 32:8, 47:19, 47:21, 49:5, 49:6
**50/50** [5] - 10:10, 32:7, 32:9, 33:15, 33:19
**51** [1] - 41:11
**5HU** [1] - 56:24

## 6

**6** [5] - 7:4, 30:1, 38:8, 38:9

## 7

**7** [1] - 38:13
**70,000** [1] - 41:13
**75** [2] - 10:10, 32:12
**75/25** [1] - 33:17

## 8

**830,000** [1] - 41:14
**8th** [1] - 82:14

## 9

**9** [1] - 41:8
**90** [2] - 32:9
**9:30** [1] - 1:21

## A

**a.m** [4] - 1:21, 55:14, 55:15, 81:23
**ability** [2] - 39:16, 81:10
**able** [14] - 8:19, 21:23, 22:11, 26:15, 33:13, 33:18, 35:12, 35:25, 39:1, 39:8, 45:13, 79:6, 81:4, 81:7
**accepted** [1] - 74:22
**access** [1] - 70:21
**account** [1] - 65:12
**accountant** [6] - 43:14, 43:23, 44:25, 47:12, 47:23, 60:3
**accounting** [4] - 5:11, 5:15, 7:6, 18:6
**accurate** [5] - 21:1, 21:3, 23:15, 33:14, 34:21
**accurately** [4] - 18:22, 22:14, 33:11, 57:2
**action** [2] - 82:11, 82:12
**actual** [2] - 8:13, 50:18
**add** [13] - 10:12, 23:24, 24:14, 26:15, 26:18, 30:3, 30:7, 30:14, 30:18, 32:2, 32:3, 33:13, 81:11
**added** [15] - 17:10, 20:7, 20:9, 20:10, 22:15, 24:13, 25:3, 29:2, 30:1, 34:20, 58:2, 58:5, 59:12, 79:12
**adding** [1] - 33:8
**addition** [3] - 13:3, 24:11, 60:12
**additional** [16] - 15:19, 20:7, 28:20, 28:21, 30:12, 34:3, 34:19, 39:9, 40:24, 43:4, 47:19, 49:6, 64:15, 64:16, 76:2
**additions** [1] - 83:6
**addresses** [1] - 70:6
**adjudication** [1] - 60:20
**adjust** [3] - 10:12, 24:24, 64:6
**adjusted** [10] - 9:3, 22:2, 22:14, 22:23, 28:17, 28:19, 28:22, 41:15, 42:7, 64:20
**adjustment** [12] - 47:13, 63:21, 65:9, 65:10, 66:3, 66:6, 66:20, 66:23, 66:24, 67:3, 67:12, 73:22
**adjustments** [15] - 8:21, 25:1, 36:6, 43:17, 44:18, 45:14, 45:22, 46:5, 46:11, 49:22, 63:11, 65:16, 65:17, 75:23, 75:24
**adverse** [1] - 60:17
**advisor** [1] - 5:4
**affixed** [1] - 82:13
**agree** [8] - 20:12, 48:12, 66:8, 67:19, 69:20, 73:8, 76:20, 80:1
**agrees** [1] - 60:14
**ahead** [3] - 14:10, 14:19, 68:15
**Ahmad** [3] - 45:17, 45:19, 46:4
**al** [1] - 6:15
**ALEXANDER** [2] - 1:6, 2:2
**Alexander** [1] - 14:20
**allocate** [4] - 27:6, 28:9, 29:7, 34:7
**allocated** [8] - 21:14, 21:15, 21:21, 27:23, 27:25, 32:7, 32:9, 63:3
**allocates** [1] - 29:18
**allocation** [44] - 8:24, 10:5, 10:9, 10:11, 10:13, 10:23, 21:19, 22:19, 25:7, 25:23, 26:9, 26:13, 29:24, 30:5, 30:8, 30:11, 30:17, 30:19, 30:23, 31:6, 31:12, 31:22, 31:24, 32:6, 32:19, 33:4, 33:9, 33:11, 33:24, 34:15, 37:16, 37:20, 40:12, 40:21, 41:7, 42:6, 42:7, 42:21, 47:14, 56:23, 56:25, 58:3, 64:20, 64:25
**Allocation** [1] - 28:24
**allocations** [1] - 37:24
**allow** [1] - 70:21
**allowed** [1] - 70:25
**amendments** [1] - 83:6
**amount** [22] - 7:8, 7:11, 7:22, 13:9, 16:11, 27:9, 38:18, 50:25, 51:10, 51:12, 67:24, 74:16, 74:25, 75:2, 75:5, 75:6, 75:7, 75:8, 75:9, 75:10, 75:11
**analysis** [8] - 39:15, 43:3, 43:5, 43:7, 49:24, 50:6, 63:3, 76:24
**AND** [1] - 1:12
**ANDREW** [1] - 1:10
**annually** [1] - 58:12
**answer** [24] - 4:18, 4:21, 4:25, 21:10, 25:15, 25:16, 28:6, 30:13, 30:14, 35:3, 44:13, 45:13, 49:15, 54:10, 54:16, 55:2, 61:10, 68:24, 72:10, 72:25, 73:4, 74:3, 74:20, 80:18
**answers** [2] - 4:12, 4:17
**anytime** [4] - 9:24, 10:4, 28:13
**Apology** [1] - 74:22
**appear** [1] - 16:23
**APPEARANCES** [1] - 2:1
**applied** [2] - 24:19, 24:21

**applying** [1] - 42:3
**appreciate** [1] - 74:13
**approach** [1] - 46:22
**assessed** [1] - 60:24
**associated** [3] - 26:19, 27:3, 75:14
**assume** [2] - 4:14, 61:13
**attached** [1] - 6:19
**attempted** [1] - 52:12
**attorney** [2] - 82:10, 82:12
**attribute** [1] - 24:15
**attributed** [1] - 37:14
**audible** [2] - 4:16, 4:21
**audit** [8] - 70:2, 70:3, 70:10, 70:13, 70:18, 70:25, 71:2
**auditing** [1] - 71:16
**auditor** [2] - 71:6, 71:20
**August** [2] - 1:20, 83:5
**AUGUST** [1] - 4:1
**available** [5] - 6:6, 35:12, 41:8, 59:2, 73:6
**Avenue** [1] - 2:7
**avoid** [1] - 4:25
**aware** [9] - 35:23, 51:25, 52:9, 52:14, 52:18, 53:2, 56:14, 68:13, 81:6

## B

**background** [1] - 16:21
**balance** [1] - 77:17
**balances** [1] - 50:22
**Based** [3] - 7:4, 15:3, 73:13
**based** [48] - 8:22, 8:23, 9:2, 10:12, 13:9, 21:23, 25:19, 26:2, 26:9, 26:22, 27:6, 27:10, 27:18, 27:25, 29:8, 30:23, 31:7, 31:24, 32:18, 33:7, 33:8, 36:4, 37:21, 40:13, 41:7, 41:22, 41:23, 42:4, 42:23, 48:10, 49:14, 52:16, 63:3, 63:19, 64:20, 64:24, 65:17, 66:23, 68:5, 70:20, 71:4, 73:5, 75:24, 75:25, 78:3, 78:5, 80:18
**bases** [1] - 41:16
**basis** [15] - 10:3, 10:22, 28:8, 28:15, 31:16, 32:6, 32:24, 33:7, 34:15, 44:24, 59:4, 59:16, 75:18, 76:18, 79:24
**Bauer** [1] - 82:6
**became** [1] - 41:14
**began** [1] - 43:13
**beginning** [1] - 71:3
**behalf** [2] - 1:19, 70:18
**behind** [5] - 10:5, 10:16, 27:24, 32:1, 79:22
**belabor** [1] - 72:15
**belaboring** [1] - 40:15
**best** [1] - 5:17
**BETH** [1] - 1:11
**better** [1] - 72:4
**Betty** [6] - 63:7, 63:8, 63:14, 66:8, 66:22, 67:5
**BETTY** [1] - 1:12
**between** [5] - 24:25, 25:13, 37:23, 55:4, 76:12
**beyond** [3] - 69:14, 69:18, 79:16
**big** [2] - 32:25, 50:12
**biggest** [3] - 22:21, 22:22, 80:22
**body** [1] - 49:12
**bona** [1] - 60:17
**book** [3] - 43:16, 75:13, 76:4
**booked** [11] - 8:1, 26:5, 42:5, 46:2, 46:3, 49:2, 69:9, 77:11, 77:15, 77:25
**booking** [3] - 8:19, 75:16, 76:4
**bookings** [2] - 46:11, 76:2
**boom** [1] - 68:16
**bottom** [1] - 56:22
**Bowser** [12] - 14:9, 15:7, 15:12, 18:20, 23:4, 25:9, 25:21, 27:2, 56:25, 66:14, 80:21, 80:24
**break** [2] - 55:10, 55:11
**Brief** [1] - 81:17
**brief** [2] - 72:1, 78:11
**bring** [2] - 43:22, 53:20
**brings** [1] - 33:16
**Bronze** [1] - 25:21
**brought** [2] - 39:10, 52:21
**business** [2] - 7:5, 44:16
**but..** [1] - 20:11
**Butler** [1] - 2:3
**BY** [20] - 4:5, 21:11, 34:1, 35:4, 37:9, 50:16, 53:12, 54:12, 55:19, 56:4, 58:9, 59:13, 62:15, 69:3, 72:2, 72:14, 73:20, 74:2, 78:12, 81:2

