**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LINDSAY GOLF GROUP LTD.,<br>CAROL KRONEN and<br>WILLIAM KRONEN<br>ALEXANDER H. LINDSAY, JR.<br>and PATRICIA W. LINDSAY,<br>JOHN LINDSAY and<br>ERICA LINDSAY,<br>JAMES LINDSAY and<br>MARY LINDSAY,<br>CHARLES LINDSAY,<br>ANDREW LINDSAY and<br>LISA LINDSAY,<br>THOMAS LINDSAY and<br>BETH LINDSAY AND<br>BETTY G. LINDSAY OIL AND GAS<br>TRUST<br><br>Plaintiffs,<br><br>v.<br><br>XTO ENERGY, INC.<br><br>Defendant. | Case No. 24-781<br><br>Electronically Filed |

**DEFENDANT XTO ENERGY INC.'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION………………………………………………………………………. ............ 1

FACTUAL BACKGROUND ........................................................................................ 2

A. Plaintiffs' Properties, Leases and Wells. ............................................................ 2

B. All of the Wells Associated with Plaintiffs are Connected to the Same Local Gathering System. ......................................................................................... 7

C. XTO Allocates Sales Revenue Determined at the McIntyre CDP to the Wells on the McIntyre Gathering System. ............................................................ 8

D. Although Production Volumes from these Wells were Accurately Measured, Sales Revenue was Incorrectly Allocated due to a Temporary Software Error. ......................................................................................... 8

E. The Misallocation of Volumes Resulted in the Overpayment of Royalties to Plaintiffs. ......................................................................................... 9

F. XTO Corrects the Software Allocation Error and Institutes A Prior Period Adjustment To Correct The Incorrect Payments. ............................................... 10

G. XTO Recouped the Overpayments from Plaintiffs' Future Royalties, a Process that is now Completed. ......................................................................... 11

PROCEDURAL HISTORY ......................................................................................... 12

A. The Pre-Suit Communications between the Parties and their Counsel................ 12

B. Plaintiffs File Their Lawsuit. .................................................................................. 13

C. The Motion to Dismiss Argument and Ruling. ...................................................... 13

D. Plaintiffs' Responses To XTO's Written Discovery And Plaintiffs' Deposition Testimony. ......................................................................................... 14

ARGUMENT ............................................................................................................... 18

I. PLAINTIFFS DID NOT MEET THEIR BURDEN TO PROVE BREACH OR DAMAGES ON THEIR BREACH OF CONTRACT CLAIM ....................................... 18

A. Plaintiffs Have No Evidence Of Breach By XTO. ............................................... 19

B. Plaintiffs Have No Evidence Of Contractual Damages. ...................................... 21

C. The Record Evidence Disproves Plaintiffs' Allegations Of Breach And Damages. ......................................................................................... 23

II. NO ALTERNATIVE BREACH THEORY SURVIVES SUMMARY JUDGMENT ......................................................................................... 24

A. The Leases Do Not Obligate XTO To Make "Monthly Payments" Of Royalties. ......................................................................................... 24

B. Plaintiffs Cannot Prove A Breach Based On XTO's Recoupment Of Overpaid Royalties.......... 25

CONCLUSION.......... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) ........ 24

*Arconic Corp. v. Novelis Inc.*
2022 U.S. Dist. LEXIS 209258 (W.D. Pa. Nov. 18, 2022) ........ 28

*Berry Bros. Buick, Inc. v. Gen. Motors Corp., etc.*,
257 F. Supp. 542 (E.D. Pa. 1966) ........ 22

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
247 F.3d 79 (3d Cir. 2001) ........ 18

*Brader v. Allegheny Gen. Hosp.*,
64 F.3d 869 (3d Cir. 1995) ........ 21

*Briggs v. Southwestern Energy Production Co.*,
224 A.3d 334 (Pa. Jan. 22, 2020) ........ 18

*Chance v. BP Chems., Inc.*,
670 N.E.2d 985 (Ohio 1996) ........ 18

*Chenault-Vaughan Fam. P'ship v. MDC Reeves Energy, LLC*,
2023 U.S. Dist. LEXIS 68832 (D. Del. Apr. 19, 2023) ........ 27

*Commonwealth v. UPMC*,
208 A.3d 898 (2019) ........ 27

*Contemporary Mission, Inc. v. United States Postal Serv.*,
648 F.2d 97 (2d Cir. 1981) ........ 21

*Drummond v. Progressive Specialty Ins. Co.*,
142 F.4th 149 (3d Cir. 2025) ........ 21

*E. Texas Motor Freight v. Lloyd*,
484 A.2d 797 (Pa. Super. 1984) ........ 18

*Fireman's Ins. Co. v. DuFresne*,
676 F.2d 965 (3d Cir. 1982) ........ 22

*Food Team Int'l, Ltd. v. Unilink, LLC*,
Civil Action No. 10-cv-03585, 2013 WL 5476582 (E.D. Pa. Sept. 30, 2013) ........ 18

*GNC Franchising LLC v. Khan*,
2008 U.S. Dist. LEXIS 16046 (W.D. Pa. Mar. 3, 2008) ........................................................21

*Gorski v. Smith*,
812 A.2d 683 (Pa. Super. Ct. 2002)..........................................................................................22

*Gulf Oil Corp. v. Lone Star Producing Co.*,
322 F.2d 28 (5th Cir. 1963) ......................................................................................................27

*Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*,
619 F.3d 1001 (3d Cir. 1980)....................................................................................................18

*Papieves v. Lawrence*,
263 A.2d 118 (Pa. 1970) ...........................................................................................................18

*Presbyterian Med. Center v. Budd*,
832 A.2d 1066 (Pa. Super. 2003)..............................................................................................18

*State Farm Mut. Auto. Ins. Co. v. Alburger*,
2006 U.S. Dist. LEXIS 109887 (E.D. Pa. July 14, 2006)........................................................21

*Tennant v. Range Res.-Appalachia, LLC*,
561 F. Supp. 3d 522 (W.D. Pa. 2021)...............................................................18, 20, 25

*Ware v. Rodale Press, Inc.*,
322 F.3d 218 (3d Cir. 2003)..................................................................................................21, 24

*Woods v. Wright Inst.*
U.S. App. LEXIS 6012 (9th Cir. Mar. 24, 1998).....................................................................21

**Other Authorities**

3 Kuntz, Law of Oil and Gas § 42.8 (2023).......................................................................................27

23 Williston on Contracts § 63:14 (4th ed. 2013)..........................................................................18

## INTRODUCTION

This is a breach of contract case involving oil and gas leases between Plaintiffs and XTO Energy Inc. ("XTO"). As framed by the Court in its Motion to Dismiss ruling, Plaintiffs' lawsuit challenges whether royalties were in fact overpaid to them, and alleges a claim of breach for nonpayment of royalties seeking, as damages, the amount of royalties that XTO represented were overpaid. The record is now closed and Plaintiffs, who bear the burden of proof in a breach of contract case, have adduced no evidence to prove their claim. To the contrary, the undisputed evidence of record disproves their claim: consistent with its pre-suit representations, XTO's witnesses testified that Plaintiffs received overpayments of royalties due to a misallocation of sales volumes that resulted from a temporary software issue. Plaintiffs also did not meet their burden of proving contract damages, because again the record evidence shows that the amounts relied upon by Plaintiffs as "damages" were the amounts of overpayments by XTO.

There is no alternative theory of breach that survives summary judgment on this record either. Plaintiffs' amended complaint alleged that their leases obligated XTO to make monthly royalty payments, but this is not the breach claim the Court described in its Motion to Dismiss ruling, and it fails as a matter of law because the leases do not require that XTO make monthly royalty payments. Plaintiffs also appeared to challenge XTO's recoupment of the overpayments, but counsel for Plaintiffs' represented to the Court that recoupment is not the basis of their claim. In any event, the record is undisputed that an overpayment happened. XTO's recoupment of that overpayment aligns with the parties' expectations under their leases and general principles of contract law and industry custom and practice. At the conclusion of the recoupment, Plaintiffs received what they should have been paid under the leases. Any other result would be an unjustified windfall.

