**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LINDSAY GOLF GROUP LTD.,** | ) | |
| **CAROL KRONEN and** | ) | **2:24-cv-781** |
| **WILLIAM KRONEN** | ) | |
| **ALEXANDER H. LINDSAY, JR.** | ) | |
| **and PATRICIA W. LINDSAY,** | ) | |
| **JOHN LINDSAY and** | ) | |
| **ERICA LINDSAY,** | ) | |
| **JAMES LINDSAY and** | ) | **Electronically Filed** |
| **MARY LINDSAY,** | ) | |
| **CHARLES LINDSAY,** | ) | |
| **ANDREW LINDSAY and** | ) | |
| **LISA LINDSAY,** | ) | |
| **THOMAS LINDSAY and** | ) | |
| **BETH LINDSAY AND** | ) | |
| **BETTY G. LINDSAY OIL AND** | ) | |
| **GAS TRUST** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **XTO ENERGY, INC.** | ) | |
| | ) | |
| **Defendant** | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION OF XTO ENERGY, INC.'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The Plaintiffs (hereinafter "the Lindsays") in this case are lessors of gas and oil rights to the Defendant XTO Energy, Inc. (hereinafter "XTO"). In December of 2009, the Lindsay Golf Group, and all but one of the Lindsay family members, including the Betty G. Lindsay Oil and Gas Trust, entered into a lease agreement with Penn Virginia Oil and

Gas Corporation. These leases were assigned to the Defendant XTO. In May of 2013, one of the Lindsays, Charles Lindsay, entered into a lease agreement with the Defendant XTO.

The Plaintiffs alleged in their complaint, XTO breached the lease agreements by failing to pay royalties for gas extracted pursuant to the lease agreements by withholding payments amounting to $241,520.95. XTO, in its defense, alleges that due to an error on XTO's part, the Plaintiffs were overpaid royalties. The Defendant XTO alleges, in its defense, that XTO suspended paying royalties to the Plaintiffs until XTO had "recouped" the overpaid royalties.

The Plaintiffs' claim of breach of contract is straight forward. The lease agreements required XTO to pay a royalty consisting of 18% of the net proceeds from the sale of gas computed at the wellhead. Commencing on or about July of 2023 and continuing thereafter until November of 2024, XTO simply ceased paying royalties to the Plaintiffs.

The defense of "recoupment" presented by XTO is by no means as clear. The Defendant XTO in its motion presents the testimony of two witnesses, namely John Maloy and Holly S. Green. A review of their testimony should indicate to this Court that the explanation submitted by XTO for its action is murky at best. It is clear from reviewing their testimony that they simply don't know the answers concerning the allegation of misallocation of royalties. Clearly there are issues of fact which will have to be resolved.

As XTO's theory of recoupment is a defense, XTO bears the burden of establishing that defense. In order to support its motion for summary judgment, XTO asks this Court

to shift the burden of proof with regard to XTO's allegation of misallocation, suspension and recoupment. Furthermore, in order to support its motion for summary judgment, XTO is suggesting to the Court that the terms of the lease agreements, or contracts, with regard to suspension must be ignored in favor of "industry custom and practice in the oil and gas industry."

## II. STATEMENT OF FACTS

### A. Portions of the Lease Agreements Regarding Suspension of Royalty Payments

As previously stated, there are two separate lease agreements. The first is a lease agreement entered into on December 21, 2009 between the Lindsays, with the exception of Charles G. Lindsay. This lease is with Penn Virginia Oil and Gas Corporation. These leases were assumed by XTO. The second lease was entered into by Charles Lindsay on May 2, 2013 directly with XTO.