## C

**calculate** [3] - 32:17, 47:17, 77:7
**calculated** [6] - 9:17, 33:8, 38:19, 39:20, 40:19, 42:11
**calculation** [12] - 22:4, 39:5, 40:9, 41:3, 42:3, 42:4, 43:11, 45:25, 47:8, 48:22, 58:7, 79:10
**calculations** [4] - 8:16, 8:17, 42:23, 70:23
**calculator** [1] - 26:13
**campus** [1] - 71:18
**capacity** [2] - 78:19, 78:20
**car** [1] - 78:22
**card** [2] - 77:18, 77:20
**Carlton** [1] - 80:24
**Carol** [1] - 38:13
**CAROL** [1] - 1:5
**carried** [1] - 36:10
**Case** [1] - 1:5
**case** [15] - 6:20, 33:21, 43:21, 44:14, 48:16, 51:24, 52:11, 53:23, 56:10, 62:1, 68:9, 68:20, 72:6, 73:25, 75:19
**cases** [3] - 10:20, 70:3, 72:5
**caused** [1] - 53:15
**CDP** [6] - 11:9, 11:12, 11:22, 12:15, 12:18, 79:23
**central** [4] - 10:16, 11:14, 28:14, 28:16
**Central** [1] - 12:15
**Centre** [1] - 2:6
**certain** [2] - 51:5, 68:5
**certainly** [3] - 69:9, 77:9, 80:4
**CERTIFICATE** [1] - 82:1
**certify** [2] - 82:7, 82:10
**cetera** [6] - 25:22, 28:10, 54:9, 60:25, 70:23
**Change** [2] - 83:9
**change** [21] - 22:11, 29:3, 29:21, 30:2, 30:4, 30:5, 30:11, 31:10, 32:13, 32:22, 33:3, 33:10, 34:12, 40:6, 41:5, 41:17, 41:23, 42:1, 71:23, 71:24, 75:21
**changed** [11] - 30:16, 30:17, 33:12, 35:24, 36:9, 41:1, 41:5, 41:18, 71:9, 71:22, 75:19
**changes** [4] - 6:8, 10:13, 32:14, 43:21
**changing** [1] - 40:23
**Charles** [2] - 59:22, 60:11
**CHARLES** [1] - 1:9
**Charlton** [7] - 14:11, 15:8, 15:11, 18:20, 23:4, 25:9, 80:21
**check** [12] - 7:25, 38:22, 38:23, 38:25, 39:15, 42:24, 44:10, 51:18, 54:7, 67:7, 67:11, 75:4
**checks** [2] - 51:18, 52:5
**child** [1] - 11:2
**chooses** [1] - 71:5
**claim** [1] - 60:21
**claims** [2] - 60:17, 60:21
**clarification** [1] - 25:8
**clause** [1] - 61:2
**close** [1] - 28:13
**collection** [1] - 12:24
**combined** [1] - 25:17
**coming** [16] - 12:19, 13:10, 16:20, 18:17, 21:4, 22:10, 27:1, 27:20, 35:25, 40:11, 42:24, 51:4, 64:2, 79:7, 81:5, 81:8
**commenced** [1] - 51:22
**Commission** [1] - 82:16
**commissioned** [1] - 82:6
**committed** [1] - 38:4
**common** [1] - 27:5
**COMMONWEALTH** [2] - 82:2, 83:1
**Commonwealth** [1] - 82:7
**communicating** [1] - 72:16
**communication** [3] - 51:23, 52:6, 56:15
**community** [1] - 6:7
**company** [3] - 50:1, 50:5, 77:20
**compare** [2] - 39:3, 77:2
**compared** [1] - 80:15
**complaint** [1] - 7:7
**complicated** [1] - 27:7
**comport** [1] - 4:15
**computer** [1] - 49:14
**computer-based** [1] - 49:14
**con** [1] - 11:13
**concept** [1] - 46:14
**concerning** [11] - 21:1, 42:24, 46:8, 53:2, 55:24, 56:5, 59:15, 67:16, 68:14, 72:17, 73:10
**concerns** [1] - 81:14
**conducted** [1] - 58:18
**confess** [1] - 9:9
**confident** [1] - 81:9
**confusing** [1] - 33:20
**connect** [1] - 11:23
**connected** [2] - 18:5, 18:8
**connection** [1] - 18:13
**conscious** [1] - 54:15
**consider** [2] - 57:23, 74:18
**consideration** [2] - 12:25, 37:25
**considered** [2] - 17:11, 74:11
**considering** [1] - 57:22
**contacted** [1] - 52:9
**contain** [3] - 10:17, 60:13, 70:13
**contest** [3] - 68:21, 69:1, 69:21
**contesting** [1] - 69:4
**continued** [2] - 34:24
**continues** [1] - 78:1
**contract** [3] - 27:15, 27:17, 61:25
**contractual** [3] - 59:15, 59:16, 62:11
**controlled** [2] - 11:15, 22:8
**conversation** [6] - 51:1, 54:14, 55:4,

70:4, 73:4, 73:15
**conversations** [4] - 50:13, 69:10, 69:12, 73:19
**conveyed** [1] - 38:4
**copacetic** [1] - 20:4
**copy** [1] - 59:19
**correct** [100] - 7:16, 9:7, 9:14, 11:4, 12:5, 12:11, 12:20, 13:1, 13:2, 13:4, 13:5, 13:15, 14:1, 14:25, 15:9, 15:13, 15:22, 18:6, 18:23, 19:2, 19:7, 19:13, 19:16, 20:22, 21:2, 23:7, 23:12, 23:21, 24:2, 24:3, 24:8, 25:4, 25:11, 27:12, 27:13, 27:22, 28:3, 29:11, 29:19, 29:21, 30:20, 30:24, 31:3, 31:7, 31:11, 31:12, 31:17, 34:4, 34:8, 34:22, 35:19, 35:22, 36:7, 36:16, 36:18, 36:21, 37:2, 37:11, 38:1, 38:5, 38:19, 39:4, 41:24, 42:16, 42:20, 43:9, 43:13, 44:6, 45:20, 46:15, 46:19, 47:1, 47:14, 50:19, 51:5, 53:9, 54:3, 57:23, 58:18, 60:9, 62:3, 63:18, 64:3, 64:4, 64:24, 65:3, 65:6, 66:7, 66:11, 66:21, 66:23, 72:19, 73:11, 73:22, 73:25, 76:13, 76:16, 80:16, 83:20
**Correct** [36] - 12:9, 13:16, 15:10, 15:14, 16:1, 19:8, 20:23, 21:3, 23:6, 23:8, 23:13, 25:5, 27:14, 27:23, 29:6, 29:12, 29:20, 29:23, 30:25, 31:4, 34:5, 35:20, 36:19, 36:22, 38:2, 38:20, 43:10, 51:6, 55:8, 63:22, 66:12, 66:18, 76:14, 76:17, 78:7, 78:9
**corrected** [3] - 39:23, 44:8, 53:16
**correction** [6] - 8:10, 24:20, 44:5, 47:2, 47:6, 64:13
**corrections** [7] - 24:23, 44:23, 45:2, 46:5, 65:18, 65:20, 83:7
**correctly** [6] - 35:25, 37:21, 46:2, 46:3, 46:21, 79:6
**counsel** [8] - 51:23, 53:25, 59:17, 59:19, 60:9, 61:4, 82:10, 82:12
**COUNTY** [2] - 82:3, 83:2
**County** [1] - 82:7
**course** [8] - 8:4, 44:18, 48:1, 57:22, 68:19, 74:7, 74:11, 76:1
**court** [1] - 4:3
**COURT** [1] - 1:2
**covenants** [2] - 60:13, 60:14
**COVID** [4] - 71:6, 71:9, 71:21, 71:24
**created** [3] - 5:8, 43:25, 58:1
**credit** [2] - 77:17, 77:19
**credited** [1] - 21:8
**current** [3] - 43:16, 45:1, 77:14
**cut** [3] - 19:25, 51:17, 68:4

## D

**daily** [1] - 32:24
**data** [9] - 8:6, 8:14, 18:13, 18:17, 21:25, 26:4, 37:13, 40:11, 74:17
**date** [2] - 7:6, 19:19
**dated** [1] - 56:17
**DDP** [1] - 11:11
**dealing** [1] - 11:1
**December** [1] - 20:6
**decide** [1] - 67:22
**decided** [2] - 47:4, 47:6
**decimal** [1] - 39:7
**decision** [8] - 46:18, 46:20, 52:25, 54:15, 56:11, 56:14, 69:22
**decisions** [1] - 49:13
**declaration** [9] - 6:19, 6:22, 7:2, 38:10, 42:13, 42:16, 43:4, 43:8, 55:24
**Defendant** [1] - 2:8
**defendant** [1] - 1:16
**defense** [1] - 67:14
**define** [1] - 52:4
**definitely** [1] - 20:17
**delay** [1] - 54:23
**deletions** [1] - 83:7
**delivery** [3] - 10:1, 11:14, 11:16
**Delivery** [1] - 12:15
**Department** [5] - 57:3, 57:4, 57:12, 58:11, 58:16
**department** [1] - 61:7
**deponent** [1] - 81:22
**deposition** [10] - 4:8, 4:15, 43:6, 52:22, 55:14, 59:14, 81:23, 82:8, 82:11, 83:5
**DEPOSITION** [1] - 1:19
**depositions** [1] - 72:13
**derived** [2] - 33:7, 33:8
**describe** [1] - 33:21
**designated** [3] - 10:2, 27:14
**detail** [10] - 7:25, 8:3, 38:22, 38:23, 38:25, 39:16, 54:7, 67:7, 67:11
**details** [1] - 7:25
**determination** [1] - 53:18
**determine** [10] - 8:19, 27:12, 27:21, 28:4, 28:15, 45:10, 52:13, 75:10, 81:4, 81:7
**determined** [16] - 7:20, 7:24, 10:3, 11:23, 34:6, 34:9, 34:10, 34:21, 45:12, 45:19, 45:21, 47:9, 48:21, 72:18, 75:8, 77:24
**determines** [1] - 74:6
**determining** [1] - 72:20
**Diamond** [1] - 2:3
**difference** [7] - 19:22, 24:25, 25:13, 26:23, 39:5, 39:19, 42:11
**differences** [1] - 77:3
**different** [7] - 14:4, 15:4, 62:1, 62:5, 62:9, 75:15, 76:16
**Direct** [1] - 3:3
**direct** [3] - 58:14, 61:21, 79:17
**DIRECT** [1] - 4:4
**directly** [1] - 69:12
**disagree** [1] - 69:7
**disagrees** [1] - 68:20
**discharge** [1] - 60:22
**discover** [1] - 21:24
**Discussed** [1] - 72:7
**discussing** [1] - 72:12
**discussion** [1] - 59:14
**discussions** [4] - 17:15, 51:22, 70:4, 80:5
**dispute** [2] - 60:15, 60:21
**distinct** [1] - 14:3
**distribute** [2] - 35:10, 47:16
**distributed** [1] - 9:1
**distribution** [4] - 22:19, 33:25, 36:12, 53:15
**DISTRICT** [2] - 1:2, 1:3
**divided** [1] - 32:5
**division** [1] - 5:12
**documents** [2] - 67:4, 71:8
**dollar** [1] - 75:2
**dollars** [5] - 50:2, 50:3, 77:24, 78:1, 78:5
**done** [13] - 24:7, 26:10, 28:25, 29:25, 40:9, 42:14, 43:7, 47:9, 56:5, 64:6, 72:5, 73:1, 81:21
**door** [7] - 35:13, 49:4, 49:7, 50:10, 53:17, 74:8, 74:12
**down** [5] - 4:19, 33:2, 38:19, 71:7, 80:3
**drastically** [1] - 49:23
**drilled** [1] - 29:25
**driving** [1] - 78:22
**duly** [2] - 4:2, 82:6
**during** [2] - 51:5, 62:23