## FACTUAL BACKGROUND

**A. Plaintiffs' Properties, Leases and Wells.**

The Plaintiffs in this action are a group of related individuals who, between 2009 and 2012, entered into oil and gas leases covering properties in Butler and Armstrong Counties, Pennsylvania (the "Leases"). *See* Ex. A. With the exception of Plaintiff Charles Lindsay, each Plaintiff entered into a lease with Penn Virginia Oil & Gas Corporation ("Penn Virginia"). *See* Ex. A-1 – Ex. A-19. Following execution, the leases were assigned by Penn Virginia to XTO which became the lessee under the leases. *See* ECF 12, ¶13. Each of these leases contained the following royalty clause.

> On gas of whatsoever nature or kind, including coalbed methane gas and other gases, liquid hydrocarbons and their respective constituent elements, casinghead gas or other gaseous substances, produced from the Land, or lands or leases unitized therewith (Gas), Lessee shall pay as royalty, eighteen-one hundredths (18/100) of the net proceeds realized by Lessee from the sale thereof, computed at the wellhead. Lessor shall pay a proportionate part of all ad valorem, excise, occupation, depletion, privilege, license, severance, processing, production or other taxes now or hereafter levied, or assessed or charged on oil and gas produced from the Land.

*See* Ex. A-1 – A-19, ¶ 3. Plaintiff Charles Lindsay entered into a lease directly with XTO. The royalty on his lease provides as follows:

> To pay Lessor as a royalty, for the native gas and casinghead gas or other gaseous substances (including shale gas), produced from said land and sold or used beyond the well or for the extraction of gasoline or other product, an amount equal to 18% of the sales proceeds actually received by Lessee from the sale of such production, less 18% of all "Post Production Costs," as defined below, and less 18% of any and all taxes, including without limitation, production, severance, and ad valorem taxes.

*See* Ex. A-20, ¶ 2(b). Each Plaintiffs' lease is associated with different properties, different units and different wells situated in the same geographic area, as described in more detail below.

***Lindsay Golf Group LTD.*** Plaintiff Lindsay Golf Group LTD ("Lindsay Golf") is a party to a December 21, 2009 Oil and Gas Lease designated lease number 0502043, publicly recorded

at bk. 3975, pg. 0256[1], covering 172.76 acres in South Buffalo Township. *See* Ex. A-1. XTO placed portions of this lease in production units designated the Terry Bowser Unit and the Frantz Unit. *See* Terry Bowser DPU; Frantz DPU, Ex. B-1, B-2. XTO pays royalties to Lindsay Golf associated with production from the Terry Bowser A3H well and the Frantz 1H well. *See* J. Maloy Dec., attached to Motion as Ex. 2, at ¶ 7. *See also* Plaintiff Check Detail Excel Spreadsheets, produced at XTO_0004-0005.[2]

***Carol Kronen and William Kronen.*** Plaintiffs Carol L. Kronen and William L. Kronen are parties to two leases: (1) a December 22, 2009 Oil and Gas Lease designated lease number 0501813, publicly recorded at bk. 3919, pg. 0209, covering 18.34 gross acres in South Buffalo Township, and (2) a December 22, 2009 Oil and Gas Lease designated 0501798, publicly recorded at bk 3919, pg. 0219, covering 20.91 acres in South Buffalo Township. *See* Exs. A-2, A-3. XTO placed these leases in a production unit designated the Charlton Unit. *See* Charlton DPU, Ex. B-3. XTO pays royalties Carol and William Kronen associated with production from the Charlton 7H well. *See* J. Maloy Dec. at ¶ 11. *See also* XTO_0004-0005.

***Alexander Lindsay and Patricia Lindsay.*** Plaintiffs Alexander H. Lindsay, Jr. and Patricia W. Lindsay are parties to a December 23, 2009 Oil and Gas Lease designated lease number 0498784, publicly recorded at Instrument No. 201003010004146, covering 51 gross acres in Buffalo Township. *See* Ex. A-4. XTO placed this lease in a production unit designated the Charlton Unit. *See* Charlton DPU, Ex. B-3. XTO pays royalties to Alexander and Patricia Lindsay

---

[1] The leases were recorded in the Office of the Armstrong County Recorder, with the exception of Alexander and Patricia Lindsay Lease (Ex. A-4) and a Betty G. Lindsay Oil and Gas Trust Lease (Ex. A-19), which were recorded in the Office of the Bulter County Recorder.

[2] XTO produced excel spreadsheets reflecting production volumes, royalty payment, and other check detail data for each Plaintiff. *See* XTO_0004-0005. These spreadsheets contain voluminous rows and columns that cannot practicably be reproduced in PDF format, and were therefore not included in the Joint Appendix. They can be produced to the Court in electronic form upon request.

associated with production from the Charlton 7H well. *See* J. Maloy Dec. at ¶ 13. *See also* XTO_0004-0005.

***John and Erica Lindsay.*** John and Erica Lindsay are parties to three leases: (1) a January 16, 2010 Oil and Gas Lease designated lease number 0502155, publicly recorded at bk. 3975, pg. 0326, covering 16.211 gross acres in South Buffalo Township, (2) a January 16, 2010 Oil and Gas Lease designated lease number 0502178, publicly recorded at bk. 3975, pg. 0289, covering 19.34 gross acres in South Buffalo Township, and (3) a January 16, 2010 Oil and Gas lease designated lease number 0502203, publicly recorded at bk. 3975, pg. 0335, covering 19.49 gross acres in South Buffalo Township. *See* Exs. A-5, A-6, A-7. XTO placed these leases in production units designated the Charlton Unit and the Alexander Lindsay Unit. *See* Charlton DPU; Alexander Lindsay DPU, Ex. B-3, B-4. XTO pays royalties to John and Erica Lindsay associated with production from the Charlton 7H well and Alexander Lindsay 5H well. *See* J. Maloy Dec. at ¶¶ 15-19. *See also* XTO_0004-0005.

***James and Mary Lindsay.*** James Lindsay and Mary Lindsay are parties to a June 17, 2010 Oil and Gas Lease designated lease number 0503689, memorandum publicly recorded at bk. 4064, pg. 0089, covering 15.47 gross acres in South Buffalo Township. *See* Ex. A-8. XTO placed this lease in a production unit designated the Alexander Lindsay Unit. *See* Alexander Lindsay DPU, Ex. B-4. XTO pays royalties to James and Mary Lindsay associated with production from the Alexander Lindsay 5H well. *See* J. Maloy Dec. at ¶ 21. *See also* XTO_0004-0005.

***Andrew and Lisa Lindsay.*** Andrew Lindsay and Lisa Lindsay are parties to two leases: (1) a December 23, 2009 Oil and Gas Lease designated lease number 0501823, publicly recorded at bk. 3919, pg. 0179, covering 10 gross acres in South Buffalo Township, and (2) a December 23, 2009 Oil and Gas Lease designated lease number 0501831, publicly recorded at bk. 4006, pg.

0168, covering 57.62 gross acres in South Buffalo Township. *See* Exs. A-9, A-10. XTO placed these leases in a production unit designated the Charlton Unit. *See* Charlton DPU, Ex. B-3. XTO pays royalties to Andrew and Lisa Lindsay associated with production from the Charlton 7H well. *See* J. Maloy Dec. at ¶¶ 23-25. *See also* XTO_0004-0005.