#### *1. Suspension Language in Penn Virginia Oil and Gas Corp Lease*

The lease entered into originally by the Lindsays and Penn Virginia Oil and Gas Corporation obtained a clause regarding suspension of royalties which is as follows:

> *10. Lessor agrees that should Lessee be advised of or receive notice of an adverse claim or of defective title affecting the Land covered hereby which could affect all or a part of the payments due hereunder, then Lessor expressly authorizes Lessee, at Lessee's sole discretion, and without liability to withhold payment and delivery of all Lessor's such payments or production in kind hereunder, without interest or penalty, until such time as said adverse claim is resolved or title cured by a final decree in a court of competent jurisdiction. Or Lessee may file an interpleader action and pay Lessor's payments or production in kind as directed by a court of competent*

> *jurisdiction until such time as said court determines and authorizes the proper distribution of said payments or payments in kind to the parties involved. Lessor agrees that in no event shall Lessee's withholding of payment or its payments made as directed by a court of competent jurisdiction constitute a default by Lessee. Lessor further agrees that Lessee shall in no event be liable for interest, conversion, penalty, or wrongful withholding of such suspended amounts. In the event of production hereunder. Lessor agrees to execute a division order confirming his interest herein.*

### ***2. The Lease Between Charles Lindsay and XTO***

The lease entered into between Charles Lindsay and XTO contain the pertinent paragraphs.

> 2c. within a reasonable period of time after production is obtained under this lease or lands pooled therewith, payment of royalties hereunder shall be made or tendered monthly, or may be withheld at the discretion of the Lessee until such time as the total withheld exceeds twenty-five dollars ($25.00) or at such other regular intervals as Lessee deems appropriate. Such payments will include production in arrears consistent with lessee's customary practices and are subject to adjustments necessary to reconcile and correct the cumulative payments made to Lessor. Lessee shall sell the production of the well on such terms and conditions as Lessee, in its sole discretion, may deem appropriate. Lessee shall have no duty to obtain production sales terms that maximize the royalties payable to Lessor hereunder, but in no event shall lessee market the royalty portion of production at a price less than Lessee receives for its production. In addition, Lessee shall have the right to suspend royalty payments under this lease in the event Lessee has a good faith concern as to Lessor's title to the leased premises, or any other concern that would modify the payment obligations under this lease.
>
> 4. In addition to the covenants of general warranty hereinabove contained, Lessor further covenants and agrees that, if Lessor's title to the Leased Premises shall come into dispute or litigation,

> or if in the judgment of Lessee, there are bona fide adverse claims to the royalties hereinabove provided, then Lessee, at its option, may withhold the payment of said royalties without interest until final adjudication or other settlement of such dispute, litigation, claim or claims; and that Lessee at its option, may pay and discharge any taxes, mortgages or other lien or liens existing, levied, assessed or which may hereafter come into existence or be levied or assessed on or against the Leased Premises, and in the event it exercises such option, Lessee shall be subrogated to the liens, any royalty or other payment accusing hereunder. The exercise of such reimbursement option shall not be considered an election of remedies.

### B. XTO Ceases Making Royalty Payments

In February, 2020 through July of 2023, the Lindsays received monthly royalty checks from XTO on two wells. In August of 2023, the Lindsays did not receive a monthly royalty check and did not receive royalty checks until November of 2024.

#### *1. Testimony of Travis Lindsay*

Travis Lindsay is the manager of the golf course owned by Lindsay Golf Group, Ltd. Travis Lindsay testified that in September of 2023 he started receiving calls from family members and neighbors. (Appendix K, Deposition of Travis Lindsay, Page 8). He testified that he first got a call from his Aunt Carol and "normally we would have gotten paid on the 29th or 30th of the previous month with August should have – the check should have come. The check didn't come." (Appendix K, Deposition of Travis Lindsay, Page 9).

On the same day that he received a call from his Aunt Carol, a neighbor, Tim Franz, called him. Mr. Franz indicated that he talked to someone named John Maloy. (Appendix

K, Deposition of Travis Lindsay, Page 9). Travis Lindsay then called John Maloy. John Maloy was the first person on behalf of XTO who Travis Lindsay spoke to, "regarding all of this." (Appendix K, Deposition of Travis Lindsay, Page 10). According to Travis Lindsay, Maloy stated something along the lines of, "I've been hearing about that." Then he stated:

> And then he – somebody in Texas pushed the wrong button and there was an accounting error. He said that they weren't going to send a letter and the he wished that they would send a letter. He said that that was the information he had at the time. He said that - - he seemed - - to me, he seemed to be frustrated with the situation itself. That was the take.
> (Appendix K, Deposition of Travis Lindsay, Page 10).