## E

**East** [1] - 2:3
**edit** [1] - 22:6
**eight** [8] - 13:21, 13:23, 21:16, 21:21, 26:6, 40:7, 63:1, 64:11
**either** [3] - 20:20, 21:6, 70:17
**electronic** [2] - 71:9, 71:22
**email** [2] - 61:8, 71:10
**employed** [2] - 82:10, 82:12
**employee** [1] - 82:11
**encompass** [2] - 5:11
**encountered** [2] - 54:22, 69:15
**end** [1] - 64:18
**ENERGY** [1] - 1:15
**Energy** [1] - 59:18
**entitled** [2] - 63:21, 64:20
**environment** [1] - 22:8
**Environmental** [5] - 57:3, 57:5, 57:12, 58:11, 58:16
**equation** [4] - 25:25, 32:13, 33:14, 41:17
**ERICA** [1] - 1:8
**erroneous** [1] - 56:23
**ESQUIRE** [2] - 2:2, 2:5
**essential** [1] - 10:1
**essentially** [1] - 48:25
**establish** [3] - 28:3, 29:4, 31:5
**established** [1] - 32:23
**et** [7] - 6:15, 25:21, 25:22, 28:10, 54:9, 60:25, 70:23
**event** [1] - 62:9
**exact** [2] - 19:19, 32:14
**exactly** [2] - 19:5, 62:8
**examination** [2] - 7:5, 7:20
**Examination** [1] - 3:3
**EXAMINATION** [1] - 4:4
**example** [9] - 10:8, 32:1, 38:12, 49:25, 63:6, 65:25, 71:1, 73:24, 80:7
**exceeds** [1] - 78:19
**Excel** [1] - 38:25
**except** [3] - 17:2, 58:23, 63:11
**exception** [2] - 63:2, 63:5
**excuse** [1] - 71:25
**Excuse** [1] - 81:16
**executed** [1] - 6:18
**exercise** [1] - 46:19
**exist** [1] - 60:1
**existence** [1] - 60:25
**existing** [2] - 30:3, 60:23
**expect** [1] - 16:16
**expectation** [1] - 16:19
**expected** [1] - 51:17
**expert** [1] - 11:18
**Expires** [1] - 82:16

**Explain** [1] - 13:11
**explain** [6] - 7:19, 24:17, 41:18, 54:17, 54:21, 75:12
**explained** [1] - 69:13
**explanation** [7] - 52:24, 53:1, 54:2, 69:17, 69:20, 72:17
**expression** [3] - 71:11, 78:15, 78:16
**extension** [1] - 74:20
**extra** [1] - 29:1
**extremely** [1] - 51:7

## F

**fact** [1] - 26:8
**factor** [1] - 39:9
**fairness** [1] - 69:12
**familiar** [11] - 4:11, 6:13, 6:20, 6:22, 6:23, 6:24, 54:18, 59:22, 59:25, 67:25, 70:10
**far** [6] - 20:18, 39:7, 52:18, 63:10, 68:25, 73:23
**favorable** [3] - 66:22, 66:24, 67:3
**February** [2] - 5:8, 6:1
**fed** [1] - 22:15
**feed** [3] - 10:21, 29:19, 81:12
**feeds** [1] - 18:13
**few** [2] - 34:12, 77:12
**fide** [1] - 60:17
**field** [2] - 9:12, 10:19
**Fifth** [1] - 2:7
**figure** [5] - 37:7, 41:21, 55:21, 64:7, 75:11
**figured** [3] - 37:6, 37:10, 39:13
**file** [1] - 55:22
**filed** [1] - 55:25
**filing** [1] - 7:6
**final** [1] - 60:20
**financially** [1] - 82:12
**findings** [1] - 68:21
**fine** [4] - 12:2, 16:25, 55:13, 61:10
**Firm** [1] - 2:2
**first** [7] - 5:22, 13:11, 13:12, 19:21, 23:17, 56:22, 76:19
**First** [1] - 6:13
**five** [12] - 13:16, 13:18, 13:25, 14:22, 15:6, 15:16, 15:18, 15:21, 16:3, 26:14, 80:19, 80:22
**Five** [2] - 14:2, 14:3
**flipped** [1] - 77:13
**fluctuates** [1] - 32:20
**focus** [2] - 46:1, 50:23
**following** [2] - 32:11, 83:6
**follows** [2] - 4:3, 60:12
**FOR** [1] - 1:3
**foregoing** [1] - 83:4
**Forgive** [1] - 23:1
**forgive** [1] - 16:24
**form** [24] - 21:9, 28:5, 31:19, 35:2, 37:4, 38:25, 49:15, 53:11, 54:4, 56:1, 57:24, 58:20, 58:22, 61:13, 62:1, 62:5, 62:6, 62:7, 68:23, 69:23, 72:9, 73:12, 74:1, 80:17
**formation** [2] - 80:4, 80:6
**formations** [1] - 80:5
**forms** [1] - 57:25
**formula** [79] - 22:1, 22:5, 22:11, 22:13, 22:23, 23:20, 23:22, 24:6, 24:14, 24:18, 24:19, 24:21, 24:25, 26:17, 28:3, 28:17, 28:18, 28:22, 29:3, 29:5, 29:9, 29:18, 29:21, 29:23, 29:25, 30:2, 30:4, 30:5, 30:12, 30:14, 30:16, 30:17, 30:19, 30:23, 31:6, 31:10, 31:16, 31:21, 32:1, 32:13, 32:15, 32:16, 32:20, 33:6, 33:9, 33:12, 33:16, 33:22, 33:24, 34:12, 34:16, 34:21, 34:25, 35:1, 35:24, 36:8, 39:23, 40:20, 40:21, 40:23, 40:25, 41:5, 41:15, 41:23, 42:3, 42:20, 44:7, 53:5, 53:14, 53:20, 57:23, 58:17, 59:9
**formulas** [1] - 33:22
**forth** [2] - 4:19, 38:14
**four** [25] - 14:4, 14:6, 18:19, 19:4, 19:5, 19:6, 20:24, 21:8, 23:3, 23:14, 25:7, 27:2, 31:14, 48:17, 48:18, 57:10, 62:18, 62:20, 62:21, 62:23, 80:1, 80:12, 80:14, 80:20
**Frantz** [14] - 14:13, 14:14, 14:15, 15:8, 15:11, 18:20, 23:4, 25:8, 25:22, 48:17, 57:1, 66:13, 80:21, 80:24
**Friday** [1] - 1:20
**front** [1] - 74:17
**full** [1] - 40:22
**funds** [1] - 64:5
**future** [1] - 51:18

## G

**gas** [12] - 11:17, 12:19, 13:1, 18:22, 18:24, 20:22, 23:16, 44:16, 48:16, 50:1, 76:21, 81:5
**GAS** [1] - 1:12
**gases** [2] - 28:2, 79:7
**general** [3] - 60:13, 70:24, 76:13
**generated** [2] - 7:25, 8:4
**gestures** [1] - 4:18
**given** [7] - 4:8, 5:6, 14:22, 49:5, 72:21, 73:9, 82:9
**global** [1] - 5:4
**Golf** [5] - 6:14, 7:8, 7:9, 38:10, 38:18
**GOLF** [1] - 1:5
**Green** [7] - 3:3, 4:7, 4:8, 55:17, 55:25, 61:10, 83:4
**GREEN** [13] - 1:19, 4:2, 28:7, 31:20, 37:5, 49:16, 55:18, 57:25, 58:21, 69:24, 72:11, 73:13, 80:18
**gREEN** [2] - 54:5, 68:24
**Group** [7] - 6:14, 7:8, 7:9, 7:22, 38:10, 38:18, 54:7
**group** [8] - 17:15, 35:15, 36:17, 36:20, 46:4, 61:16, 62:19
**GROUP** [1] - 1:5
**grouping** [1] - 80:25
**groups** [3] - 5:9, 5:13, 36:15
**guess** [36] - 4:11, 4:19, 6:6, 6:17, 8:22, 16:2, 17:5, 19:10, 20:1, 20:3, 20:14, 23:17, 24:7, 24:18, 29:4, 34:24, 36:15, 42:19, 45:7, 46:9, 47:22, 48:13, 48:17, 51:22, 55:20, 56:25, 57:23, 61:1, 62:11, 62:21, 72:3, 72:23, 75:1, 76:19, 77:16
**guidance** [1] - 5:17
**Gulf** [1] - 7:21

## H

**half** [3] - 32:10, 33:2
**hand** [1] - 82:13
**head** [2] - 11:7, 80:6
**hear** [3] - 8:20, 9:25, 55:17
**heard** [9] - 55:7, 68:2, 68:7, 68:8, 69:4, 69:6, 79:3, 80:4, 81:13
**heavyweight** [1] - 23:11
**held** [1] - 83:5
**hereby** [1] - 82:7
**hereunto** [1] - 82:13
**higher** [6] - 16:15, 16:17, 50:14, 76:22, 77:10, 78:23
**hire** [1] - 70:17
**Holly** [6] - 3:3, 4:7, 21:10, 28:6, 55:25, 83:4
**HOLLY** [2] - 1:19, 4:2
**honest** [3] - 20:8, 61:14, 71:17
**honestly** [1] - 15:4
**Honestly** [1] - 76:24
**Houston** [6] - 18:5, 18:7, 19:1, 71:13, 71:15, 71:19

## I

**idea** [3] - 23:2, 61:3, 72:16
**immediately** [2] - 36:25, 37:6
**impacted** [1] - 63:5
**IN** [1] - 1:2
**inaccurate** [1] - 35:1
**inaudible** [1] - 78:8
**INC** [1] - 1:15
**included** [2] - 25:20, 59:2
**includes** [1] - 62:19
**including** [1] - 31:14
**incomplete** [1] - 53:16
**increase** [3] - 63:10, 65:11, 67:3
**INDEX** [1] - 3:1
**indicate** [1] - 7:2
**indicated** [2] - 23:19, 24:7
**indicating** [1] - 81:14
**indication** [1] - 28:10
**individual** [10] - 23:2, 27:4, 27:10, 28:2, 29:8, 32:16, 50:18, 50:20, 57:17
**individuals** [3] - 39:2, 64:1, 64:2
**industry** [1] - 51:7
**information** [26] - 7:15, 8:14, 9:5, 17:21, 18:2, 18:7, 18:25, 21:1, 21:4, 21:23, 23:24, 35:12, 36:4, 42:23, 42:25, 44:1, 47:7, 47:16, 48:10, 63:19, 67:12, 70:5, 72:21, 73:5, 73:9, 75:18
**information-sharing** [1] - 70:5
**informed** [1] - 55:4
**initial** [5] - 8:16, 28:23, 34:15, 64:9, 64:10
**initiated** [2] - 70:4, 73:15
**initiates** [1] - 73:4
**inquire** [1] - 68:24
**inquiries** [4] - 52:12, 52:13, 53:23, 53:24
**inquiry** [2] - 72:24, 73:9
**Inquiry** [1] - 54:6
**inserted** [1] - 23:20
**insignificant** [2] - 73:25, 80:15
**instead** [1] - 25:15
**instructed** [1] - 4:14
**intent** [4] - 36:3, 72:25, 73:4, 74:23
**interest** [6] - 5:14, 44:21, 60:20, 66:12, 66:13, 66:14
**interested** [2] - 7:1, 82:12
**internal** [1] - 53:5
**internally** [1] - 53:9
**internet** [1] - 18:13
**interpret** [1] - 60:4
**interrupt** [5] - 4:24, 11:10, 11:25
**investigation** [3] - 19:11, 46:8, 56:6
**involved** [6] - 6:14, 11:4, 69:5, 69:13, 71:19, 72:3
**involving** [2] - 24:1,