***Thomas and Beth Lindsay.*** Thomas and Beth Lindsay are parties to five leases: (1) a December 22, 2009 Oil and Gas Lease designated lease number 0501937, publicly recorded at bk. 3919, pg. 0189, covering 20.392 gross acres in South Buffalo Township; (2) a December 23, 2009 Oil and Gas Lease designated lease number 0501954, publicly recorded at bk. 4006, pg. 0181, covering 26.633 gross acres in South Buffalo Township; (3) a December 22, 2009 Oil and Gas Lease designated lease number 0501961, publicly recorded at bk. 4006, pg. 0199, covering 11.237 gross acres in South Buffalo Township; (4) a December 22, 2009 Oil and Gas Lease designated lease number 0501972, publicly recorded at bk. 3919, pg. 0119, covering 0.449 gross acres in South Buffalo Township; and (5) a March 16, 2010 Oil and Gas Lease designated lease number 0502876, publicly recorded at bk. 3975, pg. 0226, covering 81.8375 gross acres in South Buffalo Township. *See* Exs. A-11, A-12, A-13, A-14, A-15. XTO placed these leases in production units designated the Terry Bowser Unit and the Alexander Lindsay Unit. *See* Terry Bowser DPU; Alexander Lindsay DPU, Ex. B-1, B-4. XTO pays royalties to Thomas and Beth Lindsay associated with production from the Terry Bowser A3H well and the Alexander Lindsay 5H well. *See* J. Maloy Dec. at ¶¶ 29-35. *See also* XTO_0004-0005.

***Betty G. Lindsay Oil and Gas Trust*** Betty G. Lindsay Oil and Gas Trust (by successor interest) is a party to four leases: (1) an December 22, 2009 Oil and Gas Lease designated lease number 0501874, publicly recorded at bk. 3919, pg. 0198, covering 4.017 gross acres in South Buffalo Township; (2) a December 22, 2009 Oil and Gas Lease designated lease number 0501848,

publicly recorded at bk. 3919, pg. 0228, covering 50.75 gross acres in South Buffalo Township; (3) a December 22, 2009 Oil and Gas Lease designated lease number 0502129, publicly recorded at bk. 3919, pg. 0168, covering 95.591 gross acres in South Buffalo Township; and (4) a December 23, 2009 Oil and Gas Lease designated lease number 0477035, publicly recorded at Instrument No. 201002218000 3475, covering 50.00 gross acres in Buffalo Township. *See* Exs. A-16, A-17, A-18, A-19. XTO placed these leases in production units designated the Charlton Unit, the Alexander Lindsay Unit, the Trilogy B Unit, the Trilogy B Unit (Utica), and the Trilogy C Unit. *See* Charlton Unit DPU; Alexander Lindsay Unit DPU; Trilogy B Unit DPU; Trilogy B Unit (Utica) DPU; Trilogy C Unit DPU, Ex. B-4, B-5, B-6, B-7, XTO pays royalties to the Betty G. Lindsay Oil and Gas Trust associated with production from the Charlton 7H well, the Alexander Lindsay 5H well, the Trilogy B 2H well, the Trilogy B 3H well, the Trilogy C 4H well, and the Trilogy 5HU well. *See* J. Maloy Dec. at ¶¶ 37-43. *See also* XTO_0004-0005.

This is the only plaintiff with an interest in the Trilogy B Unit (Utica) and the only plaintiff entitled to receive royalties associated with production from the Trilogy 5HU well. *See* J. Maloy Dep. at 63:17-19. Only a small portion of this Plaintiff's property – approximately 3.6 acres – is included in Trilogy B Unit (Utica). *See* Trilogy B Unit (Utica), Ex. B-6. *See also* XTO_0004-0005.

***Charles Lindsay.*** Charles G. Lindsay is a party to a May 2, 2023 Oil and Gas Lease designated lease number 0497565, publicly recorded at bk. 4456, pg. 0016, covering 11.58 gross acres in South Buffalo Township. *See* Ex. A-20. In August of 2014, XTO included the property subject to this lease in a production unit designated the Charlton Unit. *See* Charlton DPU. XTO subsequently developed and paid royalties to Charles Lindsay associated with production from its interest in the Charlton 7H well. *See* J. Maloy Dec. at ¶ 45. *See also* XTO_0004-0005.

## B. All of the Wells Associated with Plaintiffs are Connected to the Same Local Gathering System.

Prior to the flowing of the Trilogy 5HU well, there were eight (8) Marcellus Shale wells associated with Plaintiffs' leases: the Terry Bowser A3H, Frantz 1H, Charlton 7H, Alexander Lindsay 5H, Trilogy A 1H, Trilogy B 2H, Trilogy B 3H, and Trilogy C 4H wells. *See* H. Green Dep., Ex. I, at 11:3–12:15; *See* J. Maloy Dec., Ex. 2, ¶¶ 7-43. Each of these wells is equipped with its own production meter or meters to measure the flow of gas produced from each individual well. *See* H. Green Dep., Ex. I, at 13: 6-10. Gas produced from each of these wells flows into a shared local gathering network referred to as the McIntyre Gathering System. *Id.* at 10:15–21. Prior to the development of the Trilogy 5HU well, these were the only eight wells flowing into the McIntyre Gathering System. *Id.* at 10:14–16. Gas from the McIntyre Gathering System is commingled and flows to a common location referred to as the McIntyre Central Delivery Point. *Id*. at 11:7-14. There is a meter at the McIntyre Central Delivery Point that measures the total volume of gas produced from all of these wells and delivered to this point. *Id.* at 27:14-18.

In December of 2021, XTO brought a new well, the Trilogy 5HU well, online and onto the McIntyre Gathering System. *See Id.* at 20:6-8. The Trilogy 5HU targeted the Utica formation rather than the Marcellus Shale formation. *See* J. Maloy Dep., Ex. J, at 18:16-20. The Trilogy 5HU well was "a very good producing well" and produces the largest volume of gas among the wells associated with the McIntyre Central Delivery Point. *See* H. Green Dep., Ex. I, at 79:14-25. The Trilogy 5HU well proved to be such a high producing well that, over time, XTO installed three production meters to measure and accommodate its high volume. *See id*. at 16:6–17:14, 19:10–20:10. The additional wellhead metering was necessary to ensure accurate measurement of the early substantial production volumes of the Trilogy 5HU well. *See id;* J. Maloy Dep., Ex. J, at 7:11-13.

**C. XTO Allocates Sales Revenue Determined at the McIntyre CDP to the Wells on the McIntyre Gathering System.**

Revenue from gas sales associated with the gas produced by the nine wells on the McIntyre Gathering System and delivered to the at the McIntyre Central Delivery Point was allocated back to those wells based on their proportionate share of production, as determined by the metered production volumes at each well. *See* H. Green Dep., Ex. I, at 9:1–10:13, 28:7–29:20. This allocation process is necessary because, in multi-well gathering systems like the McIntyre system, gas from multiple wells is commingled and sold at a single sales meter, but royalties must be paid based on each well's contribution to the total sales. *Id.* The allocation formula in the production system was designed to sum the metered volumes for each well and calculate each well's share of the total sales volume. *Id.*

**D. Although Production Volumes from these Wells were Accurately Measured, Sales Revenue was Incorrectly Allocated due to a Temporary Software Error.**

During the time period that three wellhead meters were utilized with the Trilogy 5HU well, there was no error in the measurement of gas volumes produced from the wells or in the reporting of produced volumes to the Pennsylvania Department of Environmental Protection. *See* H. Green Dep., Ex. I, at 56:22-57:19. However, due to a configuration error, the production accounting system did not initially aggregate all of the production measured from each of the three meters associated with the Trilogy 5HU well into a single well total. *See id*. at 21:23-22:24. As a result of this error, the production system's allocation formula failed to properly account for multiple meters on the high-producing Trilogy 5HU well. *See id;* Jan. 10, 2024 Correspondence, Ex. D, at 1–2. Consequently, although each meter accurately recorded production, the computer system formula aggregating production for internal accounting purposes required an IT update to add the additional Trilogy 5HU well's meter into that well's total volume. *See* H. Green Dep., Ex. I, at

22:19-24. Until that update was implemented, the sales allocation process, which proportionally allocates the single sales meter's volumes and revenue at the McIntyre Central Delivery Point back to each contributing well, temporarily under-reflected the volume of the Trilogy 5HU well's production and correspondingly over-reflected certain volumes associated with the other wells. *Id.* at 22:10–22:24, 24:7–24:16.