Over the next two months there were conversations between Travis Lindsay and John Maloy. Travis indicated that he was trying to get more information and Malloy would tell him that he didn't have any or, "he would just reiterate what he already said." (Appendix K, Deposition of Travis Lindsay, Page 11).

Travis Lindsay emailed John Maloy "pretty regularly". According to Travis Lindsay, Maloy mentioned an amount he said the Lindsays, "owed XTO for an overpayment when, at that time, there was the accounting error, is what they said." (Appendix K, Deposition of Travis Lindsay, Page 12). According to Travis Lindsay, Maloy said they weren't going to be restoring the check until the amount the Lindsays owed them was paid back. (Appendix K, Deposition of Travis Lindsay, Page 12). Travis Lindsay testified he tried calling Texas once and left a message. "I felt like we weren't getting anywhere with John as far as the information was concerned so I tried to

call there." (Appendix K, Deposition of Travis Lindsay, Page 13).

### *2. Testimony of John Maloy*

John Maloy testified by deposition. When asked whether he recalled having a telephone conversation with Travis Lindsay in September of 2022. He indicated he did. He recalled discussing the issue of why the royalty checks had stopped. He recalled what he told Travis Lindsay:

Q. What did you tell him?

A. I made a casual response that somebody had pressed the wrong button. But I realize now I should have been more clear and said that was just a casual response to an error in allocation of the well.

Q. So there wasn't someone who pushed a wrong button, is that what you're saying?

A. I'm not – I don't know exactly what had happened. That happened, it's my understanding, in the revenue group in Houston, Texas, so I was not privy to exactly who or what transpired there.

Q. All right. Is it your testimony that whatever transpired, it occurred in Texas?

A. That's my understanding.

Q. Okay. And what is your understanding about what occurred in Texas?

A. The – my understanding is that there was a third meter that was installed on the well site since the flow was so high. And that third meter was misallocated to all of the royalty owners in the gathering system, which included wells outside of the Trilogy well, which the well was purposely – or was supposed to be just for the Trilogy Utica well.
(Appendix J, Deposition of John Maloy, Page 6, 7).

Maloy testified he did not know when the misallocation in question was

discovered. He knew that the "mistake in payments" were made in a five month period between June of 2022 and November of 2022. When asked how this was discovered. His reply was, "I'm not privy to that." (Appendix J, Deposition of John Maloy, Page 10). He first found out when he received a phone call from Attorney Joseph Charlton. (Appendix J, Deposition of John Maloy, Page 10).

When Maloy was asked who was the "warm body" that suggested to him that XTO was going to start the recoupment process. His reply was, "I don't know specifically. There was a lot of back and forth with many people at that time." (Appendix J, Deposition of John Maloy, Page 11).

In the conversations with Travis Lindsay, there was no explanation to the lease holders, including the Lindsays, as to what was going on with the royalty payments. He was asked the following:

A. I believe I told him that there would be no formal explanation mailed to the landowners from the company.

Q. Was there any explanation? Formal, informal, whatever?

A. To the landowners?

Q. Yes.

A. I don't know that. If – I explained to Travis what had happened. I don't know if other landowners had information or not.

Q. Was there any explanation given to you as to why there was no explanation given to the landowners?

A. No, there was not.

Q. Well, did you ask?

A. No, I did not.

Q. In other words, you have a number of landowners, not just the Lindsay Group, but other landowners, who are demanding to know what was going on with the royalty checks, correct?

A. Correct.
(Appendix J, Deposition of John Maloy, Page 13).

Maloy was asked how it was determined that there was a misallocation problem. His testimony is as follows:

Q. How is this determined that there is a misallocation?

A. That was determined before I was even aware of the problem. As I mentioned before, I was not in on that end of it. I do not know how it was discovered.