36:21
**irrelevant** [1] - 31:16
**issue** [1] - 36:21
**issues** [2] - 51:21, 79:10
**IT** [6] - 22:8, 22:24, 24:7, 24:9, 34:11, 37:15

**J**

**JAMES** [1] - 1:8
**January** [4] - 5:20, 5:21, 56:17, 56:18
**job** [2] - 5:3, 5:6
**John** [3] - 52:22, 53:24, 54:15
**JOHN** [1] - 1:7
**Joyce** [3] - 36:24, 36:25, 37:24
**JR** [2] - 1:6, 2:2
**judgment** [1] - 60:16
**June's** [2] - 75:24, 75:25
**JUSTIN** [1] - 2:5
**Justin** [1] - 44:21

**K**

**kind** [11] - 7:2, 10:7, 18:12, 22:7, 38:15, 46:1, 55:23, 60:6, 61:17, 70:5, 70:22
**knowledge** [6] - 7:5, 7:16, 7:19, 38:3, 58:14, 79:17
**known** [3] - 17:16, 36:7, 46:15
**knows** [1] - 36:25
**Kronen** [1] - 38:13
**KRONEN** [2] - 1:5, 1:6

**L**

**lack** [1] - 72:4
**land** [4] - 5:12, 61:7, 61:16, 73:16
**language** [2] - 38:11, 38:14
**large** [2] - 25:21, 51:7
**last** [2] - 43:5, 76:3
**Lauren** [1] - 82:6
**Law** [1] - 2:2
**lawyer** [3] - 4:14, 60:6, 61:17
**learned** [1] - 37:19
**learning** [1] - 41:24
**lease** [9] - 59:18, 59:20, 59:21, 59:25, 60:10, 60:11, 60:15, 70:20, 71:4
**leases** [4] - 59:24, 60:4, 70:2, 70:13
**least** [7] - 15:19, 20:2, 35:21, 37:24, 43:12, 48:15, 54:14
**led** [1] - 53:6
**length** [1] - 56:9
**lengthen** [1] - 77:9
**lessee** [4] - 60:16, 60:18, 60:22, 73:8
**lessees** [1] - 54:1
**lesser** [1] - 59:8
**lessor** [4] - 60:14, 63:17, 68:20, 73:10
**lessor's** [1] - 60:14
**lessors** [7] - 54:1, 62:18, 62:23, 63:15, 65:2, 65:11, 68:11
**letter** [1] - 56:16
**letting** [1] - 68:14
**level** [9] - 8:2, 45:24, 45:25, 46:22, 47:17, 47:24, 49:18, 49:19, 73:24
**leveraged** [1] - 76:7
**levied** [1] - 60:24
**liens** [2] - 60:23
**life** [1] - 44:18
**Limited** [3] - 7:8, 7:9, 7:22
**LINDSAY** [48] - 1:5, 1:6, 1:7, 1:7, 1:8, 1:8, 1:9, 1:9, 1:10, 1:10, 1:11, 1:11, 1:12, 2:2, 4:5, 21:11, 34:1, 35:4, 37:9, 50:16, 53:12, 54:12, 55:13, 55:16, 55:19, 56:3, 56:4, 58:9, 59:13, 61:4, 61:11, 61:17, 61:20, 61:23, 62:4, 62:7, 62:15, 69:3, 71:25, 72:2, 72:14, 73:20, 74:2, 78:10, 78:12, 81:2, 81:16, 81:18
**Lindsay** [30] - 2:2, 3:3, 6:14, 7:7, 7:9, 7:21, 14:20, 15:8, 15:11, 18:21, 23:5, 25:9, 27:2, 38:10, 38:18, 52:21, 53:23, 54:14, 55:5, 55:12, 59:22, 60:11, 61:7, 63:8, 63:15, 66:9, 66:22, 67:5, 80:21, 80:24
**line** [1] - 64:19
**Line** [1] - 83:9
**lines** [1] - 4:23
**LISA** [1] - 1:10
**litigation** [6] - 6:14, 48:2, 60:16, 60:21, 67:15, 69:5
**LLP** [1] - 2:6
**local** [1] - 14:18
**locked** [1] - 31:21
**logic** [3] - 41:3, 41:4, 41:15
**look** [16] - 6:9, 9:4, 48:8, 48:9, 49:19, 60:7, 60:10, 61:12, 61:24, 62:12, 65:14, 66:15, 68:15, 74:14, 74:25, 77:4
**looked** [4] - 8:14, 46:10, 59:24, 63:4
**looking** [14] - 6:3, 6:6, 6:7, 6:8, 14:21, 26:11, 29:9, 48:6, 48:7, 50:12, 50:14, 50:24, 75:22
**looks** [3] - 45:24, 47:24, 66:12
**lost** [1] - 23:1
**lower** [2] - 68:16, 77:12
**LTD** [1] - 1:5

**M**

**ma'am** [1] - 14:18
**mailed** [1] - 38:23
**Maloy** [7] - 52:22, 52:23, 53:24, 54:15, 55:5, 59:15, 59:17
**manager** [1] - 5:23
**managing** [1] - 45:2
**manually** [5] - 26:11, 26:12, 58:1, 59:10, 59:11
**Marcellus** [2] - 80:2, 80:3
**March** [1] - 5:24
**MARY** [1] - 1:9
**match** [1] - 78:3
**math** [11] - 32:14, 39:18, 41:3, 41:17, 41:20, 41:22, 42:23, 47:9, 47:18
**mathematical** [1] - 25:25
**matter** [2] - 7:16, 55:24
**May's** [2] - 75:23, 75:24
**MCF** [5] - 10:9, 41:13, 41:14
**McIntyre** [8] - 11:9, 11:10, 11:22, 12:13, 12:18, 25:17, 27:16, 79:23
**mean** [22] - 9:23, 11:25, 17:14, 19:25, 20:14, 30:24, 45:10, 52:18, 53:14, 56:2, 69:24, 70:3, 71:14, 71:15, 71:16, 71:17, 72:15, 72:23, 74:4, 77:16, 78:24, 79:22
**means** [3] - 48:25, 78:17, 78:19
**meant** [3] - 22:16, 26:19, 48:5
**measure** [3] - 16:13, 78:20, 79:7
**measurement** [9] - 11:18, 28:7, 28:8, 79:10, 79:16, 81:8, 81:10, 81:12, 81:15
**mention** [1] - 46:16
**mentioned** [5] - 21:24, 26:17, 44:19, 59:17, 70:10
**meshing** [1] - 77:23
**met** [1] - 67:11
**meter** [62] - 11:20, 11:21, 12:4, 12:10, 12:12, 12:24, 13:6, 13:8, 15:17, 15:18, 15:20, 15:24, 15:25, 16:2, 16:4, 16:5, 16:9, 16:13, 17:2, 17:3, 17:6, 17:10, 17:11, 17:21, 17:22, 17:24, 17:25, 18:2, 18:10, 19:12, 19:16, 20:13, 22:3, 23:23, 24:13, 25:3, 25:10, 25:17, 26:4, 26:18, 27:11, 27:16, 28:20, 29:22, 30:1, 30:3, 30:12, 31:2, 32:2, 33:17, 34:19, 57:7, 57:16, 78:14, 78:17, 78:20, 79:1, 79:6, 79:13
**metered** [12] - 10:18, 11:22, 22:15, 25:14, 25:18, 28:12, 28:14, 29:13, 30:6, 53:20, 57:9, 58:21
**metering** [4] - 12:19, 17:17, 23:16, 23:20
**meters** [59] - 10:19, 10:20, 13:3, 13:6, 13:9, 15:13, 15:21, 17:4, 17:7, 17:12, 17:13, 17:18, 17:23, 18:4, 18:8, 18:21, 19:12, 20:2, 20:8, 20:15, 20:19, 20:21, 20:25, 21:3, 21:7, 21:25, 23:5, 23:15, 24:11, 24:13, 24:14, 26:3, 27:10, 28:20, 28:21, 29:1, 30:9, 30:18, 33:9, 33:13, 33:23, 34:3, 34:20, 41:11, 57:16, 57:17, 58:4, 58:5, 58:6, 59:1, 78:15, 79:1, 79:6, 81:11, 81:14
**Microsoft** [1] - 38:25
**might** [3] - 5:14, 33:17, 43:18
**million** [2] - 50:2
**minute** [1] - 78:10
**misallocated** [2] - 36:5, 75:1
**misallocation** [6] - 9:14, 9:15, 20:12, 36:9, 37:1, 68:22
**miscalculation** [1] - 9:19
**misproportioned** [1] - 22:20
**missing** [1] - 59:9
**mistake** [3] - 50:4, 50:8, 51:13
**mix** [1] - 78:3
**mixing** [1] - 76:8
**moment** [2] - 55:9, 81:16
**Monday** [1] - 82:14
**money** [15] - 35:13, 49:4, 50:3, 50:9, 50:21, 50:25, 51:10, 51:12, 51:13, 51:16, 63:13, 63:24, 63:25, 73:18, 75:9
**money's** [1] - 64:13
**month** [28] - 10:9, 19:21, 20:18, 31:10, 31:11, 31:16, 32:11, 32:20, 32:25, 33:2, 34:17, 39:3, 43:16, 45:1, 67:23, 75:13, 75:15, 76:3, 76:9, 76:17, 77:1, 77:18, 77:20
**month's** [2] - 75:17, 77:15
**month-to-month** [1] - 31:16
**monthly** [2] - 43:15, 58:12
**months** [18] - 5:22, 8:4, 22:13, 24:22, 34:12, 37:20, 40:1,