**E. The Misallocation of Volumes Resulted in the Overpayment of Royalties to Plaintiffs.**

As a result of the error in the allocation formula utilized by the production system's accounting software that undercounted the Trilogy 5HU well's production, the sales volume calculated at the McIntyre Central Delivery Point was disproportionately allocated to the other eight wells. *See* H. Green Dep., Ex. I, at 21:14–22:24, 24:20–26:25. This resulted in those wells, and lessors under leases included in drilling units associated with those wells, being mistakenly credited with more sales volume than what was actually produced by the wells associated with their interests. *Id.* Inversely, lessors with interests associated with the Trilogy 5HU well were mistakenly credited with less sales volume than was actually produced by the Trilogy 5HU well. *Id.* This meant that royalties that were paid during this time period were based on misallocated volumes, leading to the overpayment of royalties to Plaintiffs, who did not own interests in the Trilogy 5HU well (with the exception of the Betty G. Lindsay Oil and Gas Trust, which received an underpayment relative to its small interest in that unit).[3] *See id.* at 39:1–39:8, 64:9-17. J. Maloy Dec., Ex. 2, at ¶¶ 7-43. *See also* XTO_0004-0005.

[3] Because the Betty G. Lindsay Oil and Gas Trust owned a larger interest in other wells on the McIntyre Gathering System, the net effect of the misallocation applied to all of the wells was an overpayment to it. *See* H. Green Dep., Ex. I, at 66:2-67:12; Betty G. Trust Exemplar Check Detail, Ex. H.

### F. XTO Corrects the Software Allocation Error and Institutes A Prior Period Adjustment To Correct The Incorrect Payments.

The misallocation associated with the Trilogy 5HU well volumes began around May, 2022, when the additional meters were installed on Trilogy 5HU well, and continued until the issue was discovered and the formula was corrected after September, 2022. *See* H. Green Dep., Ex. I, at 20:20-23, 34:19-23; 37:18-22. After the formula in the production accounting software was corrected to sum the measured production from all of the Trilogy 5HU well production meters, the allocation percentages were corrected, and the correct payments were calculated for each lessor with an interest in the wells on the McIntrye Gathering System, including Plaintiffs. *Id*. at 24:21–25:1, 40:16–41:17. After the correction was applied, XTO's revenue accounting team performed a process known as a prior period adjustment for the affected production months (May, 2022 through September, 2022). *Id.* at 7:24-9:8, 24:21-26:23. This process involved reversing the original well-level sales entries and rebooking them with the corrected Trilogy 5HU well volumes incorporated into the allocation percentages. *Id.* at 64:9-25. The mathematical formula of the sales allocation did not change, but the underlying Trilogy 5HU well volumes were corrected to accurately reflect volumes from all of its meters, which increased Trilogy 5HU well's allocation share and decreased the allocation share of the other eight wells correspondingly. *Id.* at 41:3-19. The prior period adjustment process calculated the amount of the overpayment to each Plaintiff down to the penny using check detail records for each owner. *See* H. Green Dep., Ex. I, at 38:22–39:8. As to lessors who were underpaid for some portion of their interest, XTO remitted interest, as is demonstrated on Betty G. Linday Oil & Gas Trust's December, 2024 statement, reflecting a payment of $5,393.71 in interest. *See* XTO_0005.

**G. XTO Recouped the Overpayments from Plaintiffs' Future Royalties, a Process that is now Completed.**

XTO performed the prior period adjustment effective in the royalty month of September, 2023. *See* H. Green Dep., Ex. I, at 43:11-14. In some cases where the overpayment of royalties is very large, XTO's policy is to immediately reach out to the overpaid lessor and seek immediate repayment. *Id.* at 49:21-51:20. The overpayments to Plaintiffs did not meet that threshold, and therefore following the prior period adjustment, Plaintiffs were placed in suspense status consistent with XTO's general practice. *Id.* at 48:21-51:20. This meant that Plaintiffs' future royalty payments were withheld until the previously overpaid amounts were recouped from the future royalties. *Id*. The recoupment is largely automated. *Id.* After the corrected volumes were entered, the system recalculated the allocations and determined the amount to be recouped from each owner. *Id.* at 49:17–51:14. As new revenue from the impacted wells was booked, it was applied to reduce the overpayment balance and, as a result, no new payments were made to the overpaid lessors until the overpayment was fully recouped. *Id.* at 48:25-49:7; 62:17–63:16. Once an overpayment is fully recouped, royalty payments resume, and the first check detail provided to a lessor reflects all of the adjustments made during the period of recoupment. *See id.* at 67:7-12; Plaintiff Exemplar Check Detail, Ex. H. Thus after the negative balance was cleared and regular payments resumed, each Plaintiff received a detailed statement reflecting a complete accounting for the suspense period. *Id.*

As a result of the prior period adjustment and subsequent recoupment from the overpayments made to Plaintiffs, "at the end of it … everybody would have the value that they were entitled to based on the adjusted allocation." *Id.* at 64:18-20. The recoupment process is now complete for each Plaintiff, and XTO has resumed paying royalties to Plaintiffs. *See* J. Maloy Dec., Ex. 2, at ¶ 47.

## PROCEDURAL HISTORY

This case began with pre-suit communications between XTO's representatives, and later its counsel, and Lindsay Golf and later its counsel (who is also a named plaintiff), and culminated in the lawsuit now pending before this Court.

**A. The Pre-Suit Communications between the Parties and their Counsel.**

Following the prior period adjustment and the placement of Plaintiffs in suspense to recoup the overpayment of royalties, communications occurred between John Maloy and Travis Lindsey, who acted as a central point of contact for the Lindsay family and related entities. *See* Lindsay Golf Group/Betty G. Trust Dep., Ex. K, at 9:6-11:25. Travis Lindsay described reaching out to XTO in September 2023 after noticing the cessation of royalty payments. *Id.* He recounted regular phone calls and email exchanges in September and November of 2023 with John Maloy, who explained to him that payments would not resume until the overpaid amount was recouped, estimating a six-month to one-year timeline depending on production. *See id.* at 9:6-13; *see also* Lindsay Golf's Answer to XTO Interrogatory No. 18, Ex. F. John Maloy confirmed these interactions, stating that "I was able to answer – many of the landowners wanted to know when they would start getting paid again. So I was able to explain to them what happened and was able to calculate where they stood at that time." *See* J. Maloy Dep., Ex. J, at 14:4-8. John Maloy continued to provide information to Travis Lindsay regarding the status of the recoupment. *See* Lindsay Golf Group/Betty G. Trust Dep., Ex. K, at 12:8-11.

On November 6, 2023, the Lindsay Law Firm sent a letter to XTO's legal department requesting information about the recoupment and the underlying allocation error. *See* November 6, 2023 Lindsay Golf Letter, Ex. C. Although Linday Golf's lease contained an express right to audit XTO to verify its royalty calculations and payments, Lindsay Golf declined to exercise that right. Ex. A-1, at Addendum, ¶ 4. Had it exercised that right, the audit could have been done

electronically, as is XTO's practice now. *See* H. Green Dep. at. 71:16-25. XTO, through its counsel, provided a written response to Plaintiffs' letter on January 10, 2024. *See* January 10, 2024 Correspondence, Ex. D. This letter summarized the circumstances of the error, the technical details of the metering and allocation, and the steps taken to correct the issue. *Id.* It also included supporting documentation and electronic spreadsheets to enable Plaintiffs to verify the calculations as to Lindsay Golf, which was the only entity identified in Plaintiff's pre-suit correspondence. *Id.*

**B. Plaintiffs File Their Lawsuit.**

On April 9, 2024, Plaintiffs filed a Complaint against XTO in the Buter County Court of Common Pleas. *See* ECF 1-2. Plaintiffs alleged XTO "refused to pay … any royalty payments after July of 2023," demanded a full accounting, and sought a money judgment "for the amount shown to be due … by such account," and exemplary damages. *Id.* XTO removed the case to this Court. ECF 1. On June 4, 2024, XTO moved to dismiss the Complaint. ECF 8, 9. Plaintiffs then filed the operative Amended Complaint. ECF 12. On July 8, 2024, XTO filed a motion to dismiss the Amended Complaint. ECF 14, 15.