Q. Nobody ever asked? You didn't ask?

A. I did not.

Q. Okay. Did anybody tell you?

A. Not in great detail.

Q. What detail did they tell you?

A. That there was just a misallocation on the meter.

Q. And somehow this is concerned with this third meter, correct?

A. That's my understanding.

Q. And how did that work?
Can you explain in simple farm boy language how this occurred with the third meter?

A. I cannot. I don't understand the meters enough to say anything about them.

Q. Who would know?

A. I would guess the revenue department in Houston, Texas.

Q. Okay. Well, do you know this much, how was the figures on these meters read?

A. I cannot answer that.
(Appendix J, Deposition of John Maloy, Page 17, 18).

***3. Testimony of Holly S. Green***

To establish its defense of suspension and recoupment, XTO relies almost exclusively on its star witness, Holly S. Green. Holly Green is the, "global process advisor for the Produce to Report Organization within XTO." (Appendix I, Deposition of Holly S. Green, Page 5). On May 24, 2024, Holly Green executed a declaration that was attached to a Notice of Removal in the Case. (ECF 1-4, Pages 1-5). She states in this document:

> Based on my personal knowledge and my examination of XTO's business and accounting records as of the date of the filing of the complaint, XTO overpaid royalties to Plaintiff Lindsay Golf Group, Limited in the amount of $52,861.75. XTO placed Lindsay Golf Group, Limited in a - in suspense for the recoupment of the overpaid royalties in the amount of $52,861.75.
> (ECF 1-4, Page 3 ¶6;)

This was from her personal knowledge. (Appendix I, Deposition of Holly S. Green, Page 7).

According to Ms. Green, there are nine wells included in a sales point called

McIntyre CDP. (Appendix I, Deposition of Holly S. Green, Page 11). CDP is a central delivery point. There is a meter at the sales point which is determined to the be the sales for the various wells, including the Lindsay wells. (Appendix I, Deposition of Holly S. Green, Page 11). It includes gas from five "Trilogy" wells, including a well known as "Trilogy 5". (Appendix I, Deposition of Holly S. Green, Page 13). There are four others wells including the Lindsay wells. There is a Lindsay well, a Franz well, a Charlton well and a Bowser well. (Appendix I, Deposition of Holly S. Green, Page 15). Each one of the five Trilogy wells has their own meter. (Appendix I, Deposition of Holly S. Green, Page 15).

Trilogy number five has more than one meter. Ms. Green testified it was her understanding this was because of the amount of volume it produced. There was a need to have more than one meter to measure the volume. (Appendix I, Deposition of Holly S. Green, Page 16). When asked whether the Trilogy 5 well was significantly higher volume than expected she gave this response:

> I can say it's significantly higher than the other wells. I would have no – not to sound – not to sound rude, but I would have no expectation of what the volumes would have been coming out of the well since that's not my – that's not my background.
> (Appendix I, Deposition of Holly S. Green, Page 16).

As stated, the four wells that were not Trilogy wells were metered, according to Ms. Green. XTO knew exactly what was being produced "volume – wise on those four wells." (Appendix I, Deposition of Holly S. Green, Page 19). Furthermore, wells on the McIntyre CDP which were not Trilogy wells would have their production reported to the

Pennsylvania Department of Environmental Protection. "That's my understanding. I don't prepare the report, but that's my understanding of how it works." (Appendix I, Deposition of Holly S. Green, Page 57). When asked how often these volumes are recorded with the Pennsylvania Department of Environmental Protection, she said, "I'm not sure if they are monthly or annually. Again, this is something that I don't do, so I have no direct knowledge of it." (Appendix I, Deposition of Holly S. Green, Page 58). The report to the Pennsylvania DEP was manually prepared and therefore the volumes could be manually added together. (Appendix I, Deposition of Holly S. Green, Page 59).