43:24, 51:14, 65:8, 76:7, 76:8, 76:13, 76:20, 77:12, 77:22, 78:2
**mortgages** [1] - 60:23
**most** [4] - 70:3, 71:9, 71:21, 80:25
**moved** [1] - 5:24
**MR** [59] - 4:5, 21:9, 21:11, 28:5, 31:19, 34:1, 35:2, 35:4, 37:4, 37:9, 49:15, 50:16, 53:11, 53:12, 54:4, 54:12, 55:11, 55:13, 55:16, 55:19, 56:1, 56:3, 56:4, 57:24, 58:9, 58:20, 59:13, 61:4, 61:6, 61:11, 61:14, 61:17, 61:20, 61:21, 61:23, 62:3, 62:4, 62:6, 62:7, 62:14, 62:15, 68:23, 69:3, 69:23, 71:25, 72:2, 72:9, 72:14, 73:12, 73:20, 74:1, 74:2, 78:10, 78:12, 80:17, 81:2, 81:16, 81:18, 81:20
**MS** [13] - 28:7, 31:20, 37:5, 49:16, 54:5, 55:18, 57:25, 58:21, 68:24, 69:24, 72:11, 73:13, 80:18
**multiple** [4] - 17:18, 24:14, 30:6, 81:11
**multiplied** [1] - 32:19
**must** [1] - 9:9

**N**

**name** [9] - 4:6, 5:7, 11:8, 14:4, 15:3, 36:24, 45:16, 45:17
**named** [2] - 14:2, 82:7
**names** [2] - 14:4, 14:23
**necessitated** [1] - 29:3
**need** [14] - 4:16, 16:12, 27:6, 29:3, 30:2, 30:4, 30:17, 33:18, 35:10, 44:22, 46:23, 50:13, 55:10, 70:6
**needed** [25] - 18:17, 22:2, 22:23, 22:24, 23:23, 24:14, 26:17, 28:21, 28:22, 30:6, 34:11, 35:18, 35:24, 36:6, 36:8, 43:18, 43:22, 45:22, 46:23, 47:10, 47:14, 53:20, 54:24, 59:9, 79:11
**needing** [3] - 53:14, 58:2, 76:3
**needs** [4] - 33:1, 51:1, 52:8, 73:14
**netting** [1] - 66:4
**never** [7] - 27:3, 28:21, 28:22, 54:22, 55:1, 55:7, 68:2
**new** [7] - 5:8, 5:18, 24:13, 30:1, 40:20, 47:16, 49:2
**Nine** [2] - 13:24, 13:25
**nine** [23] - 10:16, 11:3, 11:17, 12:8, 12:20, 13:1, 13:12, 13:15, 13:19, 14:3, 14:21, 22:20, 25:16, 25:24, 27:1, 28:24, 29:8, 29:18, 31:14, 32:16, 33:25, 66:15, 80:25
**non** [4] - 23:3, 23:15, 48:18, 48:20
**non-Trilogy** [4] - 23:3, 23:15, 48:18, 48:20
**normal** [1] - 60:4
**Notary** [3] - 82:6, 82:19, 83:25
**note** [1] - 59:20
**nothing** [1] - 82:8
**notice** [2] - 6:19, 82:7
**notification** [2] - 56:9, 68:11
**notify** [1] - 56:12
**November** [4] - 48:13, 49:12, 76:16, 76:22
**number** [11] - 7:3, 20:18, 29:9, 54:7, 72:24, 74:6, 74:14, 74:15, 77:19, 77:24, 78:1
**Number** [17] - 16:6, 16:9, 23:24, 24:3, 24:12, 24:16, 25:21, 25:24, 26:21, 28:21, 33:12, 40:4, 41:7, 58:24, 63:2, 63:10
**numbers** [4] - 44:2, 57:5, 57:6, 58:15

**O**

**object** [16] - 21:9, 31:19, 35:2, 37:4, 49:15, 53:11, 54:4, 56:1, 57:24, 58:20, 68:23, 69:23, 72:9, 73:12, 74:1, 80:17
**Object** [1] - 28:5
**occur** [7] - 19:18, 51:2, 65:10, 67:17, 67:20, 73:19, 73:21
**occurred** [8] - 8:12, 10:15, 20:11, 46:12, 50:15, 53:19, 66:3, 69:7
**occurring** [4] - 32:24, 46:7, 52:10, 53:9
**occurs** [2] - 27:19, 51:16
**October** [9] - 37:15, 37:23, 42:19, 44:6, 49:11, 76:4, 76:5, 76:6
**OF** [8] - 1:3, 1:19, 4:1, 82:1, 82:2, 82:3, 83:1, 83:2
**office** [5] - 71:7, 71:12, 71:21, 82:13
**offset** [2] - 66:25, 67:3
**often** [2] - 28:17, 58:10
**oil** [2] - 44:16, 50:1
**OIL** [1] - 1:12
**once** [10] - 16:22, 29:4, 31:9, 38:8, 39:23, 40:15, 49:3, 64:18, 69:13, 70:3
**one** [51] - 7:1, 9:25, 10:4, 12:10, 12:12, 12:24, 13:15, 13:19, 14:24, 15:16, 15:18, 15:19, 15:24, 15:25, 16:9, 16:13, 17:1, 17:2, 17:3, 17:6, 17:22, 18:1, 19:12, 20:9, 20:16, 20:17, 21:6, 24:4, 24:5, 27:1, 28:13, 29:2, 29:9, 31:2, 31:13, 32:1, 33:15, 33:17, 36:11, 38:14, 41:6, 47:22, 59:7, 63:6, 63:15, 63:20, 66:10, 77:23, 78:13
**One** [1] - 51:21
**ones** [1] - 63:21
**operate** [1] - 34:25
**opportunities** [1] - 6:8
**opposed** [2] - 78:5, 78:8
**option** [4] - 51:9, 60:19, 60:22, 73:18
**order** [2] - 5:12, 33:5
**ordinary** [1] - 20:4
**Organization** [1] - 5:5
**organization** [11] - 5:15, 5:23, 5:24, 6:4, 8:15, 18:18, 35:23, 36:11, 39:22, 73:16, 73:17
**original** [14] - 8:7, 8:19, 8:21, 8:22, 21:18, 21:19, 33:7, 39:17, 41:6, 42:6, 42:10, 43:25, 46:10, 75:16
**originally** [4] - 9:6, 41:12, 42:5, 66:25
**outlier** [1] - 80:2
**outliers** [1] - 57:10
**outlined** [2] - 62:17, 62:23
**over-allocated** [1] - 63:3
**over-settled** [1] - 67:1
**overpaid** [12] - 7:7, 7:10, 7:20, 38:17, 48:22, 49:1, 49:23, 51:12, 64:12, 64:17, 65:25, 77:10
**overpayment** [11] - 8:12, 39:4, 49:3, 50:7, 51:6, 51:19, 53:19, 64:21, 73:14, 73:18
**overpayments** [2] - 50:12, 50:17
**owe** [1] - 77:19
**owed** [1] - 77:25
**own** [11] - 8:2, 13:8, 15:12, 15:17, 15:25, 17:2, 23:5, 26:25, 64:15, 66:17, 76:17
**owned** [3] - 66:1, 66:2, 66:15
**Owner** [1] - 54:6
**owner** [22] - 38:23, 39:16, 47:17, 49:18, 50:21, 51:11, 51:17, 52:4, 52:9, 54:6, 55:2, 64:12, 65:24, 69:10, 70:16, 71:5, 72:24, 73:3, 73:8, 73:10, 74:8
**owner's** [2] - 51:18, 69:25
**owners** [15] - 8:2, 8:9, 47:3, 48:21, 49:23, 63:6, 64:11, 64:15, 64:17, 64:23, 70:1, 70:2, 72:17, 74:14, 74:15
**ownership** [2] - 43:20, 44:20
**owns** [3] - 5:13, 63:7, 63:8

**P**

**PA** [2] - 2:3, 2:7
**pad** [1] - 14:24
**pads** [1] - 15:4
**page** [2] - 56:22, 83:9
**PAGE** [1] - 3:2
**pages** [1] - 83:4
**paid** [14] - 27:10, 27:13, 27:25, 39:6, 46:21, 47:18, 47:19, 47:20, 53:18, 64:15, 64:22, 64:24, 67:24, 79:2
**paragraph** [8] - 7:1, 7:11, 38:8, 38:9, 38:13, 60:12, 62:8
**Paragraph** [1] - 7:4
**paragraphs** [1] - 7:3
**part** [7] - 13:19, 41:16, 43:15, 44:16, 58:3, 60:3, 66:17
**particular** [22] - 7:21, 9:12, 10:14, 10:19, 11:4, 11:5, 12:7, 16:14, 22:5, 23:10, 33:20, 43:21, 50:15, 50:17, 50:24, 52:11, 53:22, 59:21, 68:9, 72:3, 72:6, 75:19
**parties** [2] - 82:11, 82:12
**party** [2] - 43:20, 62:6
**past** [3] - 71:6, 71:20, 78:22
**PATRICIA** [1] - 1:7
**pause** [3] - 72:1, 78:11, 81:17
**pay** [1] - 60:22
**paying** [2] - 77:18, 77:20
**payment** [23] - 8:10, 8:13, 8:22, 8:23, 9:5, 9:7, 39:3, 39:5, 39:12, 39:13, 39:17, 39:18, 39:19, 40:18, 40:19, 41:21, 49:14, 54:9, 60:19, 64:10, 66:2
**payments** [26] - 8:7, 8:8, 21:19, 24:24, 35:22, 39:1, 39:6, 44:10, 45:7, 45:10, 45:11, 45:20, 48:15, 51:19, 51:25, 53:8, 53:16, 53:25, 62:16, 62:22, 65:23, 67:9, 67:21, 68:4, 74:7, 74:12
**pays** [1] - 25:19