**C. The Motion to Dismiss Argument and Ruling.**

Following briefing on XTO's motion to dismiss, the Court granted Plaintiffs' motion for oral argument. ECF 21. On October 3, 2024, this Court heard argument on XTO's motion to dismiss. *See* October 3, 2024 Hearing Tr., Ex. E. During the course of that argument, Plaintiffs' counsel represented that their breach of contract claim rests on a theory that XTO did not overpay royalties to Plaintiffs. *Id.* In response to the Court's question about the specific provision of the leases that XTO allegedly breached, counsel for Plaintiffs responded: "the breach is that they have to pay royalties." *Id.* at 24:19-20. When questioned by the Court as to whether the claim was that XTO had no right to recoup, counsel for Plaintiffs responded: "No. We are claiming that we are entitled to the royalties." *Id.* at 25:20-23. Plaintiffs' counsel further explained that "I'm saying

the breach is failure to provide royalties. Concomitant with that is the information that was never provided to us." *Id.* at 26:13-15. In alignment with these representations, the Court and Plaintiffs' counsel had the following exchange:

> **Court:** "So I deny the motion to dismiss, you go to discovery, you have an expert, you look at it, and there was an overpayment here, it was just a misallocation, an accounting issue -- I mean, is that -- and then the case just sort of goes away at that point from your perspective?"
>
> **Plaintiffs' Counsel:** "I guess so. If we were there."

*Id.* at 28:21-29:2.

On November 22, 2024, this Court granted in part and denied in part XTO's motion. ECF 27. The Court dismissed Count II (accounting) as an independent claim, dismissed Plaintiffs' claim for punitive damages, but allowed Plaintiffs breach claim at Count I of the Amended Complaint to proceed. *Id*. The Court found that Plaintiffs' "allegations sufficiently state a claim for breach of contract based on XTO's failure to pay royalties due to Plaintiffs under the royalty clause in the leases. Because Plaintiffs deny that they received overpayments from XTO and that an allocation error occurred, they are essentially alleging that they are entitled to the royalties that are held in suspense by XTO…" ECF No. 27 at 8. The Court further described Plaintiffs' theory as "because Plaintiffs are disputing XTO's claims that there was an allocation error, they claim they are entitled to the suspended royalties." ECF No. 27 at 8, n. 8.

### D. Plaintiffs' Responses To XTO's Written Discovery And Plaintiffs' Deposition Testimony.

In light of the Court's framing of Plaintiffs' breach of contract claim, XTO issued written discovery to Plaintiffs and took the deposition of Plaintiffs.

***Plaintiffs' Responses to XTO's Written Discovery.*** Following unsuccessful mediation negotiations, XTO served written discovery on Plaintiffs on May 20, 2025. Ex. F. Plaintiffs'

responses, served on July 23 and 24, 2025, uniformly failed to identify facts supporting their allegations of breach and damages. *See, e.g.,* Ex. F.*,* Answer to Interrogatory No. 4 ("The Plaintiff has no information concerning the paying royalties to the Plaintiff for production associated with the Trilogy 5HU well for the royalty months of May 2022 through September 2022, other than bald statements from the Defendant XTO that it paid royalties for the relevant months."); Answer to Interrogatory No. 5 ("…information concerning the precise amount owed to the Plaintiff for each such month lies within the exclusive control and knowledge of the Defendant herein. Hopefully, these figures can be identified with further discovery."). Plaintiffs failed to provide any calculations or documents supporting claims of underpayment, instead referencing the need for further discovery. *See id.* at Interrogatory No. 9-10. The only additional documents produced by Plaintiffs in response to XTO's written discovery were their leases and XTO's declaration from the Notice of Removal identifying the amounts of the overpayments.[4]

***Depositions of the Plaintiffs.*** XTO noticed and deposed each group of Plaintiffs, consistent with agreements made by counsel for the parties.[5]

---

[4] At the time Plaintiffs served their responses to XTO's written discovery, they had not yet issued written discovery to XTO. *Compare* Plaintiffs' Discovery Requests, Ex. G; Plaintiffs' Answers to XTO's Discovery Requests, Ex. F. Plaintiffs did not issue written discovery to XTO until 36 days before the expiration of the fact discovery deadline, as twice extended. *See Id.*; ECF 46. XTO notes that at its own counsel's request, Plaintiffs' counsel provided a list of topics in letter form dated July 31, 2025 on which they intended to depose XTO. XTO's counsel agreed to treat that letter as a request for a Fed. R. Civ. P. 30(b) deposition of XTO, and prepared its witnesses accordingly, although Plaintiffs later issued personal notices of deposition directed to the witnesses counsel had identified in response to those topics.

[5] Plaintiffs Carol and William Kronen, Patricia Lindsay, John Lindsay, Mary Lindsay, Charles Lindsay, and Thomas Lindsay appeared for their noticed deposition and provided testimony. Travis Lindsay appeared and testified as the 30(b)(6) representative for both Lindsay Golf Group LTD and the Betty G. Lindsay Oil and Gas Trust. James Lindsay is deceased. *See* Mary Lindsay Dep., Ex. M, at 5: 10–15. The parties stipulated that the remaining Plaintiffs (Beth Lindsay, Erica Lindsay, and Alexander Lindsay) would not provide testimony in this case. *See* Patricia Lindsay Dep., Ex. Q, at 4.

Plaintiffs uniformly testified that they lacked personal knowledge regarding the calculation of their royalties and either had not or could not identify any overpayment or underpayment of royalties by XTO. *See* Lindsay Golf Dep. and Betty G. Lindsay Oil and Gas Trust Dep., Ex. K, at 22:22-23:1 (Travis Lindsay testifying while he attempted to estimate when checks would resume, he did not perform any calculations to determine whether an overpayment had actually occurred. Further testifying that, "I didn't do any calculations to that effect. I was looking more forward."); Andrew Lindsay Dep., Ex. L, at 14:21-15:19 (testifying that "I don't have the information do that" when asked if he had calculated whether the proceeds paid matched the volumes from his wells. Further when asked that "[y]ou personally didn't do any other investigation or have any other personal knowledge of whether you were overpaid royalties or not?" he confirmed "No."); Mary Lindsay Dep., Ex. M, at 12:2-12 (testifying that "I don't know either way which way" with respect to whether royalties were overpaid); William Kronen Dep., Ex. N, at 16:5-7 (testifying that "I did not," when asked if he performed any calculations to determine whether he was overpaid prior to the suspension of royalties); Carol Kronen Dep., Ex. O, at 6:10-14 (testifying that "I simply do not," when asked if she had any personal knowledge regarding whether she was overpaid or underpaid); Charles Lindsay Dep., Ex. P, at 12:11-16 (testifying that "I have no idea what's going on here," and confirming that he did not perform any calculations or independent analysis regarding amounts paid to him by XTO); Patrica Lindsay Dep., Ex. Q, at 13:17-21 (testifying "Absolutely not," when asked if she undertook any independent review or calculations of the information provided with respect to volumes or payments); John Lindsay Dep., Ex. R, at 9:15-17 (testifying "No" when asked if he ever did any personal calculations of whether XTO had overpaid him previously); Thomas Lindsay Dep., Ex. S, at 13:20-23 (testifying "No, no" when asked if he did any independent calculations to check the volumes versus what he was paid).