Ms. Green stated:

> A. Yeah. I know the well came on in December 2021 production, and at some point they added additional meters. To be honest, I don't know if it started with two and they added a third or it if started with one and then they added two and three. I'm sorry, I don't have that specifics of when that occurred, but …
>
> Q. Can we agree that the misallocation of volume stated when the third meter came on in May of 2022?
>
> A. I guess so. I mean, it's possible you had two meters – two and three meters come on in May. It could have been you started with one and went to two, started with one and went to three. So definitely May '22 is the pivotal month. But as far as the specific number of meters, that piece, I'm not 100 percent on.
> (Appendix I, Deposition of Holly S. Green, Page 20).

Ms. Green testified that rather than getting accurate information from the meters on the various wells, in determining royalties, XTO relies on a formula. With regard to the formula, Ms. Green stated the following:

> A. I believe so. I believe what you're asking, was a portion of the Trilogy

volume allocated to – sorry, was a portion of the Trilogy 5 allocated to the other eight wells.

Q. Okay, yeah.

A. Okay. So, yes, the – the original – the original sales allocation and the payments that went out had the Trilogy 5 – a portion of the Trilogy 5 volume allocated to the other eight wells.

Q. My question is, how could that happen?

A. So based on what information I have been able to discover in the production system – so as I mentioned, you have these meters with the volumes, that data comes into the production system. And there was a formula that needed to be adjusted in the production system to take all of the meter volumes for the Trilogy and do that calculation.

That particular formula is not something that anybody can go in and edit. And so if you think about it from a standpoint of you want to have things kind of in a controlled environment, it required an IT resource to go in and make those updates. And so we – you had the volumes coming in, but the production system wasn't able, without this formula change, to take all of the Trilogy 5 volumes and give it to the Trilogy 5.

And so for those months until that formula got adjusted, the Trilogy 5 volume, although accurately metered and fed into the system, did not all get added together for the Trilogy 5, which meant when it came into the revenue system, the Trilogy 5 volume was not showing 100% of what it produced.

And so that sales allocation, that distribution across all nine wells was misproportioned because of the Trilogy 5 being the biggest producer, not showing to be the biggest producer in the system, but it was this formula that needed to be adjusted that, like I said, needed an IT resource to make that update.
(Appendix I, Deposition of Holly S. Green, Pages 21-22).

In May of 2022 there were two additional meters added to the Trilogy 5 well. It was determined that whatever was being used to allocate the royalties was, as counsel put

it, "out of whack". According to Ms. Green, "IT needed to come in and change the formula, it took a few months for that to happen." (Appendix I, Deposition of Holly S. Green, Page 34).

Ms. Green testified that from May of 2022 to September of 2022, the production part of XTO was aware that the formula needed to be changed. "They knew there was misallocation." (Appendix I, Deposition of Holly S. Green, Page 36). Ms. Green testified that she did not know if that carried over into the revenue organization who is the one who does the sales recordings and then distribution of the royalties. (Appendix I, Deposition of Holly S. Green, Page 36). When asked if it was the production group who knew about this issue involving the Trilogy well, Ms. Green replied, "Her – let's see – her name is Joyce." (Appendix I, Deposition of Holly S. Green, Page 36). She went on to testify, "I don't know that she knew immediately. I know she figured it out, but I don't know – I don't know how long it took her to figure it out." (Appendix I, Deposition of Holly S. Green, Page 37).

Ms. Green stated she knew how much royalties were overpaid to the Plaintiffs to the penny. For example, Lindsay Golf Group was overpaid in the amount of $52.861.75. (Appendix I, Deposition of Holly S. Green, Page 38). She was asked whether in September or October of 2022 there was a "redo" of the formula. Her response was, "Yeah. Redo of the percentage allocation, yes." (Appendix I, Deposition of Holly S. Green, Page 42). Specifically, Ms. Green's allocation did not occur in September or October of 2022. Her analysis was done prior to the submission of the aforementioned

declaration. She then did an additional analysis the week before her deposition on August 29, 2025. (Appendix I, Deposition of Holly S. Green, Pages 42-43).

According to Ms. Green, there was a correction in the formula sometime in 2022. Nonetheless, there was no recalculation of the check payments prior to September of 2023. When asked how that could be, her response was, "So I can't answer specifically why not in this case because I don't have – I don't have the person to go and ask. So I'm sorry about that. But it is - as part of the oil and gas business from a revenue production perspective, there are – it is not uncommon to have adjustments throughout the course of the life of a well." (Appendix I, Deposition of Holly S. Green, Page 44).