**pegged** [2] - 78:17, 78:21
**pennies** [1] - 39:8
**Pennsylvania** [8] - 57:3, 57:25, 58:8, 58:11, 58:16, 58:22, 58:25, 59:10
**PENNSYLVANIA** [3] - 1:3, 82:2, 83:1
**penny** [1] - 38:19
**people** [4] - 35:15, 56:12, 64:21, 68:15
**per** [1] - 32:5
**percent** [15] - 20:19, 22:18, 26:14, 30:8, 32:5, 32:9, 33:17, 34:16, 35:8, 40:3, 40:14, 41:5, 41:9, 41:11, 57:2
**percentage** [12] - 32:13, 32:18, 40:5, 40:25, 41:14, 41:18, 41:25, 42:6, 42:7, 42:21, 67:23, 68:5
**Percentage** [1] - 42:1
**percentages** [3] - 32:21, 33:3, 41:23
**period** [10] - 8:21, 43:17, 48:12, 51:5, 53:8, 62:24, 67:8, 76:12, 81:3, 81:15
**permanent** [1] - 17:12
**person** [8] - 36:8, 36:13, 44:14, 45:14, 49:17, 50:23, 73:17, 82:7
**personal** [3] - 7:4, 7:16, 7:19
**personally** [6] - 15:5, 26:16, 43:1, 54:25, 68:1, 69:15
**perspective** [7] - 11:20, 35:6, 44:17, 48:9, 50:11, 60:5, 69:25
**pertinent** [1] - 62:24
**phrase** [3] - 8:11, 17:8, 49:21
**physical** [1] - 26:11
**physically** [3] - 12:17, 18:11, 71:21
**piece** [3] - 20:19, 48:7, 48:8
**Pittsburgh** [1] - 2:7
**pivotal** [2] - 19:10, 20:18
**place** [11] - 10:2, 17:12, 18:21, 24:20, 49:20, 49:24, 50:13, 52:8, 68:12, 69:14, 79:11
**placed** [3] - 7:9, 19:16, 25:10
**plaintiff** [2] - 7:21, 59:22
**Plaintiff** [3] - 1:19, 7:7, 38:17
**plaintiffs** [5] - 38:12, 48:16, 51:24, 56:10, 62:1
**Plaintiffs** [2] - 1:13, 2:4
**plural** [1] - 13:6
**pocket** [2] - 64:15, 64:22
**Point** [1] - 12:15
**point** [49] - 8:5, 9:25, 10:1, 10:2, 10:5, 10:15, 10:16, 11:5, 11:6, 11:14, 11:16, 11:21, 12:5, 12:11, 12:12, 12:24, 18:1, 19:15, 20:7, 23:19, 25:6, 26:25, 27:5, 27:11, 27:14, 27:18, 27:20, 28:9, 28:11, 28:16, 28:24, 28:25, 29:10, 29:12, 29:13, 29:15, 29:16, 29:17, 29:19, 32:1, 37:23, 39:7, 45:18, 45:24, 46:4, 46:14, 46:18, 66:6, 72:15
**points** [2] - 27:5, 28:14
**policy** [7] - 54:20, 55:2, 67:16, 67:18, 68:14, 68:17, 72:22
**portion** [5] - 5:14, 21:14, 21:15, 21:20, 77:18
**portions** [1] - 5:12
**position** [5] - 5:8, 5:18, 5:20, 21:5, 50:5
**positive** [1] - 15:1
**possession** [1] - 56:16
**possible** [1] - 20:14
**post** [1] - 47:15
**PPAs** [1] - 8:21
**practice** [4] - 5:17, 51:8, 52:2, 52:4
**pre** [1] - 71:6
**pre-COVID** [1] - 71:6
**precise** [1] - 57:14
**precisely** [2] - 81:4, 81:7
**prefer** [1] - 4:21
**premises** [1] - 60:15
**preparation** [2] - 43:5, 43:8
**prepare** [1] - 57:20
**prepared** [1] - 59:11
**previous** [1] - 37:11
**price** [18] - 27:17, 43:20, 75:3, 75:14, 75:15, 75:20, 75:22, 75:24, 75:25, 76:5, 76:9, 76:11, 76:18, 76:24, 76:25, 77:6, 77:15
**prices** [7] - 76:8, 76:13, 76:15, 76:21, 77:3, 77:11, 77:12
**pricing** [5] - 44:20, 77:2, 77:22, 78:2, 78:3
**problem** [2] - 12:1, 61:19
**PROCEEDINGS** [1] - 4:1
**process** [20] - 5:4, 43:16, 44:22, 46:19, 48:13, 49:11, 50:11, 50:22, 60:4, 67:17, 67:22, 67:25, 68:12, 68:19, 69:21, 70:1, 70:11, 71:20, 72:4, 74:5
**processes** [1] - 6:9
**produce** [6] - 26:10, 32:8, 32:12, 80:19, 80:20
**Produce** [3] - 5:4, 5:10
**produced** [16] - 10:8, 10:10, 10:11, 18:24, 19:3, 19:6, 22:18, 26:2, 26:7, 26:22, 27:6, 31:25, 32:18, 33:23, 57:15, 58:3
**producer** [4] - 22:21, 22:22, 79:19, 80:22
**produces** [1] - 16:12
**producing** [4] - 19:2, 23:7, 24:13, 79:15
**Production** [5] - 36:17, 57:3, 57:5, 57:12, 58:16
**production** [49] - 5:15, 8:4, 10:21, 13:9, 17:22, 17:24, 19:21, 20:7, 21:24, 22:1, 22:2, 22:10, 23:22, 24:21, 24:22, 25:1, 30:24, 31:2, 31:5, 31:9, 31:15, 32:24, 34:11, 34:14, 35:23, 36:8, 36:14, 36:20, 37:2, 37:15, 39:3, 39:23, 40:1, 40:11, 43:16, 43:24, 44:7, 44:17, 46:6, 57:13, 59:5, 64:10, 75:17, 76:8, 79:11, 80:23, 80:25, 81:10
**project** [1] - 6:3
**projects** [3] - 5:16, 5:25, 6:2
**pronounce** [1] - 14:17
**proportion** [2] - 9:3, 28:15
**proportionate** [2] - 9:2, 31:24
**proportioned** [1] - 37:21
**Protection** [1] - 58:11
**provide** [1] - 5:16
**provided** [4] - 54:10, 59:19, 60:18, 67:4
**provision** [1] - 70:13
**provisions** [3] - 61:9, 61:21, 62:11
**Public** [3] - 82:6, 82:19, 83:25
**pull** [2] - 5:13, 38:24
**pulling** [1] - 30:10
**pursuant** [1] - 82:7
**put** [10] - 8:9, 9:19, 30:12, 36:25, 41:4, 48:23, 48:24, 51:8, 65:16, 78:14
**putting** [2] - 20:25, 29:22


## Q


**qualified** [1] - 82:6
**questioned** [1] - 56:9
**questions** [9] - 4:12, 4:17, 55:3, 61:8, 61:10, 72:25, 73:5, 81:19
**quick** [1] - 55:11
**quickly** [1] - 77:21
**quote** [2] - 6:23, 6:25


## R


**ran** [1] - 24:23
**rather** [1] - 27:11
**reach** [2] - 50:7, 50:20
**reached** [1] - 51:11
**read** [4] - 57:1, 60:2, 81:20, 83:4
**readjustment** [1] - 10:15
**reads** [2] - 18:11, 60:12
**reallocated** [3] - 45:20, 65:21, 65:22
**reallocation** [2] - 19:22, 66:23
**really** [2] - 33:18, 50:24
**Reason** [1] - 83:9
**reason** [1] - 45:23
**rebook** [4] - 8:20, 44:1, 46:21, 75:17
**rebooked** [1] - 42:7
**recalculate** [3] - 44:2, 45:6, 45:11
**recalculation** [2] - 44:9, 77:1
**receive** [6] - 18:2, 35:9, 39:17, 43:19, 44:19, 44:20
**received** [9] - 10:17, 26:3, 26:21, 27:18, 39:22, 41:9, 50:2, 73:17, 74:8
**receives** [1] - 32:21
**receiving** [4] - 52:5, 54:9, 66:9, 69:16
**recessed** [1] - 55:14
**recollection** [1] - 17:14
**recommendations** [1] - 5:17
**reconvened** [1] - 55:15
**record** [5] - 18:22, 31:13, 47:7, 55:16, 82:8
**recorded** [2] - 28:2, 58:10
**recording** [2] - 20:21, 43:25
**recordings** [4] - 36:12, 42:10, 45:23
**records** [1] - 7:6
**recoup** [7] - 49:6, 51:9, 67:23, 77:10, 77:13, 77:14, 77:25
**recouped** [7] - 9:6, 49:4, 51:14, 63:24, 64:5, 73:15, 75:10
**recouping** [3] - 64:16, 76:7, 77:11
**recoupment** [47] - 7:10, 9:8, 43:13, 46:15, 46:16, 46:19, 46:23, 47:1, 47:5, 47:10, 47:23, 47:25, 48:9, 48:14, 48:24, 49:13, 49:18, 49:20, 50:9, 51:16, 52:8, 53:7, 59:15, 61:2, 61:5, 62:10, 64:8, 64:23, 67:10, 67:20,

68:5, 68:12, 69:5, 69:11, 72:4, 72:7, 72:12, 76:1, 76:6, 77:8, 77:15, 78:1, 78:4, 78:5
**recourse** [1] - 70:7
**recruitment** [2] - 47:3, 67:14
**redistribute** [2] - 40:2, 40:13
**redistributed** [5] - 26:5, 26:8, 26:20, 34:17, 40:7
**redistribution** [1] - 76:4
**redo** [1] - 42:19
**Redo** [1] - 42:21
**reduce** [2] - 51:19, 67:24
**reduces** [2] - 49:2, 77:21
**reduction** [1] - 63:9
**redundant** [1] - 16:23
**Reed** [2] - 2:6, 2:6
**refer** [2] - 35:14, 61:9
**referred** [2] - 10:1, 59:18
**referring** [3] - 38:15, 61:5, 61:22
**refers** [2] - 38:10, 38:13
**reflect** [1] - 40:23
**reflected** [1] - 67:4
**reflection** [1] - 67:6
**regard** [12] - 15:15, 35:19, 40:16, 49:13, 56:8, 62:21, 63:23, 64:5, 67:13, 67:19, 68:22, 80:11
**regular** [1] - 44:24
**related** [1] - 82:10
**relative** [3] - 79:22, 79:23, 82:11
**relevant** [1] - 31:20
**remember** [4] - 7:11, 70:7, 72:11, 72:12
**removal** [1] - 6:19
**rephrase** [1] - 25:13
**replica** [1] - 7:3
**report** [5] - 55:23, 57:20, 58:24, 59:6, 59:10
**Report** [3] - 5:5, 5:10
**report"** [1] - 56:2
**reported** [4] - 57:2, 57:4, 57:11, 58:7
**REPORTER** [1] - 82:1
**reporter** [1] - 4:3
**reports** [1] - 58:8
**represent** [4] - 33:19, 33:23, 41:10, 46:24
**represented** [4] - 30:8, 33:11, 40:22, 57:7
**representing** [2] - 35:8, 53:17
**represents** [1] - 11:21
**reprocessed** [1] - 40:1
**request** [2] - 5:1, 70:19
**requested** [1] - 59:16
**require** [1] - 6:10
**required** [2] - 22:8, 65:8
**requires** [1] - 73:2
**rerun** [2] - 40:1, 47:14
**rerunning** [1] - 40:12
**research** [2] - 54:23, 73:2
**researched** [1] - 54:10
**resettle** [1] - 44:2
**resource** [2] - 22:8, 22:24
**respects** [1] - 83:19
**response** [1] - 54:23
**responsible** [1] - 43:15
**restricted** [1] - 56:15
**result** [2] - 47:2, 64:2
**resulted** [3] - 9:16, 48:14, 56:24
**reve** [1] - 38:4
**revenue** [63] - 5:11, 5:23, 6:5, 8:1, 8:15, 10:17, 10:22, 11:20, 22:17, 24:23, 25:1, 25:18, 26:2, 27:9, 35:6, 35:11, 35:14, 35:17, 35:18, 35:21, 35:25, 36:1, 36:10, 36:17, 38:4, 39:22, 39:25, 40:11, 40:12, 41:8, 41:9, 42:24, 43:14, 43:23, 44:16, 44:25, 45:6, 45:22, 45:23, 46:1, 46:21, 46:24, 47:12, 47:23, 48:7, 48:10, 49:2, 49:6, 58:23, 59:1, 59:6, 59:8, 60:3, 64:2, 66:9, 69:10, 73:16, 77:11, 77:14, 77:25, 81:13
**Revenue** [2] - 35:15, 47:6
**reversal** [4] - 8:8, 8:20, 43:25, 75:16
**reverse** [1] - 46:20
**reversed** [1] - 47:20
**review** [3] - 50:19, 50:20, 50:22
**reviews** [1] - 49:17
**Revised** [2] - 40:17, 40:18
**revised** [19] - 8:10, 8:17, 8:23, 9:6, 39:3, 39:10, 39:11, 39:12, 39:13, 39:18, 39:19, 39:24, 40:16, 40:19, 42:10, 43:19, 44:19, 46:24, 48:22
**rights** [2] - 70:1, 70:2
**role** [1] - 50:24
**royalties** [21] - 7:7, 7:10, 7:21, 9:14, 9:17, 27:9, 27:21, 27:24, 28:4, 34:7, 35:19, 36:12, 38:17, 39:6, 40:10, 47:8, 51:5, 60:18, 60:19, 65:11, 67:24
**royalty** [15] - 24:24, 35:11, 45:7, 45:11, 45:20, 45:25, 48:7, 48:15, 69:24, 70:1, 70:16, 71:5, 72:17, 74:7, 74:11
**rude** [1] - 16:19
**run** [8] - 6:9, 43:17, 44:23, 46:5, 47:6, 64:13, 65:16, 65:17
**running** [1] - 45:2