Plaintiffs similarly testified that they did not have facts or evidence to dispute XTO's explanation that it was recouping royalties due to a prior overpayment. *See* Andrew Lindsay Dep., Ex. L, at 14:18-20 (acknowledging reading the letter from XTO's counsel to Lindsay Golf Group and admitting that he had no reason to doubt the explanation that royalties had stopped because XTO previously overpaid); Mary Lindsay Dep., Ex. M, at 12:22-13:4 (testifying that "Do I have any facts that would contradict the explanation that they overpaid royalties? Well… I don't know … I guess I don't."); Patrica Lindsay Dep., Ex. Q, at 13:12-21 (testifying that "Obviously, where there is an absence of information, you don't know if it did or not," when asked if she had any reason to believe an overpayment did not occur); Charles Lindsay Dep., Ex. P, at 13:4-9 (testifying that "I have to rely on the integrity of XTO to pay … I don't go and check the meters, that's XTO's responsibility, and I have to trust that they are, you know, doing that honestly."); John Lindsay Dep., Ex. R, at 9:18-21 (testifying that "I have no knowledge of that," when asked if he had any personal knowledge of overpayment); Thomas Lindsay Dep., Ex. S, at 13:1-10, 20-23 (expressing skepticism about XTO's explanation but admitting his doubts were based on conversations with "drillers" in the oil and gas industry who told him "[gas] can't move to a different formation" and further acknowledging he did not have any conversations regarding XTO's explanation of an allocation mistake and had not checked the volumes produced versus what he was paid); Lindsay Golf and Betty G. Lindsay Oil and Gas Trust Dep., Ex. K, at 29:21-23 (Travis Lindsay testifying that while he had lost trust in XTO, "I don't have any evidence, no" in response to a question if he had any evidence there was not, in fact, an overpayment).

# ARGUMENT

## I. PLAINTIFFS DID NOT MEET THEIR BURDEN TO PROVE BREACH OR DAMAGES ON THEIR BREACH OF CONTRACT CLAIM

This Court found that Plaintiffs' sole claim is for breach of contract against XTO under the Plaintiffs' leases for failure to pay royalties. ECF 27 at 8. Under Pennsylvania law, a breach of contract claim requires proof of three elements: (1) the existence of a contract that includes its essential terms; (2) a breach of that contract; and (3) damages resulting from the breach. *Presbyterian Med. Center v. Budd*, 832 A.2d 1066, 1070 (Pa. Super. 2003).

A lessor alleging breach of contract under an oil and gas lease bears the burden of proof. *See Tennant v. Range Res.-Appalachia, LLC*, 561 F. Supp. 3d 522, 529 (W.D. Pa. 2021); *Briggs v. Southwestern Energy Production Co.*, 224 A.3d 334, 349 (Pa. Jan. 22, 2020) ("In all events, a plaintiff asserting a cause of action 'must be able to prove all the elements of his case by proper evidentiary standards.'") (quoting *Papieves v. Lawrence*, 263 A.2d 118, 121 (Pa. 1970)).[6] These holdings align with Pennsylvania law on the burden of proof in breach of contract actions generally, as "[a] plaintiff asserting a breach of contract claim bears the burden of proof concerning the elements of its claim and must establish them by a preponderance of evidence." *Food Team Int'l, Ltd. v. Unilink, LLC*, Civil Action No. 10-cv-03585, 2013 WL 5476582, at *10 (E.D. Pa. Sept. 30, 2013) (citing *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 102 (3d Cir. 2001) (applying Pennsylvania law); 23 Williston on Contracts § 63:14 (4th ed. 2013)); *see also E. Texas Motor Freight v. Lloyd*, 484 A.2d 797, 801 (Pa. Super. 1984) (citing *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.3d 1001, 1007 (3d Cir. 1980).

---

[6] *Briggs* in part relied on the Ohio Supreme Court's decision in *Chance v. BP Chems., Inc.*, 670 N.E.2d 985, 990-91 (Ohio 1996), where that Court rejected the argument that a defendant's "unique access" to data justified placing the burden of proving that no trespass occurred on the defendant. *See* 2020 WL 355911, at *13. *Chance* held that the plaintiffs "bore the burden of proving all elements of their claim for trespass." *See* 670 N.E.2d at 991.

## A. Plaintiffs Have No Evidence Of Breach By XTO.

The leases provide that XTO will pay a royalty based on the net proceeds from the sale of gas at the wellhead. *See* Leases A-1-A-19, ¶ 3, Lease A-20, ¶ 2. Plaintiffs' claim is that XTO breached the leases by failing to pay royalties to Plaintiffs because no prior overpayment of royalties in fact happened. *See* ECF 27 at 8, n. 8; Oct. 3, 2024 Tr. at 25:22–28:2. Plaintiffs did not meet their burden of proof on this claim because they adduced no testimonial or documentary evidence proving that XTO failed to pay royalties due to each Plaintiff in accordance with the terms of their leases.

***Plaintiffs' Written Discovery Demonstrates No Evidence Of Breach.*** In response to XTO's written discovery requests seeking facts supporting a claim that Plaintiffs were underpaid royalites, Plaintiffs did not identify any facts, documents or calculations showing that XTO underpaid royalties to Plaintiffs. *See* Plaintiffs' Answers to Interrogatory Nos. 4, 6, Doc Request Nos. 2-4, Ex. F. Instead, each Plaintiff uniformly answered this request with the response that "any facts to support XTO's contention that there were, indeed, overpayments are clearly in XTO's possession and control" and denied the existence of an overpayment because "information concerning production associated with the Trilogy 5HU well for the royalty months of May 2022 through September 2022 in in the exclusive control of defendants." *See id* at Plaintiffs' Answers to Interrogatory No. 4, 6.

***Plaintiffs' Depositions Demonstrate No Evidence of Breach.*** Plaintiffs' depositions, taken one day prior to the close of fact discovery, revealed Plaintiffs still had no evidence of breach by XTO related to royalties. Instead, Plaintiffs uniformly admitted that they lacked personal knowledge as to whether an overpayment or underpayment of royalties occurred, and conceded they had conducted no calculations or independent analysis to determine whether XTO had actually underpaid royalties. *See e.g.,* Lindsay Golf and Betty G. Oil and Gas Trust Dep., Ex. K,

at 22:22–23:1; Andrew Lindsay Dep., Ex. L, at 15, 17; Mary Lindsay Dep, Ex. M, at 12; William Kronen Dep., Ex. N, at 17; Carol Kronen Dep., Ex. O, at 6; Charles Lindsay Dep., Ex. P, at 13:7–8, 14:17–18; Patricia Lindsay Dep., Ex. Q, at 13; John Lindsay Dep., Ex. R, at p. 9; Thomas Lindsay Dep., Ex. S, at p. 13.

Fact discovery is now closed. ECF 46. Plaintiffs' collective failure to present evidence showing a breach of any duty owed by XTO under the leases now supports the entry of summary judgment in XTO's favor. *See Tennant*, 561 F. Supp. 3d at 529. The *Tennant* case is particularly on-point here. In *Tennant*, the plaintiffs claimed the operator breached their leases by deducting post-production costs without "demonstrating" that the deductions produced a net increase in the value of the gas. *Id.* at 525. The court rejected that theory and granted summary judgment to the operator, concluding the leases imposed no duty to prove compliance and the plaintiffs, who admitted they had no contrary evidence, could not meet their Fed. R. Civ. P. 56 burden. *Id.* at 532.

Like *Tennant*, Plaintiffs' responses to discovery and testimony confirm that they lack evidence that XTO breached a duty owed to Plaintiffs. They do not know and did not attempt to determine whether their allegations that XTO underpaid royalties had evidentiary support. *See* Plaintiffs' Answers to XTO Discovery; Plaintiffs' Deps, *supra.* Plaintiffs' excuse that only XTO has control of the information necessary to determine if an overpayment occurred is not a basis to avoid summary judgment *after* the close of fact discovery, particularly in light of the fact that XTO produced documents to Plaintiffs from which the overpayment could be ascertained.[7] *See*

[7] Documents related to the calculations of royalties related to all Plaintiffs were provided informally to counsel for Plaintiffs in advance of the mandatory ADR session that occurred in February, 2025. ECF 39. Plaintiffs did not issue formal written discovery in this case until mid-July, 2025, and XTO timely responded with updated documents that again contained the calculations of royalties for all Plaintiffs. *See* XTO's Answers to Plaintiffs' Discovery Requests, Ex. G. In the interim time period, as each Plaintiff moved out of suspense status, XTO as a matter of business practice also issued written royalty check detail to Plaintiffs that included all royalty calculations during the period of suspense. *See* H. Green Dep., Ex. I at 67:7-12.