Q. When did the revenue go back and recalculate – I guess, the royalty payments?

A. Well –

Q. We know that in September '23, they stopped the payments. But, I mean, when did they determine that they were going to recalculate the royalty payments? When was that determined?

A. "I'm not – I'm not able to answer that because the person who did those adjustments isn't here to talk to.

Q. What's his name? Or her name?

A. I believe - I believe his name was Ahmad."

Q. So at some point in that year, from September 2022 to September 2023, Ahmad determined that these royalty payments had to be reallocated; is that correct?

A. Yes, I would say that they would have determined that adjustments were needed to be made to the revenue recordings. And the reason why I say that is revenue looks at things at the well and sales point level. The system does the calculation at the royalty level.

> And so revenue kind of has that focus on has total volume, total sales, been booked correctly, and then have the wells been booked correctly. So at some point Ahmad or somebody in that – in that group would have gone back and run the corrections, the adjustments for the May through September 2022 production. Sometime in 2023 is when I saw that occurring.
> (Appendix I, Deposition of Holly S. Green, Pages 45, 46).

Ms. Green was asked whether in this particular case there was any notification to any of these lessors prior to the recoupment process taking place. She responded, "I'm not aware of any, no." (Appendix I, Deposition of Holly S. Green, Page 68). When asked if there was a policy of, "letting people know ahead of time that, look, we're going to lower the boom on you." She replied, "I don't – I don't think I've ever seen a policy, no." (Appendix I, Deposition of Holly S. Green, Page 68). She was asked during the course of this process if a lessor disagrees with the process how they would contest the findings of XTO with regard to misallocation. Her response was, "I don't know what or how that would work." (Appendix I, Deposition of Holly S. Green, Pages 68 -70).

With regard to information given to a lessor concerning suspension, these conversations only occur when there is a significant adjustment that has to be made. She was then asked whether the level we are talking about in this case was insignificant. Ms. Green's response was, "Yeah, I mean, it's – so it's not – it's not my process. So I'm not – I'm not sure like what the number is that determines significant…. I appreciate that it may be significant to the owners, but, you know, if you look at the number of wells and the number of owners, that would not have been a significate amount, I don't think. But,

again, I don't have the date in front of me to say what they consider to be significant." (Appendix I, Deposition of Holly S. Green, Page 74).

## III. ARGUMENT

### A. The Defendant XTO by Asserting the Defense of Recoupment Bears the Burden of Proof Concerning the Correctness of the Suspension and Recoupment of Royalty Payments. XTO cannot therefore Shift the Burden of Proof to the Plaintiffs in Order to Obtain Summary Judgment

XTO in its argument for summary judgment suggests that a lessor alleging breach of contract under an oil and gas lease bears the burden of proof. Of course, a breach of contract claim requires proof of three elements:

1. The existence of a contract that includes its essential terms;
2. A breach of that contract; and
3. Damages resulting from the breach.

As it is stated in the introduction, Plaintiffs' claim of breach of contract is straight forward. Indeed, there appears to be no dispute concerning these elements. The lease agreements required XTO to pay a royalty consisting of 18% of the net proceeds from the sale of gas computed at the wellhead. Commencing on or about July of 2023 and continuing thereafter until November of 2024, XTO simply ceased paying royalties to the Plaintiffs. The Defendant XTO itemized the amount of payments held in suspension in a declaration letter of Holly S. Green as being $241,520.95.