## S


**sale** [1] - 27:15
**sales** [69] - 8:16, 9:25, 10:5, 11:5, 11:6, 11:21, 11:23, 12:5, 12:10, 12:12, 18:1, 21:19, 22:19, 25:14, 25:18, 25:19, 25:20, 25:23, 26:1, 26:4, 26:8, 26:19, 26:22, 26:25, 27:5, 27:11, 27:18, 27:20, 27:23, 28:9, 28:11, 28:12, 28:24, 29:10, 29:15, 29:16, 29:19, 29:24, 30:19, 30:21, 30:23, 31:6, 31:12, 32:1, 32:19, 32:22, 33:3, 33:24, 35:7, 35:9, 35:10, 36:11, 40:2, 40:13, 40:21, 41:9, 41:11, 45:24, 46:2, 65:21, 75:7, 75:10, 75:13, 75:14
**Sales** [1] - 75:6
**sat** [1] - 71:7
**saw** [2] - 46:7, 71:24
**seal** [1] - 82:13
**second** [8] - 4:22, 17:10, 21:6, 25:3, 25:9, 39:7, 71:25, 78:14
**section** [1] - 35:15
**see** [12] - 6:7, 19:21, 32:25, 36:24, 46:10, 49:19, 50:6, 50:12, 50:24, 52:5, 67:6, 77:3
**sees** [1] - 48:25
**sell** [2] - 32:7, 32:9
**selling** [1] - 27:1
**send** [3] - 50:8, 51:13, 73:18
**sense** [3] - 29:23, 51:20, 76:10
**sent** [7] - 19:1, 50:25, 53:17, 61:13, 67:7, 67:11
**separate** [2] - 14:21, 30:19
**September** [31] - 24:22, 34:6, 34:9, 34:14, 34:18, 34:25, 37:20, 40:20, 42:18, 42:19, 43:12, 44:4, 44:5, 44:10, 45:9, 45:18, 45:19, 46:6, 48:13, 51:21, 65:1, 65:4, 65:6, 75:23, 76:3, 76:12, 76:15, 76:21, 76:22, 82:14, 82:16
**set** [3] - 29:24, 31:10
**settle** [1] - 36:4
**settled** [4] - 35:7, 40:8, 48:10, 67:1
**settlement** [2] - 35:13, 60:21
**settling** [1] - 45:1
**setup** [1] - 28:23
**several** [1] - 13:9
**Shale** [1] - 80:3
**shall** [1] - 60:15
**share** [2] - 9:2, 31:24
**sharing** [1] - 70:5
**shoot** [1] - 61:8
**shorted** [1] - 64:1
**show** [2] - 19:2, 19:11
**showed** [1] - 19:11
**showing** [4] - 22:18, 22:21, 31:2, 67:4
**shown** [1] - 8:12
**shows** [2] - 26:10, 39:4
**shrug** [1] - 4:18
**shut** [1] - 33:2
**sic** [1] - 11:15
**side** [1] - 67:15
**sign** [1] - 81:20
**signature** [2] - 81:22, 82:9
**significance** [2] - 58:17, 77:7
**significant** [9] - 28:2, 50:25, 73:14, 73:21, 74:6, 74:11, 74:13, 74:16, 74:18
**significantly** [3] - 16:15, 16:17, 76:21
**simple** [1] - 10:8
**simplify** [1] - 6:11
**simply** [3] - 50:18, 51:4, 77:16
**single** [1] - 52:7
**sit** [3] - 27:15, 27:19, 50:23
**site** [1] - 14:24
**sitting** [1] - 61:6
**situation** [6] - 9:25, 11:4, 28:19, 29:1, 50:15, 52:8
**slowly** [1] - 12:23
**small** [2] - 5:14, 50:18
**smaller** [1] - 50:22
**Smith** [2] - 2:6, 2:6
**smoothly** [1] - 6:9
**so..** [2] - 61:15, 61:16
**software** [1] - 6:7
**sold** [9] - 8:25, 10:3, 10:4, 10:9, 27:16, 28:10, 28:16, 29:13, 44:21
**someone** [7] - 11:2, 35:14, 35:21, 43:11, 54:16, 69:19, 72:20
**sometime** [3] - 19:20, 44:8, 46:6
**Sometimes** [1] - 73:1
**sometimes** [8] - 4:22, 8:20, 9:25, 43:19, 43:20, 44:19, 44:20, 73:2
**somewhat** [1] - 62:8
**somewhere** [1] - 49:11
**soon** [1] - 67:10
**Sorry** [2] - 14:16, 15:23
**sorry** [14] - 10:25, 11:1, 12:21, 12:22, 20:10, 21:14, 27:7, 41:13, 42:9, 44:15, 45:5, 48:3, 70:1, 74:21
**sorry,** [1] - 74:24
**sound** [3] - 16:18, 16:19, 61:17

**special** [4] - 5:16, 5:25, 6:2, 6:3
**specific** [7] - 6:5, 11:8, 13:7, 18:14, 20:18, 33:11, 71:4
**specifically** [6] - 18:8, 23:9, 44:13, 65:7, 65:15, 70:8
**specifics** [2] - 5:19, 20:11
**speedometer** [1] - 78:23
**split** [2] - 33:19, 40:5
**spread** [2] - 51:14, 77:4
**standard** [4] - 59:18, 59:25, 60:10, 61:24
**standpoint** [3] - 22:7, 46:23, 48:5
**start** [8] - 9:13, 9:18, 9:22, 23:2, 23:18, 53:22, 76:7, 78:16
**started** [10] - 17:9, 20:8, 20:9, 20:13, 20:16, 24:12, 37:12
**starters** [1] - 29:10
**starting** [3] - 11:3, 29:12, 29:13
**starts** [1] - 76:5
**state** [4] - 4:6, 38:17, 62:16, 62:22
**statement** [4] - 25:16, 55:21, 56:6, 56:23
**statements** [7] - 26:12, 26:14, 26:18, 30:6, 57:8, 57:16, 70:21
**stating** [1] - 12:8
**status** [1] - 50:9
**step** [1] - 4:23
**steps** [1] - 6:10
**still** [5] - 5:18, 32:14, 51:16, 75:21
**stoppage** [1] - 48:15
**stopped** [3] - 45:9, 53:8, 54:1
**Street** [1] - 2:3
**studied** [1] - 61:15
**submission** [1] - 43:4
**submit** [1] - 70:19
**submitted** [1] - 58:15
**Subscribed** [1] - 83:21
**subscribed** [1] - 82:13
**Sue** [1] - 4:7
**Suite** [1] - 2:3
**sum** [2] - 32:17, 58:25
**super** [1] - 33:19
**supervision** [1] - 82:8
**Suppose** [1] - 68:19
**supposedly** [1] - 24:20
**suspended** [2] - 62:22, 62:25
**suspending** [1] - 51:4
**suspense** [6] - 7:9, 8:9, 48:23, 48:24, 51:8, 67:10
**suspension** [2] - 67:21, 73:10
**swings** [1] - 32:25
**sworn** [3] - 4:3, 82:7, 83:21
**system** [39] - 10:21, 10:22, 17:22, 17:24, 18:18, 21:24, 22:1, 22:2, 22:10, 22:15, 22:17, 22:22, 23:20, 23:22, 24:21, 26:2, 26:9, 39:23, 39:25, 40:9, 40:11, 40:12, 43:24, 44:7, 44:23, 45:25, 46:12, 47:8, 47:15, 47:21, 48:25, 49:10, 59:5, 59:6, 59:8, 79:11, 81:12, 81:13
**system's** [1] - 81:10