XTO_0004-0005; Exemplar Plaintiff Check Detail Documents, Ex. H. "A bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)" *Woods v. Wright Inst*. U.S. App. LEXIS 6012, at *7 (9th Cir. Mar. 24, 1998) (quoting *Contemporary Mission, Inc. v. United States Postal Serv*., 648 F.2d 97, 107 (2d Cir. 1981))*; see also State Farm Mut. Auto. Ins. Co. v. Alburger*, 2006 U.S. Dist. LEXIS 109887, at *7 (E.D. Pa. July 14, 2006) (speculation about what undiscovered evidence might contain cannot create a genuine issue of material fact).

**B. Plaintiffs Have No Evidence Of Contractual Damages.**

Proof of damages is a fundamental and essential element to a breach of contract action. *See Drummond v. Progressive Specialty Ins. Co.,* 142 F.4th 149, 156 (3d Cir. 2025); *Brader v. Allegheny Gen. Hosp*., 64 F.3d 869, 878 (3d Cir. 1995). Under Pennsylvania law, the party alleging a breach of contract has the burden of proving damages resulting from that breach with "reasonable certainty." *GNC Franchising LLC v. Khan*, 2008 U.S. Dist. LEXIS 16046, at *1 (W.D. Pa. Mar. 3, 2008). Failure to prove recoverable damages supports entry of judgment as a matter of law in a breach of contract action. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225-26 (3d Cir. 2003) (affirming dismissal of a breach of contract claim where the plaintiff "failed to present evidence from which a factfinder could determine damages with reasonable certainty"). As with the element of breach, Plaintiffs bear the burden of proving damages in a breach of contract action. *See Drummond*, *142* F.4th 149 at 156 (3d Cir. 2025) (citing *Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002).

Plaintiffs' written discovery responses confirm that they have no evidence showing any shortfall, no quantification or calculation tying any alleged nonpayment of royalties to their lease terms, no analysis supporting an underpayment theory, and no documents evidencing an underpayment. *See* Plaintiffs' Answers to XTO Discovery. In response to interrogatories focused

on this element, Plaintiffs cite only to XTO's calculation of the overpayments identified in XTO's declaration in support of removal. *See* Plaintiffs' Answers to XTO's Interrogatory No. 9, Ex. F. Plaintiffs universally admitted that these amounts were copied verbatim from XTO's declaration and were not based on any independent calculations by Plaintiffs or an expert on their behalf. *See* Thomas Lindsay Dep., Ex. S, at 16:25–18:3; John Lindsay Dep., Ex. R, at 10:18–25; Patricia Lindsay Dep., Ex. Q, at 14:15–22; William Kronen Dep., Ex. N, at 17:19-25; Charles Lindsay Dep., Ex. P, at 13:18–14:14; Andrew Lindsay Dep., Ex. L, at 16:5–17:1. Plaintiffs similarly testified that they had no evidence of any damages that resulted from an underpayment of royalties. *See* Lindsay Golf Dep. and Betty G. Lindsay Oil and Gas Trust Dep., Ex. K, at 22:22-23:1; Andrew Lindsay Dep., Ex. L, at 14:21-15:19; Mary Lindsay Dep., Ex. M, at 12:2-12; William Kronen Dep., Ex. N, at 16:5-7; Carol Kronen Dep., Ex. O, at 6:10-14; Charles Lindsay Dep., Ex. P, at 12:11-16; Patrica Lindsay Dep., Ex. Q, at 13:17-21; John Lindsay Dep., Ex. R, at 9:15-17; Thomas Lindsay Dep., Ex. S, at 13:20-23.

The record is therefore devoid of evidence of damages. Plaintiffs' reliance on XTO's declaration in support of removal identifying the amounts of overpaid royalties does not meet their burden of proof and is insufficient to defeat summary judgment. Despite claiming that they intended to determine if there was in fact an overpayment (and representing that their claims would not continue if the evidence proved the fact of overpayment), *see* Oct. 3, 2024 Tr., Ex. E, at 24:24–25:2, Plaintiffs made no effort to prove their allegations that XTO's overpayments were not overpayments, which necessitates entry of judgment in favor of XTO. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 966 (3d Cir. 1982) (an adverse party may not rest upon mere allegations or denials to defeat summary judgment); *Berry Bros. Buick, Inc. v. Gen. Motors Corp., etc.*, 257 F. Supp. 542, 545 (E.D. Pa. 1966) ("Plaintiff cannot rest on an ignorance of the facts but must

obtain from discovery or otherwise information which he should seek to amplify or test by further discovery.").

## C. The Record Evidence Disproves Plaintiffs' Allegations Of Breach And Damages.

Not only is the record devoid of evidence that would support Plaintiffs' allegations of breach and damages, the record evidence is entirely one-sided and conclusively establishes that XTO did not breach the Plaintiffs' leases and Plaintiffs have no damages.

The only record evidence before the Court establishes that: (1) there was a misallocation of volumes of gas produced by the Trilogy 5HU well for a temporary period of time due to a accounting software issue associated with the installation of additional wellhead production meters, *see* H. Green Dep., Ex.I, at 16:6–17:14, 19:1-19:25, 22:10–24:16; 57:1-59:25; (2) as a result of that misallocation, Plaintiffs' wells were mistakenly overallocated sales volumes and associated sales revenue for gas production that was not associated with their wells, *see id*. 21:14–22:24, 26:5–26:25; (3) as a result of this overallocation, Plaintiffs were overpaid royalties by XTO, *see id.*; (4) XTO corrected the misallocation and performed a prior period adjustment to reallocate the volumes to the correct wells and correct lessors, which resulted in Plaintiffs being placed in negative suspense due to the prior overpayment of royalties, *see id.* at 38:22–39:8; 48:16–51:24; (5) XTO recouped the overpaid royalties from Plaintiffs with the end result that Plaintiffs (and all other lessors) received the exact amount of royalties they were entitled to receive under their respective leases, *see id.* at 64:1–66:25, 67:4–11; (6) recoupment is complete, Plaintiffs are no longer in negative suspense, and Plaintiffs are receiving royalties for production from their wells consistent with the terms of their leases. *See* J. Maloy Dec., Ex. 2, at ¶ 47.

There is no contradictory evidence in the record. Plaintiffs' counsel agreed with the Court's reflection at oral argument that "if the record …. Then the case sort of goes away…." *See* October 3, 2024 Hearing Tr., Ex. E, at 29:6. Based on the undisputed evidentiary record, the case

should go away. XTO is entitled to the entry of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986) (summary judgment is appropriate where evidence is "so one-sided that one party must prevail as a matter of law").

## II. NO ALTERNATIVE BREACH THEORY SURVIVES SUMMARY JUDGMENT

At the pleading stage, the Court allowed one breach of contract theory to proceed: XTO's alleged failure to pay royalties otherwise due under the royalty clause, premised on Plaintiffs' then-denial of an allocation error and their asserted entitlement to the suspended royalties. *See* ECF No. 27 at 7–8. To the extent Plaintiffs attempt to change course and rely on different theories that may be vaguely referenced in their Amended Complaint, those too fail as a matter of law.

### A. The Leases Do Not Obligate XTO To Make "Monthly Payments" Of Royalties.

Plaintiffs argued in their opposition to XTO's motion to dismiss that "the Lindsays were to be and were the recipients of monthly royalty payments from XTO. These royalty payments, along with monthly statements were stopped at the end of July, 2023." *See* ECF No. 17 at p. 10. The Court did not endorse a "monthly payment" breach theory in its motion to dismiss ruling. ECF No. 27 at 8, n.8. To the extent Plaintiffs now seek to establish a breach on this basis, it fails as a matter of law.

*First*, it fails because the Plaintiffs' leases do not require XTO to make monthly payments of royalties. To the contrary, their leases require XTO to pay an 18% royalty on "net proceeds" realized by XTO, computed at the wellhead. *See* Leases A-1-A-19 at ¶ 3, A-20 at ¶ 2 . The word "monthly" does not appear in the royalty provisions and Plaintiffs have never identified any lease provision imposing a monthly payment obligation. *See id;* ECF No. 12 at Count II. Without an express contractual provision obliging XTO to make monthly royalty payments, Plaintiffs cannot prove the existence of a duty and breach, which is an essential element of a breach of contract case. *See, e.g., Ware v. Rodale Press, Inc*., 322 F.3d 218, 225 (3d Cir. 2003) (to establish a breach of

contract claim, a plaintiff must prove the breach of a duty imposed by the essential terms of the contract).