Of course, it is XTO's position that it is excused from making these royalty payments because it had previously overpaid the Plaintiffs before it suspended the

payments and recouped the overpayment. This Court in its Opinion stated that XTO's arguments pertaining to the correctness of recoupment are more appropriately raised as a defense citing ***DDR Weinert, LTD v. Ovintiv USA, Inc.*** No. 22-00558, 2023 WL 4054600 at *4 (W.D. Tx. June 16, 2023). It is axiomatic in contract law that in an action on a contract, the burden of proof rests upon the party having the affirmative of the issue. This is particularly true when asserting an affirmative defense. As stated in the case of ***Sabella v. Appalachian Dev. Corp***, 103 A.3d 83, 93 (Pa. Super. 2014), "A defendant asserting an affirmative defense has the burden of proof as to that affirmative defense." Thus, all of the Defendants lengthy argument regarding the Plaintiffs' written discovery and deposition demonstrates that the Plaintiffsf have no evidence is of no moment.

In this regard, the Defendant XTO is deftly sidestepping the real issue in the case. This of course is the testimony by XTO's two witnesses Holly S. Green and John Maloy. As noted in the above factual summary, their testimony was filled with statements about what they didn't know and that they were the wrong person to be asking. It is suggested by the Plaintiffs that the evidence adduced in discovery regarding overpayment and recoupment is highly suspect and certainly creates numerous issues of fact which are properly resolved by the fact finder.

**B. The Plaintiffs have Provided Sufficient Evidence of Contractual Damages.**

The Defendant states in its brief, "the record is therefore devoid of evidence of damages. Plaintiffs' reliance on XTO's declaration and support of removal identifying

the amounts of overpaid royalties does not meet their burden of proof and is insufficient to defeat summary judgment." (Defendant's Brief, Page 22).

This matter was addressed by this Court in its Memorandum Order of November 22, 2024 denying the motion to dismiss. Therein the following was stated:

> As to damages, XTO argues that is post-complaint notice of removal that identified the amounts of overpayment to each Plaintiff can't serve as compensatory damages because they are not payments that owed under the leases. ECF 15, pp. 9-10. But because the parties clearly dispute the existence and extent of overpayment, Plaintiffs can properly allege that the loss sustained as a result of the breach of contract is the amount of royalties currently held in suspense by XTO since August 2023 – and Plaintiffs allege exactly this in the amended complaint. *See* ECF 12, ¶¶ 37-38 ("Presumably, the figures set forth therein [in XTO's notice of removal] are the amount of royalty payments which XTO has withheld and presumably in the future, will withhold from the Plaintiffs herein. Thus, it is alleged by the Plaintiffs that these are specific amounts of damages that have been withheld from the Plaintiffs or will in the future be held.").

As previously stated in her declaration, Holly S. Green indicates that the amount of royalties which were suspended and recouped amount, in total $241,520.95. More specifically it is broken down as follows:

A. Lindsay Golf Group, Ltd. in the amount of $52,861.75;

B. Carol and William Kronen in the amount of $11,803.42;

C. Alexander and Patricia Lindsay in the amount of $15,336.93;

D. Erica Lindsay in the amount of $7,629.20;

E. John Lindsay in the amount of $7,629.20;

F. Charles Lindsay in the amount of $3,465.70;

G. James and Mary Lindsay in the amount of $1,005.15;

H. Andrew and Lisa Lindsay in the amount of $20,336.75;

I. Thomas and Beth Lindsay in the amount of $23,679.89;

J. Betty G. Lindsay Oil and Gas trust in the amount of $97,772.96.

Ms. Green buttressed her previous calculations laid out in her declaration as part of the removal process. Ms. Green stated she did an additional analysis the week before her deposition on August of 2025. (Appendix I, Deposition of Holly S. Green, Pages 42, 43). Indeed, Ms. Green indicated that the "overpaid royalties" were calculated down to the penny. (Appendix I, Deposition of Holly S. Green, Page 38). What better evidence could there be than Ms. Green's own admission as to what was withheld?

**C. The Fact that the Penn Virginia Lease does not Refer to "Monthly Payments" does not Excuse the Defendant from Making any Payments at all.**

The Defendant XTO has consistently argued that failure of the leases of Penn Virginia to refer to "monthly payments" indicates that there was no obligation to make any payments. As noted, prior to XTO's suspension of payments, payments were made on a monthly basis to the Plaintiffs. Of course, whether the payments were on a monthly basis or not, the Defendant XTO suspended payment of $241,520.95 in royalties to the Plaintiffs. It is of no moment whether this was withheld from the Plaintiffs on a monthly basis or "in one fell swoop".