## T


**taxes** [1] - 60:23
**temporary** [1] - 17:11
**tendency** [2] - 4:18, 4:23
**term** [4] - 48:23, 67:14, 72:4, 79:3
**terminated** [1] - 81:23
**terminology** [2] - 11:19, 48:1
**terms** [2] - 70:20, 70:24
**Terry** [4] - 14:9, 15:7, 15:12, 18:20
**testified** [1] - 4:3
**testify** [1] - 82:8
**testimony** [7] - 37:11, 49:8, 52:12, 52:20, 54:14, 82:9, 82:13
**THE** [2] - 1:2, 1:3
**themselves** [1] - 70:19
**therefore** [1] - 59:11
**third** [13] - 17:11, 19:15, 20:9, 20:13, 21:6, 25:3, 25:10, 30:9, 37:1, 43:20, 62:6, 78:14, 79:12
**third-party** [1] - 62:6
**thirds** [1] - 30:9
**THOMAS** [1] - 1:11
**three** [6] - 20:10, 20:15, 20:17, 20:20, 25:3, 66:16
**threshold** [1] - 50:14
**throughout** [1] - 44:18
**ticket** [1] - 37:15
**tickets** [1] - 37:19
**timing** [1] - 46:12
**title** [2] - 44:22, 60:15
**TO** [1] - 3:1
**today** [4] - 27:19, 55:7, 61:6, 71:2
**together** [17] - 5:13, 13:23, 13:25, 22:16, 23:25, 24:15, 26:15, 27:1, 30:7, 32:3, 32:17, 33:9, 33:13, 58:2, 58:5, 59:12, 81:11
**took** [7] - 8:3, 24:20, 34:12, 37:7, 42:10, 44:21, 68:20
**tools** [1] - 6:4
**top** [2] - 11:7, 80:6
**total** [12] - 25:25, 27:20, 27:23, 29:10, 30:22, 33:22, 37:16, 46:2, 48:15, 49:17, 67:21
**tracking** [1] - 20:21
**transcript** [1] - 83:19
**Travis** [4] - 52:21, 53:23, 54:14, 55:5
**treating** [1] - 13:13
**tried** [1] - 60:9
**Trilogy** [141] - 13:8, 13:13, 13:14, 13:16, 13:18, 14:1, 14:2, 14:3, 14:22, 14:25, 15:7, 15:16, 15:18, 15:19, 15:22, 15:24, 15:25, 16:6, 16:8, 16:9, 16:15, 17:1, 17:2, 17:3, 19:9, 20:2, 20:22, 21:7, 21:14, 21:15, 21:20, 22:3, 22:12, 22:14, 22:16, 22:17, 22:21, 23:3, 23:9, 23:10, 23:12, 23:15, 23:16, 23:17, 23:24, 24:1, 24:3, 24:12, 24:16, 25:4, 25:7, 25:10, 25:20, 25:24, 26:5, 26:18, 26:20, 26:21, 27:2, 27:4, 28:21, 30:1, 30:7, 30:8, 30:15, 30:18, 31:15, 33:5, 33:6, 33:10, 33:12, 33:16, 33:23, 34:4, 34:16, 34:20, 34:23, 35:7, 36:21, 37:13, 37:16, 37:21, 37:25, 39:24, 40:4, 40:14, 40:22, 40:24, 41:7, 41:10, 41:13, 41:16, 43:22, 48:18, 48:20, 56:24, 57:8, 57:11, 58:1, 58:5, 58:6, 58:24, 59:1, 59:3, 59:7, 62:19, 63:2, 63:5, 63:7, 63:8, 63:17, 64:3, 64:12, 64:15, 65:2, 65:11, 65:24, 66:1, 66:10, 66:13, 66:17, 66:24, 79:2, 79:8, 79:18, 80:8, 80:11, 80:12, 80:14, 80:15, 80:19, 80:21, 80:22, 80:24, 81:5
**true** [3] - 7:13, 82:8, 83:19
**Trust** [4] - 63:15, 66:9, 66:22, 67:5
**TRUST** [1] - 1:12
**trust** [1] - 66:15
**truth** [2] - 82:8
**try** [3] - 4:25, 25:15, 27:8
**Trying** [1] - 6:11
**trying** [5] - 17:7, 55:21, 64:7, 65:14, 77:16
**turn** [1] - 35:10
**turned** [1] - 37:15
**tweaked** [3] - 26:18, 53:15, 53:20
**two** [28] - 5:22, 10:8, 16:3, 17:4, 17:7, 17:13, 17:23, 19:12, 20:2, 20:9, 20:10, 20:14, 20:15, 20:16, 20:20, 25:2, 30:9, 31:25, 32:11, 33:15, 33:18, 33:21, 34:3, 36:14, 36:15, 66:10, 71:3, 77:22
**two-thirds** [1] - 30:9
**two-year** [1] - 71:3
**type** [3] - 17:21, 18:10, 50:6
**types** [1] - 18:14
**typically** [2] - 46:22, 51:8
**Typically** [1] - 70:25


## U


**uncommon** [4] - 17:19, 17:20, 27:4, 44:17
**under** [2] - 5:10, 59:7
**underpaid** [2] - 64:13, 65:5
**underpayment** [3] - 64:21, 65:2
**understood** [1] - 42:9
**unfortunately** [1] - 60:6
**unique** [2] - 33:5, 76:17
**UNITED** [1] - 1:2
**unless** [1] - 29:21
**up** [13] - 5:20, 5:25, 8:4, 29:25, 30:14, 30:18, 32:4, 49:12, 52:21, 55:1, 70:16, 78:22
**update** [3] - 22:24, 25:1, 40:10
**updated** [11] - 23:23, 24:9, 24:10, 40:4, 41:10, 43:22, 44:1, 44:2, 47:7, 59:10, 64:25
**updates** [2] - 22:9, 44:20
**updating** [1] - 59:9
**upward** [1] - 63:21
**usual** [2] - 52:2, 52:4
**Utica** [1] - 80:8


## V


**value** [7] - 35:10, 39:7, 40:6, 64:16, 64:19, 75:21, 76:6
**variation** [1] - 77:6
**various** [4] - 5:9, 6:4, 14:23, 66:4
**verifying** [1] - 76:25
**versed** [1] - 9:11
**versus** [6] - 1:14, 6:15, 8:12, 39:4, 51:18, 77:13
**via** [1] - 1:20
**video** [1] - 4:20
**volume** [96] - 8:25, 9:1, 9:16, 9:19, 10:3, 10:4, 10:17, 10:18, 11:22, 16:12, 16:13, 16:14, 17:4, 17:25, 18:1, 18:22, 18:24, 19:3, 19:6, 20:12, 20:22, 21:1, 21:7, 21:14, 21:20, 22:14, 22:17, 23:16, 24:15, 25:7, 25:14, 25:17, 25:18, 25:20, 25:21,

25:23, 25:25, 26:1, 26:7, 26:22, 27:3, 27:6, 27:16, 27:20, 27:25, 28:1, 28:10, 28:12, 28:14, 29:7, 29:10, 29:13, 29:18, 30:9, 30:15, 30:18, 32:16, 32:20, 33:7, 33:10, 33:22, 35:7, 35:8, 35:9, 35:24, 37:14, 37:25, 39:24, 40:3, 40:5, 40:24, 41:9, 41:16, 41:25, 42:1, 43:21, 46:2, 47:13, 53:21, 56:25, 59:8, 75:3, 75:8, 75:11, 75:13, 75:14, 75:19, 78:19, 79:7, 80:18, 80:20, 81:5

**volume-wise** [1] - 19:6

**volumes** [33] - 10:20, 16:20, 21:25, 22:3, 22:10, 22:12, 30:20, 30:22, 32:2, 32:12, 34:17, 35:7, 37:16, 37:22, 40:22, 41:8, 41:10, 56:24, 57:2, 57:7, 57:8, 57:9, 57:13, 57:14, 57:16, 58:1, 58:4, 58:21, 59:3, 59:11, 76:5, 78:3

## W

**wait** [2] - 10:24, 12:21

**waive** [2] - 81:22, 82:9

**walk** [1] - 70:22

**walked** [2] - 69:13, 71:7

**warm** [1] - 49:12

**warranty** [1] - 60:13

**WASHINGTON** [1] - 82:3

**waylaid** [1] - 74:20

**ways** [1] - 6:9

**website** [2] - 38:24, 54:8

**week** [2] - 43:5

**well's** [1] - 57:8

**well-versed** [1] - 9:11

**wellhead** [1] - 30:15

**Wells** [1] - 25:21

**wells** [130] - 9:1, 9:16, 9:20, 10:6, 10:8, 10:12, 10:14, 10:16, 10:20, 11:3, 11:17, 11:23, 12:8, 12:20, 13:1, 13:7, 13:12, 13:15, 13:16, 13:18, 13:23, 13:25, 14:3, 14:22, 14:25, 15:7, 15:16, 15:18, 15:22, 15:25, 16:18, 17:1, 17:2, 17:3, 17:25, 18:19, 18:23, 19:2, 19:4, 19:5, 19:6, 20:25, 21:2, 21:4, 21:8, 21:16, 21:21, 22:20, 23:3, 23:5, 23:10, 23:15, 24:2, 25:7, 25:16, 25:22, 25:24, 26:6, 26:9, 26:21, 26:23, 26:25, 27:2, 27:11, 27:24, 28:24, 28:25, 29:8, 29:18, 31:1, 31:14, 31:15, 31:25, 32:12, 32:16, 32:23, 33:15, 33:25, 40:7, 43:15, 46:3, 47:7, 47:13, 48:10, 48:17, 48:19, 53:15, 57:10, 57:18, 58:22, 59:4, 62:19, 62:20, 62:21, 63:1, 63:4, 63:9, 63:11, 64:23, 65:21, 65:22, 66:1, 66:3, 66:4, 66:10, 66:14, 66:15, 66:16, 66:25, 74:15, 75:20, 75:21, 79:22, 79:24, 80:2, 80:6, 80:12, 80:14, 80:19, 80:20, 80:22, 81:1, 81:6

**Werner** [1] - 56:16

**WERNER** [27] - 2:5, 21:9, 28:5, 31:19, 35:2, 37:4, 49:15, 53:11, 54:4, 55:11, 56:1, 57:24, 58:20, 61:6, 61:14, 61:19, 61:21, 62:3, 62:6, 62:14, 68:23, 69:23, 72:9, 73:12, 74:1, 80:17, 81:20

**WESTERN** [1] - 1:3

**whack** [1] - 34:8

**whatsoever** [2] - 51:23, 54:2

**whereas** [2] - 48:7, 59:1

**whereof** [1] - 82:13

**whichever** [1] - 30:9

**whining** [1] - 62:11

**whoever's** [1] - 69:22

**whole** [2] - 50:3, 72:16

**WiFi** [1] - 18:12

**WILLIAM** [1] - 1:6

**William** [1] - 38:13

**window** [1] - 71:3

**wise** [1] - 19:6

**wish** [1] - 83:5

**withheld** [2] - 62:17, 63:24

**withhold** [1] - 60:19

**WITNESS** [2] - 3:1, 3:2

**witness** [3] - 4:2, 82:9

**word** [2] - 9:11, 70:7

**words** [6] - 4:24, 50:17, 63:25, 67:24, 69:6, 72:20

**works** [5] - 4:12, 57:21, 71:18, 76:18, 78:4

**writing** [3] - 52:14, 52:25, 56:5

**written** [3] - 53:1, 67:16, 67:18

## X

**XTO** [24] - 1:15, 5:5, 6:15, 7:7, 7:8, 7:20, 21:5, 34:24, 35:15, 48:1, 50:4, 50:11, 53:13, 54:16, 59:18, 60:10, 60:17, 64:14, 64:24, 67:16, 67:22, 68:21, 69:8

**XTO's** [2] - 7:5, 64:22

## Y

**year** [7] - 5:9, 6:1, 45:18, 53:8, 54:2, 68:20, 71:3

**years** [4] - 54:25, 71:1, 71:20, 77:23

**yesterday** [1] - 52:20

**yourself** [1] - 4:15

## Z

**Zoom** [1] - 1:20

**ZOOM** [1] - 4:1