*Second*, Plaintiffs did not identify any facts supporting this supposed duty in response to XTO's written discovery. XTO propounded interrogatories asking each Plaintiff to identify all facts to support the contention "that XTO was not entitled to cease monthly payments." *See* Plaintiffs' Answers to XTO Interrogatory 12, Ex. F. Each Plaintiff uniformly responded by ignoring the request and attempting to reverse the burden on XTO, stating that:

> The plaintiff is aware of no authority for the proposition that XTO is entitled to seize monthly royalty payments to the Plaintiff. Nor has the Defendant ever provided any justification or authority for the proposition that XTO, without explanation or documentation simply cease monthly payments to Plaintiff.

*Id*. Plaintiffs bear the burden of proving their breach of contract theory, which includes proving the existence of a duty and breach. *See Tennant*, 561 F. Supp. 3d at 529. Plaintiffs cannot meet this burden by claiming XTO has not disproven their unproven allegations. *See id.* In any event, the record does disprove any allegation that XTO wrongfully withheld royalties due to Plaintiffs, because Plaintiffs were overpaid royalties and XTO recouped royalties until the overpayments to Plaintiffs were corrected. *See* H. Green Dep., Ex. I, at 38:22–39:8; John Maloy Dec., Ex. 2, at ¶ 47; XTO_0005. This breach of contract theory, if still pursued by Plaintiffs, fails under the plain language of their leases, and XTO is entitled to summary judgment.

### B. Plaintiffs Cannot Prove A Breach Based On XTO's Recoupment Of Overpaid Royalties

In their Amended Complaint, Plaintiffs asserted that "[t]he Defendant has failed to produce any clause in the lease which would permit the Defendant to cease royalty payments to the Plaintiffs in order to recoup overpayments. ECF 12 at ¶ 48. Plaintiffs later disclaimed a breach of contract theory premised on XTO's right to recoup overpaid royalties. ECF No. 27 at 8, n.8.

In response to the Court's question whether Plaintiffs challenged XTO's right to recoup overpaid royalties, Plaintiffs' counsel unequivocally stated: "No. We are claiming that we are entitled to the royalties." *See* Oct. 3. Hearing Tr., Ex. E, at 25:19. The Court's motion to dismiss opinion adopted counsel's representations as to the theory of breach Plaintiffs were pursuing. ECF No. 27. But even if Plaintiffs now attempted to change course, their claim would fail.

***XTO's Recoupment Resulted In Plaintiffs' Receiving What They Were Entitled To Under The Leases.*** The record demonstrates that XTO's recoupment of overpaid royalties resulted in the accurate payment of royalties to all parties. *See* H. Green Dep., Ex. I, at 38:22–39:8; John Maloy Dec., Ex. 2, at ¶ 47; XTO_0005; Ex. H. The recoupment process quantified each Plaintiff's overpayment "to the penny" using owner-level check detail and as a result of the correction, "everybody would have the value that they were entitled to based on the adjusted allocation." *See* H. Green Dep. at 38:22–39:8, 64:18-20. The owner-level check detail and suspense summaries XTO produced to Plaintiffs confirms the testimony by XTO's witness: these documents detail the amounts of the overpayments, the corrected allocations, how royalties were applied to the suspense balance, and the resumption of payments upon completion of the recoupment process. *See* H. Green Dep., Ex. I, at 38:15–39:22, 67:4–67:12; Ex. H; XTO_0005. Plaintiffs therefore have no breach of contract damages.

***XTO's Recoupment Aligns with the Leases, Pennsylvania Law and Industry Custom and Practice.*** XTO's recoupment was permissible because it aligned with the parties' express expectations under their leases and is consistent with Pennsylvania law and industry custom and practice in the oil and gas industry. Plaintiffs' leases provide that XTO will pay the agreed percentage of net proceeds on production attributable to Plaintiffs' interests. *See* Leases A-1-A-19 at ¶ 3; A-20 at ¶ 2. Where, as here, royalties were mistakenly paid to Plaintiffs based on

production that was *not* associated with Plaintiffs' interests, their leases do not contain any language entitling Plaintiffs to keep overpayments. *Id.* XTO recouped the amounts of the overpayments from subsequent production such that, at the completion of the process, Plaintiffs have been paid their applicable royalty percentage on all production properly associated with wells in which they have an interest. *See* H. Green Dep., Ex. I, at 38:15–39:22, 67:4–67:12; Ex. H; XTO_0005. Recoupment is merely the accounting process used by XTO to effectuate the parties' written intent – ensuring payment of the agreed-upon percentage royalty on production from the wells that are associated with the interests covered by the leases. *See* Leases A-1-A-19 at ¶ 3; A-20 at ¶ 2; *Commonwealth v. UPMC*, 208 A.3d 898, 900 (2019) ("the cardinal rule followed by courts is to ascertain the intent of the contracting parties").

The recoupment of overpaid royalties from future royalties is also an efficient and practical method for addressing overpayments because it is reduces the potential harshness of XTO demanding immediate repayment of overpaid royalties where future payments are available to offset the overpayment. It is a recognized practice in the oil and gas industry. *See, e.g., Chenault-Vaughan Fam. P'ship v. MDC Reeves Energy, LLC*, 2023 U.S. Dist. LEXIS 68832, at *31 (D. Del. Apr. 19, 2023) ("a recognized practice in oil and gas law allows operators to recoup overpaid royalties by deducting past overpayments from future royalty payments until the overpayments have been repaid") (vacated in part on other grounds) (citing *Gulf Oil Corp. v. Lone Star Producing Co.*, 322 F.2d 28, 33 (5th Cir. 1963) 3 Kuntz, Law of Oil and Gas § 42.8 (2023) ("A lessee may recover from the lessor any overpayment of royalty that was made because of mistake of law or fact. The lessee may also recoup from current royalties any overpayments made by mistake.").

***The Issue of Recoupment Is Now Concluded.*** The recoupment process is complete and Plaintiffs are out of suspense and receiving royalties from XTO pursuant to their leases. *See* J. Maloy Dec., attached to Motion as Ex. 2, at ¶ 47. Any challenge to recoupment is now indistinguishable from a challenge to the calculation and payment of royalties under the leases. Plaintiffs have not proven they were underpaid royalties and the record conclusively establishes they were overpaid royalties and as a result of the recoupment, have now received the royalties they are entitled to under their leases. Plaintiffs cannot maintain a breach of contract claim to recover royalties that they are not entitled to under their leases, as that outcome would amount to an impermissible windfall for Plaintiffs which is not permitted under Pennsylvania law. *Arconic Corp. v. Novelis Inc.* 2022 U.S. Dist. LEXIS 209258, at *15 (W.D. Pa. Nov. 18, 2022) (Pennsylvania contract law does not entitle a party to receive a windfall.).

## CONCLUSION

For the foregoing reasons, Defendant XTO Energy Inc. is entitled to summary judgment on Plaintiffs' Amended Complaint.

REED SMITH LLP

Dated: October 20, 2025

/s/ Justin H. Werner

Justin H. Werner
Pa I.D. No. 203111
jwerner@reedsmith.com
Thomas J. Galligan
Pa I.D. No. 317941
tgalligan@reedsmith.com
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Tel: (412) 288-3131
Fax: (412) 288-3063
*Counsel for XTO Energy Inc.*

**CERTIFICATE OF SERVICE**

I certify that on October 20, 2025, a true and correct copy of the foregoing has been served by ECF upon the following individuals:

Alexander H. Lindsay, Jr.
The Lindsay Law Firm, P.C.
110 East Diamond Street, Suite 301
Butler, Pennsylvania 15001

/s/ Justin H. Werner