Furthermore, in XTO's lease with Charles Lindsay, the royalties were to be paid on a monthly basis. Paragraph 2c of that lease states, "Within a reasonable period of time

after production is obtained under this lease or lands pulled therewith, payment of royalties hereunder shall be made or tendered monthly, or may be withheld a the discretion of the lessee as to such time as the total withheld exceeds twenty-five dollars ($25.00) or at such other regular intervals as Lessee deems appropriate."

## IV. <u>COUNTERMOTION FOR SUMMARY JUDGMENT</u>

### A. The Suspension and Recoupment Actions Taken by XTO was not in Accordance with the Specific Provisions with the Lease Agreements with Regard to Suspension of Lease Payments and Therefore, the Defense Asserted by the Defendant XTO Should be Dismissed and Summary Judgment Should be Granted in Favor of the Plaintiffs.

The leases in question set forth specific suspension language as detailed on Pages 3 and 4 of this brief.

In each case, the process of suspension begins with a dispute between adverse claims of lessors.

Therefore, it would be well within the contemplation of the parties entering such a lease that in the event that there became an issue between two lessors regarding title or otherwise that XTO should be able to withhold payment of said royalties without interest until the adjudication or other settlement of such dispute should be made.

There are, of course certain conditions precedent to XTO suspending payments. With regard to the Penn Virginia Oil and Gas Lease, the lessee, XTO must be advised and receive notice of an adverse claim of defective title. That certainly did not occur here. With regard to the XTO lease, specifically paragraph four, if the lessor's title to the lease premises shall come into dispute or litigation or if the judgment of a lessee, there are bona

fide and adverse claims then lessee at its option could without the payment of said royalties without interest until final adjudication or other settlement of such dispute. Of course, none of this happened in his particular case.

There is no related paragraph permitting the suspension and withholding of paid royalties under circumstances that occurred in this case. It would hardly be in the contemplation of the parties to a gas lease that if the lessee was involved in the following there could be a withholding of royalties and recoupment back to the lessor. These conditions would be as follows:

1. There was a misallocation of royalties based solely on the mistakes made by XTO;

2. That the lessee, in this case XTO could unilaterally, without notice, withhold royalty payments to the lessor and then take them back to cover its mistake.

All of this would be done without any information being provided to the lessor concerning the mistakes made by the lessee, XTO, without any reasonable explanation from persons with knowledge, how this occurred.

It is suggested that no lessor would agree to those terms or contemplate the same.

Thus, there are no provisions in the contract that would support the Defendant's conduct in this case. Instead, XTO relies on what it calls "the custom and practice in the oil and gas industry". The Defendant in its brief indicates that XTO's recoupment was permissible because it aligned with the parties' expressed expectations under the leases and is consistent with Pennsylvania law and industry custom and practice in the oil and

gas industry.

XTO's recoupment was impermissible because it was not aligned with the parties' express expectations under their leases. As it was not aligned with the expressed expectations under the leases, "industry custom and practice in the oil and gas industry" should have no precedence. As previously stated, the parties to a gas lease would never have expected the type of conduct used by XTO in this particular situation.

As the Defendant XTO's conduct was outside the parameters of the lease agreement, the defense of recoupment should be dismissed and summary judgment should be granted in favor of the Plaintiffs.

## V. CONCLUSION

Wherefore, showing these things, it respectfully requested that XTO's motion for summary judgment be denied and the Plaintiffs' motion for summary judgment should be granted.

Respectfully submitted:

THE LINDSAY LAW FIRM, P.C.

/s/ Alexander H. Lindsay, Jr.

Alexander H. Lindsay, Jr., Esquire
Attorney for Plaintiffs
Pa. Supreme Court ID. No. 15088
110 East Diamond Street, Suite 301
Butler, Pennsylvania 16001
Phone: (724) 282-6600
Fax: (724) 282-2672
Email: Michele@lindsaylawfirm.com